**No. 06-829C**
**(JUDGE HORN)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**URMILA BANERJEE,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S MOTION TO DISMISS, IN PART, AND FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND APPENDIX

---


**PETER D. KEISLER**
**Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**BRYANT G. SNEE**
**Deputy Director**

**MEREDYTH D. COHEN**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tel: (202) 353-7978**
**Fax: (202) 514-8624**

**Of Counsel:**

**MAJOR JERRETT DUNLAP**
**United States Army Litigation Division**
**Military Personnel Branch**
**901 N. Stuart Street, Suite 400**
**Tel: (703) 696-1628**
**Fax: (703) 696-8126**


**April 27, 2007**

**Attorneys for Defendant**

TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I. This Court Should Dismiss Counts I And II For Lack Of Subject Matter Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A. Standard Of Review For Motions To Dismiss . . . . . . . . . . . . . . . . . . . . . . 5

B. This Court Does Not Possess Subject Matter Jurisdiction Pursuant To The Administrative Procedure Act, The Declaratory Judgment Act, Or 10 U.S.C. § 1552 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II. This Court Should Grant Judgment Upon The Administrative Record As To Count III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

A. Standard Of Review For Judgment Upon The Administrative Record . . . 9

B. The Court's Review Of ABCMR Decisions Is Limited . . . . . . . . . . . . . 10

C. The ABCMR's Decision Is Supported By Substantial Evidence . . . . . . 12

i. The ABCMR's Decision Denying Ms. Banerjee's Mental Disability Claim Is Supported By Substantial Evidence . . . . . . . 12

ii. The ABCMR's Decision Denying Ms. Banerjee's Physical Disability Claim Is Supported By Substantial Evidence . . . . . . 14

D. The Veterans Affairs Determinations Do Not Demonstrate Any Error Or

Injustice By The Army . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

i. The VA’s Decision To Grant Ms. Banerjee Disability Benefits For Schizophrenia Does Not Require The Army To Grant Disability Separation Or Retirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ii. The VA's Decision To Grant Ms. Banerjee Disability Benefits For Stress Fractures Does Not Require The Army To Grant Disability Separation Or Retirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III. Any Potential Sexual Harassment Claim Is Barred By The Feres Doctrine . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## TABLE OF AUTHORITIES

## CASES

A&D Fire Prot., Inc. v. United States,
72 Fed. Cl. 126 (2006) . . . . . 10

Bannum, Inc. v. United States,
404 F.3d 1346 (Fed. Cir. 2005) . . . . . 9

Bernard v. United States,
59 Fed. Cl. 497 (2004) . . . . . 11, 12, 13, 15

Berry v. United States,
27 Fed. Cl. 96 (1992) . . . . . 8

Bice v. United States,
72 Fed. Cl. 432 (2006) . . . . . 10

Bockoven v. United States,
727 F.2d 1558 (Fed. Cir.1984) . . . . . 11

Chappell v. Wallace,
462 U.S. 296 (1983) . . . . . 20, 21

Cole v. United States,
32 Fed. Cl. 797 (1995) . . . . . 16

Cummings v. Navy,
279 F.3d 1051 (D.C. Cir. 2002) . . . . . 19

Doe v. United States,
74 Fed. Cl. 794 (2006) . . . . . 8

Doe v. United States,
132 F.3d 1430 (Fed. Cir. 1997) . . . . . 11

Dorl v. United States,
200 Ct. Cl. 626 (1973) . . . . . 11

Dynalectron Corp. v. United States,
4 Cl. Ct. 424 (1984) . . . . . 5

Feres v. United States,
340 U.S. 135 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-21

Fidelity Constr. Co. v. United States,
700 F.2d 1379 (Fed. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fort Carson Support Servs. v. United States,
71 Fed. Cl. 571 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Griggs v. United States,
178 F.2d 1 (10th Cir. 1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Groff v. United States,
72 Fed. Cl. 68 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Hary v. United States,
223 Ct. Cl. 10 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Heisig v. United States,
719 F.2d 1153 (Fed. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Hinkle v. United States,
229 Ct. Cl. 801 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Jefferson v. United States,
77 F. Supp. 706 (D. Md. 1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Koretsky v. United States,
57 Fed. Cl. 154 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Long v. United States,
12 Cl. Ct. 174 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Major v. United States,
835 F.2d 641 (6th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Martinez v. United States,
33 F.3d 1295 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

McNutt v. Gen. Motors Acceptance Corp.,
298 U.S. 178 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Moyer v. United States,
190 F.3d 1314 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Myers v. United States,
50 Fed. Cl. 674 (2001) . . . . . . . . . . 11, 15, 18

Nat'l Air Traffic Controllers Ass'n v. United States,
160 F.3d 714 (Fed. Cir. 1998) . . . . . . . . . . 8

Neuren v. United States,
41 Fed. Cl. 422 (1998) . . . . . . . . . . 8

New York Life Ins. Co. v. United States,
118 F.3d 1553 (Fed. Cir. 1997) . . . . . . . . . . 7

Porter v. United States,
163 F.3d 1304 (Fed. Cir. 1998) . . . . . . . . . . 10

Reynolds v. Army & Air Force Exch. Serv.,
846 F.2d 746 (Fed. Cir. 1988) . . . . . . . . . . 5, 6

Rominger v. United States,
72 Fed. Cl. 268 (2006) . . . . . . . . . . 10

Rostker v. Goldberg,
453 U.S. 57 (1981) . . . . . . . . . . 21

Saab Cars USA, Inc. v. United States,
434 F.3d 1359 (Fed. Cir. 2006) . . . . . . . . . . 9, 10

Scheuer v. Rhodes,
416 U.S. 232 (1974) . . . . . . . . . . 6

Slesinski v. United States,
34 Fed. Cl. 159 (1995) . . . . . . . . . . 11, 12

Stencel Aero Engineering Corp. v. United States,
431 U.S. 666 (1977) . . . . . . . . . . 19

Thoen v. United States,
765 F.2d 1110 (Fed. Cir. 1985) . . . . . . . . . . 5

Todd v. United States,
386 F.3d 1091 (Fed. Cir. 2004) . . . . . . . . . . 7

Union Bank and Trust Co. v. United States,

27 Fed. Cl. 403 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Johnson,
481 U.S. 681 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

United States v. King,
395 U.S. 1 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v.Mitchell,
445 U.S. 530 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Mitchell,
463 U.S. 206 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

United States v. Shearer,
473 U.S. 52 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

United States v. Sherwood,
312 U.S. 584 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Stanley,
483 U.S. 669 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Testan,
424 U.S. 392 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Van Cleave v. United States,
70 Fed. Cl. 674 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Voge v. United States,
844 F.2d 776 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Walters v. United States,
358 F.2d 957 (Ct. Cl. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Wyatt v. United States,
23 Cl. Ct. 314 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**STATUTES**

5 U.S.C. §§ 701 et. seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 8

10 U.S.C. § 1201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8, 16

10 U.S.C. § 1552 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 7, 9

28 U.S.C. §1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

28 U.S.C. § 1491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 7, 8

28 U.S.C. § 1491(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

28 U.S.C. §§ 2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 8

28 U.S.C. §§ 2202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 8

**REGULATIONS**

38 C.F.R. § 3.400(b)(2)(ii) (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**MISCELLANEOUS**

A. Reg. 635-40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

A. Reg. 635-200, Personnel Separations, Enlisted Personnel, Chapter 13 . . . . . . . . . . . . . . . . 12

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| URMILA BANERJEE, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | No. 06-829C |
| v. | ) | (Judge Horn) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS, IN PART, AND FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND APPENDIX**

Pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that the Court dismiss Counts I and II of the complaint for lack of subject matter jurisdiction. Pursuant to RCFC 52.1, the United States respectfully requests that the Court enter judgment upon the administrative record in favor of the United States as to Count III. In support of this motion, we rely upon the complaint, the following brief, the appendix attached to this brief, the joint statement of facts filed on April 11, 2007 and the administrative record filed on March 13, 2007.[1]

**STATEMENT OF THE ISSUES**

1. Whether this Court possesses subject matter jurisdiction over Ms. Banerjee's claim pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 et. seq., the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, or 10 U.S.C. § 1552.

2. Whether the decision of the Army Board for Correction of Military Records

[1] "App." refers to the appendix attached to this brief. The appendix contains the relevant Army regulations. "AR" refers to the administrative record. "Compl." refers to plaintiff's complaint. "Compl. Ex." refers to the exhibit to plaintiff's complaint.

("ABCMR") denying plaintiff's application for military disability retirement benefits was arbitrary, capricious, unsupported by substantial evidence, or contrary to law.

## STATEMENT OF THE CASE

Plaintiff, Urmila Banerjee, enlisted in the United States Army and entered active duty on October 9, 1990. AR 280. On May 17, 1991, Ms. Banerjee was counseled that her overall behavior was not in keeping with military standards. AR 291. Ms. Banerjee indicated that she did not wish to remain in the Army and requested to be discharged. Id. On May 22, 1991, Ms. Banerjee was again counseled regarding her motivation and ability to become a productive soldier and was advised that proceedings were being initiated to separate her from the Army. AR 289. She once again indicated her desire to be discharged. Id.

In preparation for her recommended separation, Ms. Banerjee underwent a complete medical examination and mental evaluation. AR 62-69. On May 28, 1991, Ms. Banerjee received a Mental Status Evaluation by Major Stephen Brannen, an Army Medical Services Officer. AR 64. The mental health evaluation found her to be fully alert and oriented, to have good memory, and a clear and normal thought process. Id. Further, Major Brannen determined Ms. Banerjee had the mental capacity to understand and participate in the proceedings, and was mentally responsible. Id. He specifically found that she met the retention requirements of Chapter 3, Army Regulation 40-501, Standards of Medical Fitness. AR 64. He also stated there was "no evidence of a mental disease or defect of psychiatric significance or of sufficient severity to warrant disposition through medical channels." Id. After noting her continued desire to be separated, he concluded that she was cleared for administrative action deemed appropriate by her command. Id.

On May 22, 1991, a bone scan was performed on Ms. Banerjee that found a stress fracture of the distal third metatarsal of the left foot, as well as stress related changes of the tibias and the left foot. AR 69. Although the stress fractures were noted on May 22, 1991, a Medical Evaluation Board was not recommended by the treating medical officer. Id. On May 31, 1991, Ms. Banerjee under went a medical examination as a part of the separation proceedings. AR 62-63, 66. The examination also revealed that she had stress fractures. Id. The physician concluded that although Ms. Banerjee had stress fractures, she was nevertheless qualified for separation. AR 66.

On June 24, 1991, Ms. Banerjee was honorably discharged from the Army at the rank of Specialist, pay grade E-4, under the provisions of Army Regulation 635-200, Chapter 13, for unsatisfactory performance. AR 280.

On May 22, 2000, Ms. Banerjee submitted an Application for Change of Discharge with the ABCMR. AR 6, 15-279. Ms. Banerjee requested that her military records be corrected to reflect that she was medically retired on June 24, 1991, because of schizophrenia and stress fractures, thereby entitling her to retired pay or separation pay from that date through judgment. AR 6. She stated that she was entitled to a formal Medical Review Board prior to her separation. Id. Ms. Banerjee's application included a statement from Colonel Hansa Raval, a retired Army Medical Corps Officer, regarding Ms. Banerjee's application, AR 20; her military records, AR 21-82; as well as medical records for treatment she received after her discharge from the Army and disability rating decisions from the Veterans Administration ("VA"). AR 83-279.

On August 7, 2003, the ABCMR denied Ms. Banerjee's application to correct her military records. AR 5. The ABCMR, based upon the administrative record, determined that

Ms. Banerjee's involuntary discharge from the service was accomplished in compliance with applicable regulations. Id. The ABCMR further determined that at the time of her discharge, she was not unfit to serve because of any disabling condition. Id. The ABCMR noted that, in fact, prior to her separation from the Army, a mental health evaluation of Ms. Banerjee found her to be fully alert and oriented, to have good memory, and a clear and normal thought process. AR 4. Further, Ms. Banerjee underwent a separation medical examination on May 30, 1991, noting her stress fractures, but finding that they were not medically unfitting. AR 62-66.

On December 6, 2006, Ms. Banerjee filed a complaint before this Court. Compl. at 1. Ms. Banerjee asks this Court to set aside the ABCMR's decision and award a change of discharge status to her in order to permit her to receive disability retirement pay or severance pay. Compl. at 16-19.

## STATEMENT OF FACTS

In accordance with RCFC 52.1(b) and this Court's February 21, 2007 order, the parties filed a separate joint statement of facts upon which defendant bases its motion for judgment upon the administrative record.

## SUMMARY OF ARGUMENT

This Court possesses jurisdiction over Ms. Banerjee's claim pursuant to the Tucker Act, 28 U.S.C. § 1491, and 10 U.S.C. § 1201. However, contrary to Ms. Banerjee's assertion, this Court does not possess jurisdiction pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 et. seq., the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, or 10 U.S.C. § 1552. Thus, this Court should dismiss Counts I and II of the complaint for lack of subject matter jurisdiction.

The Court should grant judgment upon the administrative record in favor of the United States as to Count III. The ABCMR's decision denying Ms. Banerjee's claim for disability retirement pay was not arbitrary, capricious, unsupported by substantial evidence, or contrary to law. The ABCMR properly concluded that Ms. Banerjee did not satisfy the criteria for unfitness for military service at the time of discharge, and all appropriate procedures were followed in evaluating her claim for disability retirement. The ABCMR conducted a detailed review of all of Ms. Banerjee's records, and correctly concluded that there was no basis for determining that Ms. Banerjee had a medically unfitting disability that required physical disability processing at the time of her separation. The VA's disability determinations do not demonstrate any error or injustice on the part of the Army. Accordingly, the ABCMR did not err as a matter of law and the Court should affirm the ABCMR's denial of relief.

Additionally, to the extent that Ms. Banerjee is making any claims of sexual harassment, those claims are barred by the Feres doctrine.

## ARGUMENT

### I. This Court Should Dismiss Counts I And II For Lack Of Subject Matter Jurisdiction

#### A. Standard Of Review For Motions To Dismiss

The Court of Federal Claims is a court of limited jurisdiction. Dynalectron Corp. v. United States, 4 Cl. Ct. 424, 428, aff'd, 758 F.2d 665 (Fed. Cir. 1984)(table). If the Court finds jurisdiction lacking as a matter of law, dismissal is required. Thoen v. United States, 765 F.2d 1110, 1116 (Fed. Cir. 1985). The plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. See McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir.1988).

When deciding a motion to dismiss based upon lack of subject matter jurisdiction, this Court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). The Court may examine relevant evidence in order to resolve any factual disputes. See Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999); Reynolds, 846 F.2d at 747.

This Court's jurisdiction to entertain claims and to grant relief depends upon, and is circumscribed by, the extent to which the United States has waived its sovereign immunity. See United States v. Mitchell, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."). A waiver of sovereign immunity "cannot be implied and must be unequivocally expressed." United States v. King, 395 U.S. 1, 4 (1969). Absent congressional consent to entertain a claim against the United States, the Court lacks authority to grant relief. United States v. Testan, 424 U.S. 392, 399 (1976); United States v. Sherwood, 312 U.S. 584, 586 (1941). "In construing a statute waiving the sovereign immunity of the United States, great care must be taken not to expand liability beyond that which was explicitly consented to by Congress." Fidelity Constr. Co. v. United States, 700 F.2d 1379, 1387 (Fed. Cir. 1983).

In the Court of Federal Claims, consent to suit is based upon the Tucker Act, 28 U.S.C. § 1491. See Mitchell, 463 U.S. at 215. The Tucker Act states:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act requires that a plaintiff identify an independent substantive right enforceable against the United States for money damages. 28 U.S.C. § 1491; see United States v.Mitchell, 445 U.S. 530, 538 (1980). Generally, the Court possesses jurisdiction to entertain monetary claims founded upon the Takings Clause of the United States Constitution, statutes, regulations, or contracts. 28 U.S.C. § 1491(a)(1); see Mitchell, 463 U.S. at 215-18.

The statutory or constitutional claims a plaintiff asserts must be "money-mandating" to come within the jurisdiction of the Court. United States v. Testan, 424 U.S. 392, 398 (1976). The plaintiff must identify and plead an independent contractual relationship, constitutional provision, Federal statute, and/or executive agency regulation that provides a substantive right to money damages in order for the Court to possess jurisdiction. See Todd v. United States, 386 F.3d 1091, 1094 (Fed. Cir. 2004) (stating that "jurisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act itself"). Merely requesting money damages, however, does not satisfy the money-mandating criterion, as there must be a statute, regulation, or contract that specifically allows the monetary relief plaintiff requests. See New York Life Ins. Co. v. United States, 118 F.3d 1553, 1556 (Fed. Cir. 1997), cert. denied, 523 U.S. 1094 (1998).

B. This Court Does Not Possess Subject Matter Jurisdiction Pursuant To The Administrative Procedure Act, The Declaratory Judgment Act, Or 10 U.S.C. § 1552

Ms. Banerjee properly relies on the Tucker Act as the basis for subject matter jurisdiction

over this cause of action. Compl. ¶ 1.[2] Ms. Banerjee also properly relies on 10 U.S.C. § 1201 as a money-mandating statute upon which she bases jurisdiction pursuant to the Tucker Act. Compl. ¶ 2. See Neuren v. United States, 41 Fed. Cl. 422, 425-26 (1998) (noting that 10 U.S.C. §§ 1201-21 is a money-mandating statute for disability retirement claims). However, none of the other statutes asserted by Ms. Banerjee provide a basis for subject matter jurisdiction in this Court.

Count I of the complaint asserts a claim pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et. seq. Compl. ¶¶ 3, 72-73.[3] It is well-established that the APA does not establish jurisdiction in this Court over claims for money. Union Bank and Trust Co. v. United States, 27 Fed. Cl. 403, 404 (1992); Berry v. United States, 27 Fed. Cl. 96, 102-03 (1992). Accordingly, this Court should dismiss Count I for lack of subject matter jurisdiction.

Count II of the complaint asserts a claim pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Compl. ¶¶ 3, 74-75. It is well-established that this Court does not possess jurisdiction pursuant to the Declaratory Judgment Act. See Nat'l Air Traffic Controllers

---

[2] However, Ms. Banerjee improperly also relies upon the Little Tucker Act, 28 U.S.C. § 1346. Compl. ¶¶ 3, 76-7[8]. The Little Tucker Act provides United States District Courts and the United States Court of Federal Claims with concurrent jurisdiction to adjudicate claims against the United States, "not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2); Doe v. United States, 74 Fed. Cl. 794, 797 (2006). Ms. Banerjee asserts damages in the amount of $116,196.90, compl. at 19, far greater than the Little Tucker Act's $10,000 limit, therefore the Little Tucker Act is inapplicable to this claim. However, for purposes of this motion, defendant will assume that this Court possesses jurisdiction over Count III of the complaint pursuant to the Tucker Act, 28 U.S.C. § 1491, and 10 U.S.C. § 1201, even though Count III of the complaint cites the Little Tucker Act. See compl. at 18.

[3] The complaint cites "28 U.S.C. § 701 et seq.," which is not the APA, but it is clear that Ms. Banerjee is referring to the APA. See compl. at 16.

Ass'n v. United States, 160 F.3d 714, 717 (Fed. Cir. 1998). Accordingly, this Court should dismiss Count II for lack of subject matter jurisdiction.

Finally, Ms. Banerjee argues that her claim for relief arises under 10 U.S.C. § 1552. Compl. ¶ 3. Although section 1552 has been interpreted to be a money-mandating statute in certain limited situations, it cannot be used to provide the relief that Ms. Banerjee wants in this case. In Martinez v. United States, 33 F.3d 1295 (Fed. Cir. 2003) (en banc), the Federal Circuit held that "section 1552 is not the 'money-mandating' statute that gives rise to the cause of action that provides the basis for a Tucker Act suit in the Court of Federal Claims," and that section 1552 is also not the basis for an action for back pay. Martinez, 333 F.3d at 1314-15. While the court recognized two exceptions in which section 1552 is money-mandating, neither of those exceptions is applicable to Ms. Banerjee's claim.[4] Accordingly, this Court does not possess jurisdiction pursuant to 10 U.S.C. § 1552.

II. This Court Should Grant Judgment Upon The Administrative Record As To Count III

A. Standard Of Review For Judgment Upon The Administrative Record

A motion for judgment upon the administrative record is distinguishable from a motion for summary judgment. Bannum, Inc. v. United States, 404 F.3d 1346, 1355 (Fed. Cir. 2005); see also Saab Cars USA, Inc. v. United States, 434 F.3d 1359, 1372 (Fed. Cir. 2006). In

[4] The court held that section 1552 is money-mandating when a military correction board has (1) "concluded that the service member's discharge was unlawful," or (2) "granted relief and the service member seeks to enforce or challenge the implementation or scope of the remedial order." Id. at 1314-15, 1315 n.4. Since no military correction board has found Ms. Banerjee's discharge to be unlawful, and since a board has not granted relief that she seeks to enforce, neither of these exceptions apply.

reviewing a motion for judgment on the administrative record, the Court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based upon the evidence in the record. A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). The existence of a question of fact neither precludes the granting of a motion for judgment nor requires this Court to conduct an evidentiary proceeding. See Saab Cars, 434 F.3d at 1372; Fort Carson Support Servs. v. United States, 71 Fed. Cl. 571, 585 (2006). Instead, such fact questions must be resolved by reference to the administrative record, "as if [this Court] were conducting a trial on [that] record." Bannum, 404 F.3d at 1357; see also Groff v. United States, 72 Fed. Cl. 68, 70 (2006).

RCFC 52.1, which replaced the repealed RCFC 56.1, now provides for judgment upon the administrative record. RCFC 52.1. The standard of review for a motion for judgment upon the administrative record under RCFC 52.1 depends upon the specific law to be applied in the specific case. See Rules Committee Note to RCFC 52.1; Rominger v. United States, 72 Fed. Cl. 268, 272 (2006); but see Bice v. United States, 72 Fed. Cl. 432, 441 (2006) ("The standard of review for a motion for judgment on the administrative record under RCFC 52.1 remains unchanged from the standard under the now-repealed RCFC 56.1.").

B. The Court's Review Of ABCMR Decisions Is Limited

In the present case, the Court is governed by the well-settled standards governing review of military correction board decisions. Once a plaintiff has sought relief from a military corrections board, he is bound by that board's determination unless he can demonstrate that the board's determination was arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations. Porter v. United States, 163 F.3d 1304, 1312 (Fed. Cir.

1998); Koretsky v. United States, 57 Fed. Cl. 154, 158 (2003); Myers v. United States, 50 Fed. Cl. 674, 688 (2001). Ms. Banerjee can only meet her considerable burden by presenting "cogent and convincing evidence" that the ABCMR's decision was in error. Dorl v. United States, 200 Ct. Cl. 626, 633 (1973), cert. denied, 414 U.S. 1032 (1973).

This standard of review "does not require a reweighing of the evidence, but a determination whether the conclusion being reviewed is supported by substantial evidence." Heisig v. United States, 719 F.2d 1153, 1157 (Fed. Cir. 1983). Because the Court of Federal Claims does not sit as a "super correction board," when substantial evidence supports a board's action, and when that action is reasonable in light of all the evidence presented, the Court will not disturb the result. Van Cleave v. United States, 70 Fed. Cl. 674, 678-79 (2006).

Judicial review in this case is limited to the administrative record before the ABCMR. See Wyatt v. United States, 23 Cl. Ct. 314, 319 (1991); Long v. United States, 12 Cl. Ct. 174, 177 (1987). As a general rule, courts presume civil and military officials in the armed forces act properly and in accordance with the law. Bockoven v. United States, 727 F.2d 1558, 1563 (Fed. Cir.1984), cert. denied, 469 U.S. 880 (1984). Accordingly, the plaintiff bears the burden of overcoming the "strong, but rebuttable, presumption" that the military discharges its duties "correctly, lawfully and in good faith." Bernard v. United States, 59 Fed. Cl. 497, 501 (2004), (quoting Hary v. United States, 223 Ct. Cl. 10, 17 (1980)).

When a branch of the armed forces has made a decision concerning who is or who is not fit to serve, that decision is generally entitled to great deference. Doe v. United States, 132 F.3d 1430, 1434 (Fed. Cir. 1997); Slesinski v. United States, 34 Fed. Cl. 159, 163 (1995). Responsibility for determining who is fit or unfit to serve in the armed services is not a judicial

province, and courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence. Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983); Bernard, 59 Fed. Cl. at 501. Furthermore, it is "singularly inappropriate" to second-guess the judgment of military medical officers. Voge v. United States, 844 F.2d 776, 780 (Fed. Cir. 1998); Slesinski, 34 Fed. Cl. at 153-64.

C. The ABCMR's Decision Is Supported By Substantial Evidence

After reviewing the allegations contained in Ms. Banerjee's application for correction of military records and the administrative record, the ABCMR determined that she had failed to show probable error or injustice, and accordingly denied her application. AR 4-5. Substantial evidence supports the ABCMR's finding that Ms. Banerjee was separated in accordance with applicable regulations with no indication of procedural errors which would tend to jeopardize her rights. AR 5. Ms. Banerjee's commander properly initiated action to separate her from the Army for unsatisfactory performance, under the provisions of A. Reg. 635-200, Personnel Separations, Enlisted Personnel, Chapter 13. AR 3; App. 8-12. Substantial evidence also supports the ABCMR's finding that there is no basis for physical disability retirement or separation. Id.

i. The ABCMR's Decision Denying Ms. Banerjee's Mental Disability Claim Is Supported By Substantial Evidence

Ms. Banerjee claims that she suffered from a mental disability, namely schizophrenia, on the date of her discharge. Consistent with regulations, Ms. Banerjee was given a Mental Status Evaluation as a regular part of separation proceedings for unsatisfactory performance. See A. Reg. 635-200, ¶ 1-34, App. 9-10; AR 3. The Mental Status Evaluation performed by Major Stephen Brannen, an Army Medical Services officer, cleared Ms. Banerjee for separation. AR 3,

64. Major Brannen noted that there was no evidence of mental disease or defect of psychiatric significance or of sufficient severity to warrant disposition through medical channels. Id. Major Brannen also noted that Ms. Banerjee was fully oriented, her thinking process was clear, and her thought content was normal. Id. In his opinion, Major Brannen concluded that Ms. Banerjee was mentally responsible and had the capacity to understand and participate in the proceedings. Id. Major Brannen also noted that Ms. Banerjee had indicated her desire to be separated from the Army. Id. Accordingly, she was cleared for any administrative action deemed appropriate by the command. Id. If Major Brannen had been of the opinion that Ms. Banerjee had medical conditions that may have warranted disability retirement or discharge, he would have referred her to a Medical Evaluation Board, relying upon the medical retention standards outlined in Chapter 3, A. Reg. 40-501. App. 1-4. The fact that he did not do so is substantial evidence that he did not believe Ms. Banerjee had mental conditions that warranted disability retirement or discharge. Major Brannen's opinion should be given deference, as he was in the best position to determine her fitness at the time of separation. It would not be appropriate for this Court to attempt to look back over fifteen years to determine that Major Brannen's medical opinion was wrong, absent compelling evidence. See Bernard, 59 Fed. Cl. at 501.

Ms. Banerjee presents no evidence that establishes that she had a medically unfitting mental disability at the time of her separation which required physical disability processing. On the other hand, the Mental Status Evaluation, conducted in accordance with applicable regulatory requirements, provides substantial evidence that she did not require disability processing. AR 4, 5, 64. Accordingly, Ms. Banerjee has failed to overcome the strong presumption that the Army properly determined that she did not require disability processing. Bernard, 59 Fed. Cl. at 501.

ii. The ABCMR's Decision Denying Ms. Banerjee's Physical Disability Claim Is Supported By Substantial Evidence

Ms. Banerjee is also not entitled to disability benefits for her alleged medically unfitting physical disability, namely stress fractures. "Disability compensation is not an entitlement acquired by reason of service-incurred illness or injury; rather, it is provided to soldiers whose service is interrupted and they can no longer continue to reasonably perform because of a physical disability incurred or aggravated in service." A. Reg. 635-40, ¶ 3-2(b)(1). App. 7. Furthermore, the Army's retention standards and guidelines

> should not be interpreted to mean that possessing one or more of the listed conditions or physical defects signifies automatic disability retirement or separation from the Army. The fact that the soldier has one or more defects sufficient to require referral for evaluation, or that these defects may be unfitting for soldiers in a different office, grade, rank, or rating, does not justify a decision of physical unfitness.

Id. at ¶3-1(a).

The ABCMR's determination that Ms. Banerjee did not have a medically unfitting disability that required physical disability processing is supported by substantial evidence. AR 5. Ms. Banerjee's separation physical noted the existence of stress fractures. AR 62-63, 66. However, the existence of a stress fracture alone does not justify a decision of physical unfitness. A. Reg. 635-40, ¶ 3-1(a). App. 6. The examining physician determined Ms. Banerjee's stress fractures were not sufficient to be classified as medically unfitting. AR 66 ("Examinee is qualified for ETS/Chapter."). As with the Mental Status Evaluation performed on Ms. Banerjee, the examining physician's opinion should be given deference, as he was in the best position to determine her fitness at the time of separation. Accordingly, the ABCMR's determination that Ms. Banerjee did not have a medically unfitting disability properly relied on the examining

physician's medical opinion and should be granted deference. See Bernard, 59 Fed. Cl. at 501.

D. The Veterans Affairs Determinations Do Not Demonstrate Any Error Or Injustice By The Army

i. The VA's Decision To Grant Ms. Banerjee Disability Benefits For Schizophrenia Does Not Require The Army To Grant Disability Separation Or Retirement

Ms. Banerjee argues that the ABCMR did not refer to the National Institute of Mental Health Records or the VA Department Rating Decision. Compl.¶ 63. While the ABCMR did not directly refer to these two documents, the ABCMR discussed more generally Ms. Banerjee's post-discharge medical records and VA disability determinations. AR 4-5. The ABCMR correctly noted that the VA and Army apply different standards in making disability determinations, and thus that a disability rating by the VA does not necessarily reflect any error or injustice on the part of the Army. Id.

VA disability ratings, although evidence, are not binding on the ABCMR. Myers v. United States, 50 Fed. Cl. 674, 690 (2001). "[W]hile the ABCMR does consider VA disability ratings as relevant evidence during its deliberations, it is not bound by them, and these ratings are 'in no way ultimately determinative of claims for military disability retirement. The [VA] does not determine fitness for military duty, which is the responsibility of the Secretary and military authorities.'" Id. (quoting Hinkle v. United States, 229 Ct. Cl. 801, 805 (1982)). As the ABCMR correctly noted, the VA "awards compensation solely on the basis that a medical condition exists and that said medical condition reduces or impairs the social or industrial adaptability of the individual concerned." AR 4.

A member of the armed forces who incurs a disability during active military service is not

entitled to disability retirement unless the disability renders her unfit for military service at the time of separation. 10 U.S.C. § 1201; Cole v. United States, 32 Fed. Cl. 797 (1995). Thus, it is not enough for Ms. Banerjee "merely to show that [her] service connected injuries resulted in an eventually disabling condition or that at the time of release from active duty this condition was in an incipient stage of pathological development." Id. at 803 (citing Walters v. United States, 358 F.2d 957, 962 (Ct. Cl. 1966)). Ms. Banerjee must show that her condition rendered her unfit for duty at the time of her discharge from active duty. As she has failed to do so, Ms. Banerjee's claim fails and the United States should be granted judgment upon the administrative record.

Even if the VA's determinations were binding on the Army's disability determination, the timing of the VA diagnosis of schizophrenia is consistent with the Mental Status Evaluation completed prior to Ms. Banerjee's discharge. Ms. Banerjee contends the ABCMR did not explain why the diagnosis of schizophrenia after her discharge did not establish that she developed the condition during her period of military service. Compl. ¶ 64. Ms. Banerjee notes that she was seen by a VA psychiatrist on July 25, 1991, one month after her discharge. Compl. ¶ 33. At that time, consistent with the Army's Mental Status Evaluation, Ms. Banerjee was not diagnosed with schizophrenia. AR 89. Ms. Banerjee was later diagnosed with "Incipient Schizophrenic decompensation" at a follow up visit on August 15, 1991. AR 90; Compl. Ex. B at 11. The characterization "incipient" indicates that Ms. Banerjee's schizophrenia was only beginning to come into being after her discharge from the Army. On August 23, 1991, Ms. Banerjee was diagnosed with acute schizophrenia. Compl. ¶ 36. The timing of Ms. Banerjee's diagnosis, several months after her separation from the Army, is consistent with the Mental Status Evaluation conducted by Major Brannen, which indicated that Ms. Banerjee was

medically fit at the time of separation. AR 64.

In addition, the VA's later disability determinations are also consistent with the Mental Status Evaluation completed prior to Ms. Banerjee's discharge. The VA determination that Ms. Banerjee's schizophrenia is service connected is based on presumptions that apply to VA determinations. Compl. Ex. B at 14. These presumptions do not apply to the Army's physical disability evaluation. See A. Reg. 635-40, ¶ 3-2 (listing applicable presumptions). App. 7. The Code of Federal Regulation section entitled "Presumptive Service Connection" provides that an entitlement to VA benefits begins on the:

> Date entitlement arose, if claim is received within 1 year after separation from active duty; otherwise date of receipt of claim, or date entitlement arose, whichever is later. Where the requirements for service connection are met during service, the effective date will be the day following separation from service if there was continuous active service following the period of service on which the presumption is based and a claim is received within 1 year after separation from active duty.

38 C.F.R. § 3.400(b)(2)(ii) (2004).

Ms. Banerjee claims that the VA found that she "was 100% disabled as of the day she was discharged from the U.S. Army." Compl. ¶ 68. However, this claim is inconsistent with the VA decision cited by Ms. Banerjee. Compl. Ex. B at 15. The VA actually determined that:

> Since the requirements for service connection were not met while veteran was in service, the effective date cannot be the day following separation. Since a claim for service connection was received within 1 year after separation from active duty, the effective date is the date entitlement arose. The date entitlement arose is the first date on which the condition was diagnosed. Based on granting benefit of doubt, service connection has been granted from August 15, 1991, the date of diagnosis of "incipient schizophrenic decompensation.

Compl. Ex. B at 14 (emphasis added). That is, the VA determined that Ms. Banerjee was disabled as of August 15, 1991, not as of the date of her discharge. Accordingly, the VA's

determinations support the ABCMR's finding that "[t]he evidence of record indicates [Ms. Banerjee] did not have any medically unfitting disability which required physical disability processing. Therefore, there is no basis for physical disability retirement or separation." AR 5.

ii. The VA's Decision To Grant Ms. Banerjee Disability Benefits For Stress Fractures Does Not Require The Army To Grant Disability Separation Or Retirement

As stated above, VA disability ratings, although evidence, are not binding on the ABCMR. Myers, 50 Fed. Cl. at 690. The VA's determination that Ms. Banerjee's stress fractures are subject to VA compensation is not the same as a determination of unfitness for military duty at the time of discharge. Id. Even if the VA's determination were binding on the ABCMR, the VA's findings regarding Ms. Banerjee's stress fractures are consistent with the ABCMR's determination because the VA disability rating for stress fractures was zero percent at the time of discharge through 1998. Compl. Ex. B at 16.

III. Any Potential Sexual Harassment Claim Is Barred By The Feres Doctrine

In Feres v. United States, 340 U.S. 135 (1950) and two companion cases, Griggs v. United States, 178 F.2d 1 (10th Cir. 1949), rev'd sub nom., Feres, 340 U.S. 135, and Jefferson v. United States, 77 F. Supp. 706 (D. Md. 1948), aff'd, 178 F.2d 518 (4th Cir. 1949), aff'd sub nom., Feres, 340 U.S. 135, the Supreme Court announced a doctrine of military immunity that operated to bar service members from recovering damages for injuries sustained incident to service. This doctrine, originally applied only to cases brought under the Federal Tort Claims Act ("FTCA"), has been expanded to include any claim for damages where the plaintiff alleges injury sustained

incident to service.[5]

In Feres, the estate of a soldier sued the United States alleging Army negligence in quartering the decedent in unsafe barracks. In Griggs and Jefferson the suits alleged medical malpractice by military surgeons. In this trio of cases, the Supreme Court examined congressional intent underlying the FTCA and the system for compensating military personnel injured in the course of their duty and held that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to military service." Feres, 340 U.S. at 146. Accordingly, the claims were excepted from the coverage of the FTCA and were barred by sovereign immunity.

Over the years, the Supreme Court has repeatedly reaffirmed and broadened the Feres "incident to service" test and spread the bar against recovery for damages even where injury was due to the negligence of persons outside the military. See, e.g., Stencel Aero Engineering Corp. v. United States, 431 U.S. 666 (1977) (Feres bars civilian manufacturer's indemnity action for damages paid to a service member when the injuries arose incident to the service member's military service); United States v. Shearer, 473 U.S. 52 (1985) (Feres bars suit arising out of service member's alleged negligence in failing to control soldier who kidnaped and murdered another off duty soldier away from post); United States v. Johnson, 481 U.S. 681 (1987) (Feres bars suit by estate of Coast Guard member for injuries even where negligence is alleged against civilian federal employees where claims arise out of a helicopter accident while the member was

[5] One case has crafted an exception to the doctrine for violations of the Privacy Act. Cummings v. Navy, 279 F.3d 1051 (D.C. Cir. 2002).

flying a military mission and was therefore acting incident to the military member's service).

The Supreme Court has also broadened the Feres doctrine to bar suits seeking damages for injuries incident to service founded on theories other than tort. See Chappell v. Wallace, 462 U.S. 296 (1983) (Feres bar precludes enlisted members from maintaining a suit to recover damages from a superior officer based upon racial discrimination that resulted in low performance evaluations, assignment to undesirable duties and resulted in the imposition of unequal penalties); United States v. Stanley, 483 U.S. 669 (1987) (applying the Feres "incident to service" test to bar constitutional tort remedy against state actors or the military whenever the service member's injury arises out of or in the course of activity incident to service).

The United States Court of Appeals for the Sixth Circuit summarized the ever widening reach of the military immunity doctrine:

> Review of these Supreme Court precedents makes it clear that in recent years the Court has embarked on a course dedicated to broadening the Feres doctrine to encompass, at a minimum, all injuries suffered by military personnel that are even remotely related to the individual's status as a member of the military, without regard to the location of the event, the status (military or civilian) of the tortfeasor, or any nexus between the injury-producing event and the essential defense/combat purpose of the military activity from which it arose.

Major v. United States, 835 F.2d 641, 644 (6th Cir. 1987).

The allegations of the instant complaint relate to an alleged injury directly connected to Ms. Banerjee's service in the military; she alleges that she was repeatedly harassed by male soldiers. Compl. ¶ 29. These allegations establish the nexus to the military as they deal with military personnel issues, to include military discipline.[6] Although it is unclear if Ms. Banerjee is

6 The courts traditionally grant judicial deference to military personnel determinations.

seeking redress for the alleged sexual harassment, if this Court determines she is seeking such redress, then the injuries Ms. Banerjee allegedly suffered are incident to service and therefore barred by Feres.

**CONCLUSION**

For the foregoing reasons, defendants's motion to dismiss, in part, and for judgment upon the administrative record should be granted.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ BRYANT G. SNEE
BRYANT G. SNEE
Deputy Director

---

> [I]t is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgements, subject always to civilian control of the Legislative and Executive Branches.

Rostker v. Goldberg, 453 U.S. 57, 65 (1981). See also Chappell v. Wallace, 462 U.S. 296, 300 (1983) ("Civilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers.").

/s/ MEREDYTH D. COHEN
MEREDYTH D. COHEN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-7978
Fax: (202) 514-8624

OF COUNSEL:

MAJOR JERRETT DUNLAP
United States Army Litigation Division
Military Personnel Branch
901 N. Stuart Street, Suite 400
Arlington, VA 22203-1837
Tel: (703) 696-1628
Fax: (703) 696-8126

April 27, 2007

Attorneys for Defendant

# APPENDIX

TABLE OF CONTENTS

Army Regulation 40-501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Army Regulation 635-40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Army Regulation 635-200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Copy 3

S/S by 30 August 1995

Replacement Copy

Army Regulation 40–501

Medical Services

# Standards of Medical Fitness

Pentagon Library (ANR-PL)
ATTN: Military Documents Section
Room 1A518, Pentagon
Washington, DC 20310-6050

Headquarters
Department of the Army
Washington, DC
15 May 1989

Army Regulation 40–501

Medical Services

# Standards of Medical Fitness

Headquarters
Department of the Army
Washington, DC
27 June 2006

UNCLASSIFIED

*(m)* Leptomeningeal cysts or Arteriovenous Fistula.

(2) History of moderate head injury (854.03) is disqualifying. After 2 years post-injury, applicants may be qualified if neurological consultation shows no residual dysfunction or complications. Moderate head injuries are defined as unconsciousness, amnesia, or disorientation of person, place, or time alone or in combination, of more than 1 and less than 24-hours duration post-injury, or linear skull fracture.

(3) History of mild head injury (854.02) is disqualifying. After 1 month post-injury, applicants may be qualified if neurological evaluation shows no residual dysfunction or complications. Mild head injuries are defined as a period of unconsciousness, amnesia, or disorientation of person, place, or time, alone or in combination of 1 hour or less post-injury.

(4) History of persistent post-traumatic symptoms (310.2) that interfere with normal activities or have duration of greater than 1 month is disqualifying. Such symptoms include, but are not limited to headache, vomiting, disorientation, spatial disequilibrium, impaired memory, poor mental concentration, shortened attention span, dizziness, or altered sleep patterns.

*g.* Infectious diseases of the central nervous system.

(1) Current of history of acute infectious processes of the central nervous system, including, but not limited to meningitis (322), encephalitis (323), or brain abscess (324), are disqualifying if occurring within 1 year before examination, or if there are residual neurological defects.

(2) History of neurosyphilis (094) of any form, including but not limited to general paresis, tabes dorsalis or meningovascular syphilis, is disqualifying.

*h.* Current of history of narcolepsy or cataplexy (347) is disqualifying,

*i.* Current or history of paralysis, weakness, lack of coordination, chronic pain, sensory disturbance or other specified paralytic syndromes (344) is disqualifying.

*j.* Epilepsy (345) occurring beyond the 6th birthday, unless the applicant has been free of seizures for a period of 5 years while taking no medication for seizure control, and has a normal electroencephalogram (EEG) is disqualifying . All such applicants will have a current neurology consultation with current EEG results.

*k.* Chronic nervous system disorders, including but not limited to myasthenia gravis (358.0), multiple sclerosis (340), and tic disorders (307.20) (for example, Tourett's (307.23)) are disqualifying.

*l.* Current or history of retained central nervous system shunts of all kinds (V45.2) are disqualifying.

## 2–27. Learning, psychiatric and behavioral disorders

*a.* Attention Deficit Disorder/Attention Deficit Hyperactivity Disorder (314), or Perceptual/Learning Disorder(s) (315) is disqualifying, unless applicant can demonstrate passing academic performance and there has been no use of medication(s) in the previous 12 months.

*b.* Current or history of academic skills or perceptual defects (315) secondary to organic or functional mental disorders, including, but not limited to dyslexia, that interfere with school or employment, are disqualifying. Applicants demonstrating passing academic and employment performance without utilization or recommendation of academic and/ or work accommodations at any time in the previous 12 months may be qualified.

*c.* Current or history of disorders with psychotic features such as schizophrenia (295), paranoid disorder (297), and other unspecified psychosis (298) is disqualifying.

*d.* Current mood disorders including, but not limited to, major depression (296.2–3), bipolar (296.4–7), affective psychoses (296.8–9), depressive not otherwise specified (311), are disqualifying.

(1) History of mood disorders requiring outpatient care for longer than 6 months by a physician or other mental health professional (V65.40), or inpatient treatment in a hospital or residential facility is disqualifying.

(2) History of symptoms consistent with a mood disorder of a repeated nature that impairs school, social, or work efficiency is disqualifying.

*e.* Current or history of adjustment disorders (309) within the previous 3 months is disqualifying.

*f.* Current or history of conduct (312), or behavior (313) disorders is disqualifying. Recurrent encounters with law enforcement agencies, antisocial attitudes or behaviors are tangible evidence of impaired capacity to adapt to military service and as such are disqualifying.

*g.* Current or history of personality disorder (301) is disqualifying. History (demonstrated by repeated inability to maintain reasonable adjustment in school, with employers or fellow workers, or other social groups), interview, or psychological testing revealing that the degree of immaturity, instability, personality inadequacy, impulsiveness, or dependency will likely interfere with adjustment in the Armed Forces is disqualifying.

*h.* Current or history of other behavior disorders is disqualifying, including, but not limited to conditions such as the following:

(1) Enuresis (307.6) or encopresis (307.7) after 13th birthday is disqualifying.

(2) Sleepwalking (307.4) after 13th birthday is disqualifying.

(3) Eating disorders (307.5), anorexia nervosa (307.1), bulimia (307.51), or unspecified disorders of eating (307.59) lasting longer than 3 months and occurring after 13th birthday are disqualifying.

*i.* Any current receptive or expressive language disorder, including, but not limited to any speech impediment, stammering and stuttering (307.0) of such a degree as to significantly interfere with production of speech or to repeat commands, is disqualifying.

*j.* History of suicidal behavior, including gesture(s) or attempt(s) (300.9), or history of self-mutilation, is disqualifying.

*k.* Current or history of anxiety disorders (anxiety (300.01) or panic (300.2)), agoraphobia (300.21), social phobia (300.23), simple phobias (300.29), obsessive-compulsive (300.3), other acute reactions to stress (308), and post-traumatic stress disorder (309.81) are disqualifying.

*l.* Current or history of dissociative disorders, including, but not limited to hysteria (300.1), depersonalization (300.6), and other (300.8), are disqualifying.

*m.* Current or history of somatoform disorders, including, but not limited to hypochondriasis (300.7) or chronic pain disorder, are disqualifying.

*n.* Current or history of psychosexual conditions (302), including, but not limited to transsexualism, exhibitionism, transvestism, voyeurism, and other paraphilias, are disqualifying.

*o.* Current or history of alcohol dependence (303), drug dependence (304), alcohol abuse (305), or other drug abuse (305.2 thru 305.9) is disqualifying.

*p.* Current or history of other mental disorders (all 290–319 not listed above) that in the opinion of the civilian or military provider will interfere with, or prevent satisfactory performance of military duty, are disqualifying.

### 2–28. Skin and cellular tissues

*a.* Current diseases of sebaceous glands to include severe acne (706.1), if extensive involvement of the neck, shoulders, chest, or back is present or would be aggravated by or interfere with the proper wearing of military equipment, are disqualifying. Applicants under treatment with systemic retinoids, including, but not limited to isotretinoin (Accutane(r)) are disqualified until 8 (eight) weeks after completion of therapy.

*b.* Current or history of atopic dermatitis (691) or eczema (692) after the 9th birthday is disqualifying.

*c.* Current or history of contact dermatitis (692.4), especially involving materials used in any type of required protective equipment, is disqualifying.

*d.* Cysts.

(1) Current cysts (706.2), (other than pilonidal cysts) of such a size or location as to interfere with the proper wearing of military equipment is disqualifying.

(2) Current pilonidal cysts (685), if evidenced by the presence of a tumor mass or a discharging sinus is disqualifying. Surgically resected pilonidal cyst that is symptomatic, unhealed, or less than 6 months post-operative is disqualifying.

*e.* Current or history of bullous dermatoses (694), including, but not limited to dermatitis herpetiformis, pemphigus, and epidermolysis bullosa, is disqualifying.

*f.* Current chronic lymphedema (457.1) is disqualifying.

*g.* Current localized types of fungus infections (117), interfering with the proper wearing of military equipment or the performance of military duties, are disqualifying. (For systemic fungal infections, refer to paragraph 2–30.)

*h.* Current or history of furunculosis or carbuncle (680), if extensive, recurrent, or chronic is disqualifying.

*i.* Current or history of severe hyperhidrosis of hands or feet (780.8) is disqualifying.

*j.* Current or history of congenital (757) or acquired (216) anomalies of the skin such as nevi or vascular tumors that interfere with function, or are exposed to constant irritation are disqualifying. History of Dysplastic Nevus Syndrome (232) is disqualifying.

*k.* Current or history of keloid formation (701.4), if the tendency is marked or interferes with the proper wearing of military equipment, is disqualifying.

*l.* Current lichen planus (697.0) is disqualifying.

*m.* Current or history of neurofibromatosis (von Recklinghausen's disease) (237.7) is disqualifying.

*n.* History of photosensitivity (692.72), including, but not limited to any primary sun-sensitive condition, such as polymorphous light eruption or solar urticaria; any dermatosis aggravated by sunlight such as lupus erythematosus is disqualifying.

*o.* Current or history of psoriasis (696.1) is disqualifying.

*p.* Current or history of radiodermatitis (692.82) is disqualifying.

*q.* Current scars (709.2), or any other chronic skin disorder of a degree or nature that requires frequent outpatient treatment or hospitalization, which in the opinion of the certifying authority will interfere with proper wearing of military clothing or equipment, or which exhibits a tendency to ulcerate or interferes with the satisfactory performance of duty, is disqualifying.

*r.* Current or history of extensive scleroderma (710.1) is disqualifying.

*s.* Tattoos (709.9) that are otherwise prohibited under AR 670–1 are disqualifying.

*t.* Current of history of chronic or recurrent urticaria (708.8) is disqualifying.

**Army Regulation 635–40**

**Personnel Separations**

# Physical Evaluation for Retention, Retirement, or Separation

Headquarters
Department of the Army
Washington, DC
15 August 1990

**UNCLASSIFIED**

*a.* Become thoroughly familiar with the purpose of the Army Physical Disability Evaluation System.

*b.* Ensure that any physical defects impacting on a soldier's performance of duty are reflected in the soldier's evaluation report.

*c.* Refer a soldier to the servicing MTF for medical evaluation when the soldier is believed to be unable to perform the duties of his or her office, grade, rank, or rating.

*d.* Upon request of the MTF commander, provide the information, statements, and records on soldiers of their command being processed for physical disability evaluation.

*e.* Ensure timely compliance with AR 600–8–1 to prevent delay in the disability processing of soldiers under their command.

## Section II
## Related Boards

### 2–10. Board Elements

*a.* The Army Physical Disability Evaluation System consists of—

(1) MEBDs (a function of the Army Medical Department).

(2) PEBs (elements of the USAPDA).

(3) Case reviews, when applicable, by USAPDA.

*b.* Certain Department of the Army (DA) boards, though not a part of the disability system, are closely related to disability evaluation because of their assigned function to review disability decisions upon request of the soldier, former soldier, or when otherwise required. These boards are described in paragraphs 2–11 through 2–13 below.

### 2–11. Army Physical Disability Appeal Board (APDAB)

The APDAB is a component of the Army Council of Review Boards (ACRB). APDAB was established to review disability evaluation cases forwarded by the CG, USAPDA as provided under the circumstances prescribed in chapter 4.

### 2–12. The Army Board for Correction of Military Records (ABCMR)

The ABCMR is a statutory board established within the OSA under the provisions of section 1552, title 10, (10 USC 1552). The ABCMR provides a means for correcting an error or removing an injustice. Within 3 years of the first knowledge of an error or injustice, a soldier, former soldier, or individual acting on the soldier's behalf may submit an application to the ABCMR according to AR 15–185 if the individual—

*a.* Believes that his or her military records reflect an error or an injustice.

*b.* Has exhausted all administrative remedies offered by existing laws and regulations.

### 2–13. Army Disability Rating Review Board (ADRRB)

The ADRRB is a component of the Army Council of Review Boards (ACRB). The ADRRB reviews disability percentage ratings on request of a soldier who was retired because of physical disability (chap 4, sec VI). Requests for review must be made within 5 years from the date of retirement.

# Chapter 3
# Policies

### 3–1. Standards of unfitness because of physical disability

The mere presences of an impairment does not, of itself, justify a finding of unfitness because of physical disability. In each case, it is necessary to compare the nature and degree of physical disability present with the requirements of the duties the soldier reasonably may be expected to perform because of his or her office, grade, rank, or rating.

*a. Objectives of standards.* To ensure all soldiers are physically qualified to perform their duties in a reasonable manner, medical retention qualification standards have been established in AR 40–501, chapter 3. These standards include guidelines for applying them to fitness decisions in individual cases. These guidelines are used to refer soldiers to a MEBD. The major objective of these standards is to achieve uniform disposition of cases arising under the law. These retention standards and guidelines should not be interpreted to mean that possessing one or more of the listed conditions or physical defects signifies automatic disability retirement or separation from the Army. The fact that the soldier has one or more defects sufficient to require referral for evaluation, or that these defects may be unfitting for soldiers in a different office, grade, rank, or rating, does not justify a decision of physical unfitness.

*b. Considering the overall effect of disabilities.* The overall effect of all disabilities present in a soldier whose physical fitness is under evaluation must be considered. The effect will be considered both from the standpoint of how the disabilities affect the soldier's performance and the requirements imposed on the Army to maintain and protect him or her during future duty assignments. A soldier may be unfit because of physical disability caused by a single impairment or physical disabilities resulting from the overall effect of two or more impairments even though each of them, alone, would not cause unfitness.

*c. Evaluating the soldier's fitness to perform duties.* All relevant evidence must be considered in evaluating the fitness of a soldier.Findings with respect to fitness or unfitness for military service will be made on the basis of the preponderance of the evidence. Thus, if the preponderance of evidence indicates unfitness, a finding to that effect will be made. For example, when a referral for physical evaluation immediately follows acute, grave illness or injury, the medical evaluation may have the greater weight.This is particularly true if medical evidence establishes the fact that continued service would be harmful to the soldier's health or would prejudice the best interests of the Army. A soldier may be referred for physical evaluation under other circumstances. If so, evaluations of the performance of duty by supervisors (letters, efficiency reports, or personal testimony) may provide better evidence than a clinical estimate by the soldier's physician describing the physical ability to perform the duties of the office, grade, rank, or rating. Thus, if the evidence establishes the fact that the soldier adequately performed the normal duties of his or her office, grade, rank, or rating until the time of referral for physical evaluation, the soldier might be considered fit for duty. This is true even though medical evidence indicates the soldier's physical ability to perform such duties may be questionable.However, inadequate duty performance should not be considered as evidence of physical unfitness unless a cause and effect relationship exists between the inadequate duty performance and the presence of physical disabilities.

*d. Deciding the soldier's unfitness to perform duties.* Initial enlistment, induction, or commissioning physical standards are not relevant to deciding unfitness for continued military service. Once a soldier has been enlisted, inducted, or commissioned, the fact that the soldier may later fall below initial entry physical standards does not, in itself, authorize separation or retirement unless it is also established that the soldier is unfit because of physical disability as described above. Likewise, a lack of special skills in demand, inability to meet physical standards established for specialized duty such as flying, or transfer between components or branches within the Army, does not, in itself, establish eligibility for disability separation or retirement. Although the ability of a soldier to reasonably perform his or her duties in all geographic locations under all conceivable circumstances is a key to maintaining an effective and fit force, this criterion (world-wide deployability) will not serve as the sole basis for a finding of unfitness.

*e. Prior-service disabilities.* Prior-service medical conditions are to be considered according to the following standards and limitations.

(1) Despite any other provisions of this regulation, after a soldier has been enlisted, inducted, and appointed or commissioned, the soldier will not be declared physically unfit for military service because of disabilities known to exist at the time of the soldier's acceptance for military service that have remained essentially the same in degree since acceptance, and have not interfered with the soldier's performance of effective military service.

(2) Nowithstanding the above, when a soldier enters the military with a waiver for a medical condition or physical defect, and the condition represents a decided medical risk which would probably prejudice the best interests of the Government were the soldier to remain in military service, separation without benefits may be appropriate, if initiated within 6 months of initial entry on active duty. Entry physical standards will be used in separating individuals with pre-existing medical conditions. Such cases will be referred to a PEB to determine if the pre-existing condition has been service-aggravated.

### 3–2. Presumptions

The following presumptions will apply to physical disability evaluation

*a. Before and during active service.*

(1) A soldier was in sound physical and mental condition upon entering active service except for physical disabilities noted and recorded at the time of entry.

(2) Any disease or injury discovered after a soldier entered active service, with the exception of congenital and hereditary conditions, was not due to the soldier's intentional misconduct or willful neglect and was incurred in line of duty (LD).

(3) If the foregoing presumptions are overcome by a preponderance of the evidence, any additional disability or death resulting from the preexisting injury or disease was caused by military service aggravation. (Only specific findings of "natural progression" of the preexisting disease or injury, based upon well-established medical principles are enough to overcome the presumption of military service aggravation.)

(4) Acute infections and sudden developments occurring while the soldier is in military service will be regarded as service-incurred or service-aggravated. Acute infections are those such as pneumonia, active rheumatic fever (even though recurrent), acute pleurisy, or acute ear disease.Sudden developments are those such as hemoptysis, lung collapse, perforating ulcer, decompensating heart disease, coronary occlusion, thrombosis, or cerebral hemorrhage. This presumption may be overcome when a preponderance of the evidence shows that no permanent new or increased disability resulting from these causes occurred during active military service or that such conditions were the result of "natural progression" of preexisting injuries or diseases as in (3) above.

(5) The foregoing presumptions may be overcome only by a preponderance of the evidence, which differs from personal opinion, speculation, or conjecture. When reasonable doubt exists about a soldier's condition, an attempt should be made to resolve the doubt by further clinical investigation and observation and by consideration of any other evidence that may apply. In the absence of such proof by the preponderance of the evidence, reasonable doubt should be resolved in favor of the soldier.

*b. Processing for separation or retirement from active service.*

(1) Disability compensation is not an entitlement acquired by reason of service-incurred illness or injury; rather, it is provided to soldiers whose service is interrupted and they can no longer continue to reasonably perform because of a physical disability incurred or aggravated in service.

(2) When a soldier is being processed for separation or retirement for reasons other than physical disability, continued performance of assigned duty commensurate with his or her rank or grade until the soldier is scheduled for separation or retirement, creates a presumption that the soldier is fit. An enlisted solider whose reenlistment has been approved before the end of his or her current enlistment, is not processing for separation; therefore, this rule does not apply. The presumption of fitness may be overcome if the evidence establishes that—

*(a)* The soldier was, in fact, physically unable to perform adequately the duties of his or her office, grade, rank or rating for a period of time because of disability. There must be a causative relationship between the less than adequate duty performance and the unfitting medical condition or conditions.

*(b)* An acute, grave illness or injury or other significant deterioration of the soldier's physical condition occurred immediately prior to, or coincident with processing for separation or retirement for reasons other than physical disability and which rendered the soldier unfit for further duty.

(3) A soldier previously found unfit but approved for continuation on active duty (COAD) is evaluated according to chapter 6.

### 3–3. Conditions existing before active military service

*a.* According to accepted medical principles, certain abnormalities and residual conditions exist that, when discovered, lead to the conclusion that they must have existed or have started before the individual entered the military service.

(1) Examples of these conditions are as follows:

*(a)* Scars.

*(b)* Fibrosis of the lungs.

*(c)* Atrophy following disease of the central or peripheral nervous system.

*(d)* Healed fractures.

*(e)* Absent, displaced, or resected organs.

*(f)* Supernumerary parts.

*(g)* Congenital malformations and hereditary conditions

*(h)* Similar conditions in which medical authorities are in such consistent and universal agreement as to their cause and time of origin that no additional confirmation is needed to support the conclusion that they existed prior to military service.

(2) Likewise, manifestation of lesions or symptoms of chronic disease from date of entry on active military service (or so close to that date of entry that the disease could not have started in so short a period) will be accepted as proof that the disease existed prior to entrance into active military service.

(3) Manifestations of communicable disease within less than the minimum incubation period after entry on active service will be accepted as proof of inception prior to military service.

*b.* Standard in-service medical and surgical treatment reducing the effect of the disease or other conditions incurred prior to entry into military service does not constitute service aggravation unless the treatment was required to relieve disability that had been aggravated by military service.

*c.* Unexpected adverse effects, over and above known hazards, directly attributable to treatment, anesthetic, or operation performed or administered for a disease or medical condition existing before entry on active duty, may be considered service aggravation.

*d.* For separation guidance on non-service aggravated EPTS conditions when a soldier requests waiver of referral to a PEB, see chapter 5.

### 3–4. LD decisions

*a.* Under the laws governing the Army Physical Disability Evaluation System, soldiers who sustain or aggravate physically unfitting disabilities must meet the following LD criteria to be eligible to receive retirement and severance pay benefits.

(1) The disability must have been incurred or aggravated while the soldier was entitled to basic pay or as the proximate cause of performing active duty or inactive duty training.

(2) The disability must not have resulted from the soldier's intentional misconduct or willful neglect and must not have been incurred during a period of unauthorized absence.

*b.* LD decisions are reached according to policies and procedures prescribed in AR 600–8–1, chapters 39, 40, and 41. Copies of LD decision, DA Form 2173 (Statement of Medical Examination and Duty Status), or DD Form 261(Report of Investigation—Line of Duty and Misconduct Status) must be included in the official records of the case. When a board or council has substantial evidence, however, showing that a prior decision may be incorrect for any reason, they must include such evidence in the case record and request PERSCOM(TAPC–PED–S) to review the LD determination before final disposition of disability processing at HQDA level (para 4–19*g*).

*c.* In certain categories of activities, the Deputy Commander, PEB president, or alternate president have the authority to make

Headquarters
Department of the Army
Washington, DC
17 September 1990

*Army Regulation 635–200

Effective 17 October 1990

Personnel Separations

# Enlisted Personnel

This publication was originally printed on 5 July 1984. Since that time, permanent Changes 1 through 13 have been issued. As of 17 September 1990, those changes remain in effect. This UPDATE printing incorporates those changes into the text.

This UPDATE printing also publishes a Change 14. The portions being revised by this change are highlighted.

By Order of the Secretary of the Army:

CARL E. VUONO
*General, United States Army*
*Chief of Staff*

Official:

MILTON H. HAMILTON
*Administrative Assistant to the Secretary of the Army*

**Summary.** This regulation implements DOD Directive 1332.14 dated 28 January 1982, subject: Enlisted Administrative Separations.

**Applicability.** (See para 1–6.)

**Internal control systems.** This regulation is subject to the requirements of AR 11–2. It contains internal control provisions but does not contain checklists for conducting internal control reviews. These checklists are being developed and will be published at a later date.

**Supplementation.** Supplementation of this regulation and establishment of command or local forms are prohibited without prior approval from HQDA (TAPC–PDT–S), ALEX VA 22331–0479.

**Interim changes.** Interim changes to this regulation are not official unless they are authenticated by the Administrative Assistant to the Secretary of the Army. Users will destroy interim changes on their expiration dates unless sooner superseded or rescinded.

**Suggested improvements.** The proponent agency of this regulation is the Office of the Deputy Chief of Staff for Personnel. Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to HQDA (TAPC–PDT–S), ALEX VA 22331–0479.

**Distribution.** Distribution of this publication is made in accordance with the requirements on DA Form 12–09–E, block number 2565, intended for command level A for Active Army, Army National Guard, and U.S. Army Reserve.

**Contents** (Listed by paragraph number)

**Chapter 1**
**General Provisions**

*Section I*
*General*
Purpose and Scope • 1–1
References • 1–2
Explanation of abbreviations and terms • 1–3
User guidance • 1–4
Statutory authority • 1–5
Applicability • 1–6
Processing goals • 1–7
DA Form 5138–R (Separation Action Control Sheet • 1–8
Suspension of favorable personnel action • 1–9
Forwarding fingerprints to the Federal Bureau of Investigation (FBI) *(Rescinded.)* • 1–10
Leave in conjunction with separation • 1–11
Separation orders • 1–12
Separation of soldiers with access to Special Intelligence, other compartmented information, or sensitive programs • 1–13
Reduction in grade • 1–14
Disposition of proceedings/records • 1–15

*Section II*
*Guidelines on Separation*
Scope • 1–16
Guidance • 1–17
Counseling and rehabilitative requirements • 1–18
Restrictions on administrative separation and board hearings • 1–19
Suspension of execution of approved separation • 1–20

*Section III*
*Authority to Order and Accomplish Separation*
Authority to order separation prior to expiration of term of service • 1–21
Action by commanders having separation authority • 1–22

*Section IV*
*Separation after* Expiration of Term of Service/Period of Active Duty/Active Duty Training
Time lost to be made good • 1–23
When investigation is initiated with view to trial by court-martial or soldier is awaiting trial or result of trial • 1–24
En route to United States or to territory of origin • 1–25
Medical/dental care required or sick in hospital when period of service expires • 1–26
Indebtedness • 1–27
Retention for miscellaneous reasons • 1–28
Retained in service while subject to criminal jurisdiction of foreign courts but not physically confined by such courts • 1–29

*Section V*
*Separation Prior to Expiration of Term of Service*
Discharge or release from active duty prior to expiration of term of service • 1–30

*Section VI*
*Effective Date of Discharge*
Effective date of discharge • 1–31
Mentally incompetent • 1–32
When retained in service awaiting trial or result of trial • 1–33

*This regulation supersedes AR 635–200, 15 December 1988.

## Section V
## Separation Prior to Expiration of Term of Service

### 1–30. Discharge or release from active duty prior to expiration of term of service

*a.* When separation is to be completed before ETS or the period for which ordered to AD or ADT, it will be completed per this regulation or other applicable regulations by the commanders specified in paragraph 1–21. Exceptions are indicated in *b* and *c* below.

*b.* When discharge or release from AD is to be completed before ETS or the period for which ordered to AD or ADT, time lost need not be made good. The exception is in cases where discharge or release for the convenience of the Government is to be completed per paragraphs 16–6, 16–7, ~~16–9,~~ 16–10 and 16–11. In these cases, the ETS of a soldier with time lost will be adjusted to include such lost time (adjusted ETS).

*c.* Personnel under sentence of dishonorable or bad conduct discharge will not be discharged or released from active duty before appellate review is completed, unless so directed by HQDA.

*d.* When the soldier is discharged per chapters 9, 10, 13, 14, or 15 of this regulation, the case file of the soldier will be reviewed by the commander having authority to approve discharge. The commander will decide whether the reporting requirements set forth in AR 190–10 apply. When such conditions exist in a soldier's case file, the report required by AR 190–10 will be submitted.

*e.* For discharge prior to ETS for immediate reenlistment, see paragraph 16–3.

## Section VI
## Effective Date of Discharge

### 1–31. Effective date of discharge

*a.* The discharge of a soldier for the reasons listed in (1) and (2) below is effective at 2400 on the date of notice of discharge. The soldier will be so notified.

(1) Discharge because of ETS.

(2) Discharge to continue on active duty in the same or another status.

*b.* Release from active duty is effective at 2400 on the date of release when the soldier—

(1) Is transferred to the USAR to complete a reserve obligation.

(2) Is transferred to the temporary disability retired list per AR 635–40.

*c.* For a soldier who entered on active duty from a reserve component, who reverts to USAR or State ARNG control, release is effective at 2400 on the date of expiration of authorized travel time.

*d.* Discharge for all reasons other than those set forth in *a, b,* and *c* above is effective at 2400 on the date of notice of discharge to the soldier.

*e.* Notice of discharge may be either of the following:

(1) Actual, as by delivery to the soldier of the discharge certificate.

(2) Constructive, when actual delivery of the discharge order cannot be accomplished owing to the absence of the soldiers to be discharged. Such a situation arises in the cases of soldiers on authorized leave and in those cases covered by paragraph 2–15. Receipt by the soldier's organization at their proper station of the order directing their discharge will be deemed sufficient notice. The soldier's organization will annotate the date of receipt and the reason actual notice was not given on the discharge order and on the back of the certificate. The annotated discharge certificate, discharge order, and copy of DD Form 214 (Certificate of Release or Discharge from Active Duty) reflecting effective date of discharge, will be sent to the soldier at the address provided for that purpose. The annotated discharge order and copy of DD Form 214, further reflecting date of mailing to the soldier, will be included in the personnel file. The personnel file will be sent to the Commander, US Army Enlisted Records and Evaluation Center, Fort Benjamin Harrison, IN 46249. If the documents mailed to the soldier are returned unclaimed or undeliverable, they will be destroyed.

*f.* Distribution of DD Form 214. Distribution will be made per AR 635–5.

### 1–32. Mentally incompetent

The effective date of discharge of a mentally incompetent soldier may be constructive, as when he or she has been placed in an institution. (See AR 635–40.)

### 1–33. When retained in service awaiting trial or result of trial

When soldiers are retained in service per paragraph 1–24, the effective date of his or her discharge or release depends upon the result of the trial or the disposition made of the case. Examples are given below.

*a.* A soldier who has no lost time to make good under 10 USC 972, who is confined awaiting trial will, if acquitted after ETS, be discharged or released from active duty within 5 days after date of announcement of acquittal. The soldier will be regarded as having been retained in service for the convenience of the Government.

*b.* If convicted and sentenced to either confinement only, or confinement and forfeiture only, a soldier who is confined awaiting trial will be discharged on the adjusted ETS. The adjusted ETS date will be computed by adding to the date of release from confinement or completion of the court-martial case, as applicable, all time lost before and including the original ETS date.

*c.* A soldier who is retained per paragraph 1–24 with a view to trial by court-martial and court-martial charges are not brought or are disposed of without trial, will be separated within 5 days after the decision is made. The soldier will be regarded as having been retained in service for the convenience of the Government.

## Section VII
## Medical Processing

### 1–34. Medical evaluation

*a.* Medical examinations are required for soldiers being separated per paragraph 5–3~~, or 16–4;~~ chapter 8, 9, 12, or 13; chapter 14, section III, ~~for absentees who are returned to military control from a status of AWOL or desertion~~chapter 15; and certain other soldiers as required by AR 40–501, paragraph 8–23 and table 8–3. Medical examinations under other provisions of this regulation are not required, but may be requested by soldiers in writing. (See DA Pam 600–8–11, procedure 1–6.)

*b.* When a soldier is to be processed per paragraph 5–13; chapter 13; chapter 14, section III; or chapter 15, the unit commander must insure that an appropriate mental status evaluation is obtained in addition to the medical examination. A soldier to be processed under the provisions of chapter 10 who requests a medical examination will be required to undergo a mental status evaluation. Detailed information about the reasons for considering the soldier for separation will be furnished the medical examiner to allow a thorough understanding of the contemplated action.

*c.* The servicing medical treatment facility will perform the medical examination, and if required, the mental status evaluation. When only mental status evaluations are required, they will be performed only by a physician or licensed clinical psychologist. When both a medical examination and a mental status evaluation are required, the mental status evaluation may be performed with the examining physician, by a clinical psychologist, or social worker. Except as provided in *d* below, referral to a psychiatrist will be made only when—

(1) Specifically requested by the soldier.

(2) Deemed appropriate by the examining physician.

(3) Specifically requested by the commander who recommended separation or by the board considering separation action.

*d.* Soldiers being considered for discharge per paragraph 5–13 (Personality disorders) must be evaluated by a ~~physician trained in psychiatry and psychiatric diagnosis~~psychiatrist or licensed clinical psychologist.

*e.* When a mental status evaluation is required, DA Form 3822–R (Report of Mental Status Evaluation) will be used. DA Form 3822–R is in the back of this volume. Reproduce it locally on 8½ x 11 inch paper.

*f.* Under no circumstances will medical personnel be used as an investigative agency to determine facts relative to the soldier's behavior.

### 1–35. Disposition through medical channels

*a.* When the medical treatment facility commander determines that a soldier being considered for separation for unsatisfactory performance (chap 13) does not meet retention medical standards (AR 40–501), he or she will process the soldier per AR 40–3. The soldier's unit commander will be notified of this action. The separation action will be closed.

*b.* When the examining medical officer decides that a soldier being considered for separation for misconduct (chap 14)~~or fraudulent entry (chap 7, sec V)~~ does not meet the retention medical standards, he or she will refer the soldier to a medical board. If there is no medical board at the examining facility, the soldier will be referred to the nearest medical treatment facility that does have a medical board. The medical treatment facility commander will furnish a copy of the approved board proceedings to the commander exercising general court-martial jurisdiction over the soldier concerned. A copy will also be furnished to the unit commander. The commander exercising general court-martial jurisdiction will direct the soldier to be processed through disability channels per AR 635–40 when it is determined that—

(1) The disability is the cause or substantial contributing cause of the misconduct.

(2) Circumstances warrant disability processing instead of administrative processing.

*c.* If the general court-martial authority determines that the soldier will be processed for discharge per this regulation and if the soldier is also eligible for retirement per chapter 12, the case will be referred to HQDA (TAPC–PDT–SS), ALEX VA 22331–0479. HQDA will decide whether to retire or discharge the soldier.

*d.* A copy of the signed decision of the general court-martial authority to process the soldier through disability channels will be included in the records. The commander exercising general court-martial jurisdiction will notify the medical treatment facility commander of the decision. Then appropriate further medical processing may be expedited. The commander will also notify the unit commander of the decision to process the soldier through medical channels. The unit commander will close the separation action.

*e.* See paragraph 14–12*c*(2)(*c*) for the disposition of soldiers medically diagnosed as drug dependent.

## Section VIII
## Mobilization Asset Transfer Program

### 1–36. Policy

To retain potential mobilization assets, *only* those soldiers with *no potential* to meet mobilization requirements will be discharged. Soldiers separated because of alcohol or other drug abuse rehabilitation failure, misconduct or homosexuality, or with a characterization of service of under other than honorable conditions will not be transferred to the IRR. All other personnel who have not completed their statutory service obligation (10 USC 651) and who meet the criteria in *a*and *b* below will be transferred to the IRR.

*a.* Except as provided in *d* below, transfer to the IRR to complete a statutory service obligation *is mandatory* for soldiers who have completed basic training (BT) or at least 8 weeks of one station training or one station unit training (OSUT) and are separated for one of the following reasons:

(1) Separation of personnel who did not meet procurement medical fitness standards but meet retention standards. (See para 5–11.)

(2) Sole surviving sons or daughters and surviving family members. (See para 5–4.)

(3) Involuntary separation due to parenthood. (See para 5–8.)

(4) Dependency. (See para 6–3*a*.)

(5) Hardship. (See para 6–3*b*.)

(6) Parenthod of married service women/sole parents. (See para 6–3*b*(1) and (2).)

(7) Pregnancy. (See chap 8.)

(8) Failure to meet Army weight control standards. (See para 5–15.)

(9) Oversea returnees. (See para 16–6.)

(10) Physical disqualification for duty in MOS. (See para 16–7.)

(11) Reduction in authorized strength. (See para 16–8.)

(12) Separation of soldiers of medical holding detaachments/companies. (See para 16–10.)

(13) Separation of personnel assigned to installations or units scheduled for inactivation or permanent change of station. (See para 16–11.)

(14) Holiday early transition program. (See para 16–12.)

*b.* Except as provided in *d* below, the following criteria apply to soldiers who have completed BT or at least 8 weeks of one station training or OSUT and who are to be separated under one of the reasons cited in (1) or (2) below. Soldiers separated under (2) below whose service will be characterized as honorable will be transferred to the IRR. Soldiers separated under (1) below with an uncharacterized ~~separation~~description of service and (2) below whose service is characterized as under honorable conditions will be transferred to the IRR unless *they clearly have no potential for useful service under conditions of full mobilization.* Before making an "no potential" determination, the separation authority *must* give due consideration to all pertinent factors. This includes the positive motivation that a full mobilization may have on the soldier and the probable maturing effect of 2 or more years in age. The fact that the soldier is being separated from active duty for one of these reasons is not sufficient basis, by itself, for a "no potential" determination.

(1) Entry level performance and conduct (chap 11).

(2) Unsatisfactory performance (chap 13).

*c.* The criteria in *a* and *b* above also apply to those ARNGUS and USAR soldiers who are separated while serving under a contractual obligation only, as distinct from a 6-year or 8-year statutory obligation.

*d.* RA soldiers who have completed their statutory service obligation, or who have less than 3 months of such obligation remaining, will be discharged. ARNGUS and USAR Soldiers who have less than 3 months to serve on their statutory or contractual obligation, whichever expires later, will be discharged.

### 1–37. Purpose

The purpose of this policy is to retain in the IRR all soldiers who have *some potential* for useful service under conditions of full mobilization. Many soldiers who are separated in peacetime would be retained during a full mobilization.

### 1–38. Character/description of service

The service of soldiers who are transferred to the IRR under the programs cited in paragraph 1–36 will be characterized as honorable or under honorable conditions, unless~~entry level separation with~~ an uncharacterized ~~discharge is appropriate~~description of service is required for soldiers in entry level status. The character of service will be based upon the soldier's behavior and performance as set forth in chapter 3.

## Section IX
## Naturalized Personnel Separated Under Other Than Honorable Conditions

### 1–39. General

This section prescribes the procedures for notifying the Immigration and Naturalization Service when naturalized personnel are separated under other than honorable conditions.

### 1–40. Revocation of citizenship

The citizenship of soldiers of the United States Armed Forces naturalized through active duty service in the Armed Forces during

**12–27. Periods not creditable for retirement**

None of the following periods are creditable for retirement under this chapter.

*a.* All time required to be made good (10 USC 972). See paragraph 1–23.

*b.* Periods of service voided by the Government other than those voided because of minority.

*c.* Time in a nonpay (noncasualty) status under 37 USC 552(C).

*d.* Service in a Reserve Component not on—

(1) Active duty.

(2) Active duty for training.

(3) Other full-time training duty.

**12–28. Verification of service**

*a.* Each soldier of the Regular Army will be interviewed by the officer having custody of his or her records when the soldier completes 18 years' service for basic pay. The interview determines if the soldier has had service (active Federal service or inactive service in any branch of the Armed Forces) in addition to that shown in the Military Personnel Records Jacket (DA Form 201) or Personal Financial Records, US Army (DA Form 3716). Further verification is not required for soldiers whose only claimed service is Army service which is clearly substantiated in their MPRJ or PFR.

*b.* Army service claimed by the soldier which is not clearly substantiated in his MPRJ or PFR will be verified as follows:

(1) Claimed National Guard service will be verified with the Adjutant General of the State or territory. (See app C for list of addresses.)

(2) If breaks in the applicant's Army service or periods of prior Army service have been previously verified, one copy of DA Form 2339 will be submitted to the Commander, U.S. Army Enlisted Records and Evaluation Center, ATTN: PCRE–RP–R, Fort Benjamin Harrison, IN 46249–5301, requesting verification. It is important that inclusive dates for all service claimed, both active Federal service and inactive service, be furnished.

*c.* Other service claimed by the applicant will be verified by certified statements of service and other official statements. These statements will be furnished from the addresses below. Statements will contain all dates of active duty, active duty for training or other full-time training duty, and all time lost. The original or certified copies will be attached as enclosures to an application for retirement.

(1) Navy. Military Personnel Records Center, GSA (Navy) 9700 Page Boulevard, St. Louis, MO 63132.

(2) Air Force. Military Personnel Records Center, GSA (Air Force), 9700 Page Boulevard, St. Louis, MO 63132.

(3) Marine Corps. Military Personnel Records Center, GSA (Marine Corps), 9700 Page Boulevard, St. Louis, MO 63132.

(4) Coast Guard. Military Personnel Records Center, GSA (Coast Guard), 9700 Page Boulevard, St. Louis, MO 63132.

(5) National Guard. Adjutant General of the State concerned.

*d.* The signature of the commander or personnel officer at the close of section II, DA Form 2339 certifies that the service claimed by the soldier in items 14 through 18, DA Form 2339, is correct. Exceptions are indicated in items 25 or 31.

## Section V
## Medical Examination

**12–29. General**

*a.* Active Army soldiers retiring after more than 20 years active duty are required to undergo a medical examination. This includes Army Reserve and Army National Guard soldiers on active duty. The examination will provide a better health assessment of the soldier and continue the cardiovascular attention. The examination will also record the soldier's state of health and protect the interest of the soldier and the Government.

*b.* Examination will be accomplished not earlier than 4 months and not later than 1 month before the scheduled date of retirement.

*c.* The examining physician will inform the soldier of the results of the medical examination, either verbally or in writing. A copy of the SF 88 may be furnished on request on an individual basis.

*d.* The immediate commander of each soldier requesting retirement will insure that medical examination procedures are followed per AR 40–501 and DA Pamphlet 600–8–9.

**12–30. Hospitalization/Physical Evaluation Board proceedings**

If a soldier who has requested retirement becomes hospitalized or has an identified medical problem, he or she might be referred to a physical evaluation board. The commander of the medical treatment facility, or a senior medical officer who has detailed knowledge of medical fitness and unfitness standards, dispositon of patients, and disability separation processing to whom the commander has delegated such authority will make this decision. If referral to a physical evaluation board will result, the medical treatment facility commander or designated representative will notify HQDA (TAPC–PDT–SR), 2461 Eisenhower Avenue, Alexandria, VA 22331–0479 by mail or message as soon as possible. The notification will request a change of retirement date if appropriate and furnish a copy of the request to the retirement approval authority. If the physical evaluation board is not necessary, but additional medical care is, the retirement will be processed as a nondisability retirement. Continuing medical problems will be treated up to and after the retirement date. Retirement dates will not be changed to continue medical treatment that will extend past the approved retirement date. If referral to a physical evaluation board results, approved retirement dates will not be changed until approved by HQDA (TAPC–PDT–SR).

**12–31. Reports of medical examination**

*a.* A medical examination report for retirement will consist of the originals of the following:

(1) Report of Medical Examination (SF 88).

(2) Report of Medical History (SF 93).

(3) Electrocardiogram properly mounted and identified on clinical record-Electrocardiographic Report (SF 520).

(4) Report of any consultation accomplished.

(5) Complete report of medical board proceedings, if accomplished (AR 40–3)—Medical Board Proceedings (DA Form 3947), Clinical Record-Narrative Summary (SF 502) and Report of Medical Examinations (SF 88).

*b.* One copy of the complete report of medical examination of medical board proceedings will be filed in the Health Record (DD Form 3444 series). Additional copies will be placed in the Health Record for distribution by the transfer activity per AR 635–10.

# Chapter 13
# Separation for Unsatisfactory Performance

## Section I
## General

**13–1. Policy**

A soldier may be separated per this chapter when it is determined that he or she is unqualified for further military service because of unsatisfactory performance. (See chap 1, sec II.) This reason will not be used if the soldier is in entry level status.

**13–2. Criteria**

*a.* Commanders will separate a soldier for unsatisfactory performance when it is clearly established that—

(1) In the commander's judgment, the soldier will not develop sufficiently to participate satisfactorily in further training and/or become a satisfactory soldier, or

(2) (Rescinded.)

(3) The seriousness of the circumstances is such that the soldier's retention would have an adverse impact on military discipline, good order, and morale, and

(4) It is likely that the soldier will be a disruptive influence in present or future duty assignments, and

(5) It is likely that the circumstances forming the basis for initiation of separation proceedings will continue or recur, and

(6) The ability of the soldier to perform duties effectively in the future, including potential for advancement or leadership, is unlikely, and

(7) The soldier meets retention medical standards (AR 40-501). See paragraph 1-34.

*b.* Commanders will initiate separation action only when the soldier is under military control. As an exception, commanders may initiate this action when a soldier is confined by civil authorities and his or her military record indicates that he or she should be processed for separation by reason of unsatisfactory performance. (See chapter 2, section IV for completing proceedings initiated before a soldier departs absent without leave.)

*c.* When a soldier has committed serious acts of misconduct, commanders will not take action per this chapter instead of disciplinary action solely to spare him or her harsher penalties which may be imposed under the UCMJ.

*d.* This provision applies to soldiers who are pregnant and whose substandard duty performance is not caused solely by pregnancy. Substandard duty might include failure to report to duty without medical or military authorization, or refusal of CONUS reassignment during the first 6 months of pregnancy.

*e.* Commanders will consider soldiers meeting the criteria of *a* above, and convicted by court-martial, but not sentenced to a punitive discharge, for administrative separation under this chapter, when the underlying misconduct and the soldier's performance warrant separation. When appropriate, commanders may start separation action while the soldier is serving a sentence to confinement at the installation detention facility.

### 13-3. Separation authority

The commanders specified in paragraph 1-21 are authorized to take final action in cases processed under this chapter.

### 13-4. Counseling and rehabilitation requirements

Before initiating separation action against a soldier, commanders will insure that the soldier has received adequate counseling and rehabilitation. Because military service is a calling different from any civilian occupation, a soldier should not be separated when unsatisfactory performance is the sole reason unless there have been efforts at rehabilitation. Paragraph 1-18 prescribes the counseling and rehabilitation requirements.

## Section II
## Procedures

### 13-5. Action by unit commander when soldier is under military control

When separation for unsatisfactory performance is appropriate, the unit commander will—

*a.* Take action specified in the Notification Procedure (chap 2). Also, see figure 2-5.

*b.* Forward the case recommending separation for unsatisfactory performance.

*c.* Insure that a medical examination and mental status evaluation is obtained per paragraph 1-34.

*d.* When appropriate, forward the case recommending that the soldier be processed through medical channels. This is required when UCMJ action is not initiated and when the soldier has an incapacitating physical or mental illness which was the direct or substantial contributing cause of the conduct for which action is being considered.

### 13-6. Action by commanding officer when soldier is confined

See chapter 2, section IV.

### 13-7. Commanding officer's report

When the immediate commander determines that separation for unsatisfactory performance is in the best interest of the Service, he or she will report the fact. It will be reported in letter form (fig 2-6) to the separation authority specified in paragraph 1-21 through the intermediate commander.

### 13-8. Action by intermediate commander

The intermediate commander will take one of the following actions:

*a.* Disapprove the recommendation and direct reassignment of the soldier to another organization, or direct disposition by other means. In case of reassignment, forward the commanding officer's report to the new organization commander for information.

*b.* Forward the report recommending approval. Recommendation will be made as to characterization of service (see para 2-2*f*(4)).

*c.* Disposition through medical channels is required if the soldier does not meet medical retention standards, and action under the UCMJ is not initiated.

### 13-9. Action by the separation authority

On receiving a recommendation for separation for unsatisfactory performance, the separation authority (para 1-21) will take one of the following actions:

*a.* Disapprove the recommendation and direct reassignment of the soldier to another organization. In this case the commanding officer's report will be forwarded to the new organization commander for information.

*b.* Disapprove the recommendation and return the case to the originator for disposition by other means. The return indorsement will include reasons for considering separation for unsatisfactory performance inappropriate.

*c.* Take other appropriate action under this regulation.

*d.* If the soldier has less than 6 years of total active and/or reserve military service, or has properly waived his or her right to consideration by a board—

(1) Approve separation for unsatisfactory performance, or

(2) Approve separation for unsatisfactory performance and suspend execution of the separation (para 1-20).

*e.* If the soldier has 6 or more years of total active and/or reserve military service and has not executed a waiver, convene a board of officers, as prescribed in chapter 2, to determine whether the soldier should be separated for unsatisfactory performance.

### 13-10. Separation authority action after board hearings

See chapter 2.

### 13-11. Characterization of service

The service of soldiers separated because of unsatisfactory performance will be characterized as honorable or under honorable conditions as warranted by their military record. (See para 3-5 and 3-7.) An honorable characterization of service is generally required when limited use evidence is initially introduced by the Government. (See para 3-8*a* and *g*.)

### 13-12. Type of separation

The criteria in chapter 1, section VIII, will govern whether the soldier will be released from AD or ADT with transfer to the IRR, or discharged. (See para 1-12 for additional instructions on ARNGUS and USAR personnel.)

### 13-13. Reentry into Army

***(Rescinded.)***

CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of April, 2007 a copy of the foregoing "DEFENDANT'S MOTION TO DISMISS, IN PART, AND FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND APPENDIX" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/MEREDYTH D. COHEN