No. 06-829C
(Judge Horn)

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**URMILA BANERJEE,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# PLAINTIFF'S REPLY TO DEFENDANT'S MOTION TO DISMISS AND MOTION FOR JUDGMENT ON THE RECORD AND CROSS-MOTION FOR JUDGMENT ON THE RECORD

---

Thomas J. Reed
Attorney for Plaintiff
Widener University School of Law
Veterans Law Clinic
P.O. Box 7474
Wilmington, DE 19803
TEL: (302) 477-2070
FAX: (302) 477-2257
E-mail: tjreed@mail.widener.edu

Attorney for Plaintiff

# TABLE OF CONTENTS

Table of Contents ........ i

Table of Authorities ........ ii

STATEMENT OF THE ISSUES ........ 1

STATEMENT OF THE CASE ........ 2

STATEMENT OF FACTS ........ 5

SUMMARY OF ARGUMENT ........ 7

ARGUMENT ........ 8

I. DOES THE COURT HAVE ANCILLARY DECLARATORY AND EQUITY JURISDICTION TO AFFORD MS. BANERJEE FULL RELIEF INCLUDING PLACEMENT ON THE U.S. ARMY DISABILITY RETIREMENT LIST? 8

II . WAS THE DECISION OF THE U.S. ARMY BOARD FOR CORRECTION OF MILITARY RECORDS ("ABCMR") ARBITRARY, CAPRICIOUS AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE? 13

CONCLUSION ........ 18

APPENDIX: ARMY REGULATION 40-501 ¶ 3.14

# TABLE OF AUTHORITIES

## CASES

Adkins v. United States, 68 F.3d 1317 (1995) .......... 10, 11, 12
Ayala v. United States, 16 Cl. Ct. 1 (1988) .......... 16
Bivens v. Six Unnamed Agents of the Federal Bureau of Narcotics, ...... 16
403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971)
Feres v. United States, 340 U.S. 135, 71 S. Ct. 153, 95 L. Ed. 152 (1950) 16
Haselrig v. United States, 53 Fed. Cl. 111(2002) .......... 9, 10, 14
Roth v. United States, 378 F.3d 1371 (Fed. Cir. 2004) .......... 11, 12

## STATUTES

5 U.S.C. § 701 .......... 7, 9, 13
10 U.S.C. §1201 .......... 2, 9
10 U.S.C. § 1401 .......... 2, 9
28 U.S.C. § 1346 .......... 2, 9, 10
28 U.S.C. § 1491 .......... 2 , 7, 9, 13
28 U.S.C. §2201 .......... 7
28 U.S.C. § 2202 .......... 7
37 U.S.C. § 204 .......... 10

## REGULATIONS

38 C.F.R. § 4.01 .......... 2
38 C.F.R. § 4.125 .......... 18

## RULES OF COURT

U.S. Court of Federal Claims Rule 12(b)(1) .......... 1, 8, 18
U.S. Court of Federal Claims Rule 52.1 .......... 6

## ARMY REGULATIONS

Army Regulations 40-501 ¶ 3 .......... 17
Army Regulations 40-501 ¶ 2-27 .......... 17
Army Regulation 40-501 ¶ 3.14 .......... 17
Army Regulation 635-200, Chapter 13 .......... 4
Army Regulation 645-40 ¶ 3.1 .......... 7, 16, 17

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| URMILA BANERJEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 06-829C |
| v. | ) | May 5, 2007 (Judge Horn) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## REPLY TO DEFENDANT'S MOTION TO DISMISS AND MOTION FOR JUDGMENT ON THE RECORD AND CROSS-MOTION FOR JUDGMENT ON THE RECORD

Plaintiff Urmila Banerjee makes the following Reply to Defendant's Motion to Dismiss for lack of jurisdiction under Rule 12(b)(1) of the Rules of the U.S. Court of Federal Claims addressed to Counts I and II of complaint. Banerjee also makes the following reply to Defendant's Motion for Judgment on the Administrative Record on Count III of Complaint. Banerjee also respectfully moves for judgment on the administrative record and for all other appropriate relief.

## STATEMENT OF THE ISSUES

1. DOES THE COURT HAVE ANCILLARY DECLARATORY AND EQUITY JURISDICTION TO AFFORD MS. BANERJEE FULL RELIEF INCLUDING PLACEMENT ON THE U.S. ARMY DISABILITY RETIREMENT LIST?

2. WAS THE DECISION OF THE U.S. ARMY BOARD FOR CORRECTION OF MILITARY RECORDS ("ABCMR") ARBITRARY, CAPRICIOUS AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE?

## STATEMENT OF THE CASE

Ms. Banerjee seeks an award of back military disability retirement pay amounting to $117,000 at the inception of her suit. She also seeks ancillary equitable and declaratory relief determining that she was more than 30% disabled as of June 24, 1991, the date she was released from active duty, and an order directing the Secretary of the Army to place her on the Disability Retirement List.

Ms. Banerjee contends the Court has jurisdiction under 28 U.S.C. § 1346 (Tucker Act) because she has a statutory claim for disability retirement pay based on 10 U.S.C. §1201 (Disability Retirement Pay) computed according to 10 U.S.C. § 1401. She also contends that she is entitled to declaratory and equitable relief ancillary to her complaint based on 28 U.S.C. § 1491. She seeks an order of the Court finding that as of June 24, 1991, she was more than 30% disabled as defined by Army Regulations and 38 C.F.R. § 4.01 et seq. (VA Schedule for Rating Disabilities) and placing her on the Army Permanent Disability Retirement List.

Ms. Banerjee relies on the following pertinent facts from the Joint Statement of Facts and Administrative Record to support her claim:

Ms. Banerjee enlisted in the United States Army and entered active duty on October 9, 1990. AR 280.[1] Ms. Banerjee attained the rank of Specialist, pay grade E-4, and was released from

[1] "AR __" refers to the Administrative Record.

active duty on June 24, 1991. *Id.* She completed basic training at Fort Dix, New Jersey, AR 300, and was assigned to the Academy of Health Sciences, at Fort Sam Houston, Texas, for advanced individual training. AR 301.

On May 17, 1991, Ms. Banerjee was counseled that her overall behavior was not in keeping with military standards. AR 291. Ms. Banerjee indicated that she did not wish to remain in the Army and requested to be discharged. *Id.* On May 22, 1991, Ms. Banerjee was again counseled regarding her motivation and ability to become a productive soldier and was advised that proceedings were being initiated to separate her from the Army. AR 289. She once again indicated her desire to be discharged. *Id.*

In preparation for her recommended separation, Ms. Banerjee underwent a medical examination and mental evaluation. AR 62-69. On May 28, 1991, Major Stephen Brannen, an Army Medical Service Office gave Ms. Banerjee a Mental Status Evaluation. AR 64. Major Brannan found her to be fully alert and oriented, to have good memory, and a clear and normal thought process. *Id.* Further, Major Brannen determined Ms. Banerjee had the mental capacity to understand and participate in the proceedings, and was mentally responsible. *Id.* He specifically found that she met the retention requirements of Chapter 3, Army Regulation 40-501, Standards of Medical Fitness. AR 64. He also stated there was "no evidence of a mental disease or defect of psychiatric significance or of sufficient severity to warrant disposition through medical channels." *Id.* After noting her continued desire to be separated, he concluded that she was cleared for administrative action deemed appropriate by her command. *Id.*

On May 22, 1991, a bone scan was performed on Ms. Banerjee that found a stress fracture of the distal third metatarsal of the left foot, as well as stress related changes of the tibias and the left foot. AR 69. The treating medical officer did not recommend that Banerjee be reviewed by a Medical Evaluation Board, although the stress fractures were noted on May 22, 1991. *Id.* On May 31, 1991, Ms. Banerjee underwent a medical examination as a part of the separation proceedings. AR 62, 63, 66. The examination also revealed that she had stress fractures. *Id.* The physician concluded that although Ms. Banerjee had stress fractures, she was nevertheless qualified for separation. AR 66.

On June 5, 1991, Ms. Banerjee was relieved from her advanced individual training in her military occupational specialty, 91Q (Pharmacy Specialist) because she was being processed for separation. AR 305. On June 14, 1991, Ms. Banerjee's commander initiated separation proceedings under Army Regulation 635-200, Chapter 13, for unsatisfactory performance. AR 285-88. Ms. Banerjee was advised of her rights, which she acknowledged with her initials and signature. Id. The appropriate separation authority approved Ms. Banerjee's discharge and issuance of an honorable discharge. AR 281.

On June 24, 1991, Ms. Banerjee was honorably discharged from the Army under the provisions of Army Regulation 635-200, Chapter 13, for unsatisfactory performance. AR 280.

On May 22, 2000, Ms. Banerjee submitted an Application for Change of Discharge to the Army Board for Correction of Military Records ("ABCMR"). AR 6, 15-279. Ms. Banerjee

requested that her military records be corrected to indicate she is qualified for disability retirement or pension. AR 6. She stated that she was entitled to a formal Medical Review Board prior to her separation. *Id.*

Ms. Banerjee's application included a statement from Colonel Hansa Raval, a retired Army Medical Corps Officer regarding Ms. Banerjee's application, AR 20, her military records, AR 21-82, as well as medical records for treatment she received after her discharge from the Army and disability rating decisions from the Veterans Administration ("VA"). AR 83-279.

Ms. Banerjee's VA medical records indicate that beginning July 23, 1991, she was seen for various issues, including hip, arch, knee, and thigh pain. AR 85. An August 15, 1991, VA radiology report stated a bilateral exam indicated a normal right and left knee. AR 83. Ms. Banerjee continued to receive occasional treatment related to her knee, foot, and hip pain. This included an April 28, 1992, examination that indicated a good range of motion to knees and hip, no edema, and no tenderness. AR 99.

Ms. Banerjee's VA medical records also indicate that she was seen by a VA psychiatrist on July 25, 1991, one month after her discharge. AR 86. At that time, Ms. Banerjee was diagnosed "with a profile of a character disorder and depression." Id. Ms. Banerjee was seen on a weekly basis, AR 89, and was diagnosed with "Incipient schizophrenic decompensation" at a follow up visit on August 15, 1991. AR 90. On August 23, 1991, Ms. Banerjee was diagnosed with acute schizophrenic disorder. AR 93. She continued to receive treatment from the VA in the following

years after her diagnosis. AR 95-122.

Ms. Banerjee's VA records also indicate that (after several denials) on September 17, 1999, the VA issued a rating decision regarding Ms. Banerjee's claims. AR 128-32. The VA determined:

> 1. Service connection for paranoid schizophrenia is granted with an evaluation of 70 percent effective June 16, 1998.
> 2. Service connection for stress changes, tibias (claimed as stress fractures) is denied.
> 3. New and material evidence adequate to reopen the claim for left hip and femur has not been submitted.
> AR 128. Service connection for paranoid schizophrenia was granted on the basis of presumption. Id.

Ms. Banerjee's complaint includes a VA decision granting her an entitlement to service connection for paranoid schizophrenia, evaluated as 100 percent disabling, effective August 15, 1991. Compl. Ex. B at 9. The VA based its service connection on a presumption, citing 38 C.F.R. 3.400(b)(2)(ii) as authority, which states:

> Date entitlement arose, if claim is received within 1 year after separation from active duty; otherwise date of receipt of claim, or date entitlement arose, whichever is later. Where the requirements for service connection are met during service, the effective date will be the day following separation from service if there was continuous active service following the period of service on which the presumption is based and a claim is received within 1 year after separation from active duty.

## STATEMENT OF FACTS

Plaintiff and Defendant submitted a separate Joint Statement of Facts to the Court in compliance with the Court' Scheduling Order of 21 February 2007 and Rule 52.1(b) of the U.S. Court of Federal Claims on 11 April 2007. Plaintiff and Defendant base their motions and

replies upon the Joint Statement of Facts.

## SUMMARY OF ARGUMENT

Ms. Banerjee contends that Counts I and II of her complaint refer to ancillary jurisdiction conferred on this Court by 28 U.S.C.§ 1491(a)(2). Her references to 5 U.S.C. § 701 et seq. and 28 U.S.C. §2201 and 2202 are surplus and should be struck from the complaint counts. She asserts that she is not seeking tort damages against the United States due to sexual harassment by fellow soldiers in 1991, nor is she seeking damages due to the deprivation of her civil rights by reason of sexual harassment.

Ms. Banerjee seeks monetary compensation consisting of disability retired pay, and ancillary relief remanding her case to the ABCMR for review of the per cent of disability due to her mental condition and stress fractures, and placement on the Disability Retirement List. She contends that at the time of her discharge on June 24, 1991, she was unfit for military service due to an active psychosis that had manifested itself during Advanced Individual Training at Ft. Sam Houston, TX. She asserts that she furnished the ABCMR with a superabundance of evidence showing that she had a severe, disabling mental illness -- schizophrenia -- that was mis-diagnosed or ignored by the Army physician who examined her prior to her administrative separation. Within two months' time after her discharge, she contends she was correctly diagnosed as a schizophrenia victim. Since she had no mental disease or disorder on entering active service with the Army, her condition was presumed to have been the result of active military duty. Army Regulation 645-40 ¶ 3.1(a) The Army was required to rebut that

presumption by a preponderance of the evidence. *Id.* Hence, she contends that she was improperly and wrongfully discharged for unsatisfactory performance when she ought to have been given a Medical Evaluation Board review, and Physical Evaluation Board determination of the per cent of her disability due to her condition.

Ms. Banerjee argues that the ABCMR decision that refused to correct her military record to reflect that she was unfit for further military service by reason of a disease or disorder was arbitrary and capricious because it was based on the ABCMR's acceptance of one Army psychiatrist's opinion that her mental disease was not significant enough to refer to an MEB. AR 64. The ABCMR made this arbitrary choice, despite evidence that VA psychotherapists diagnosed her schizophrenia within two months after she was released from active duty. AR 86, 90, 93. The ABCMR also refused to find that Ms. Banerjee's stress fractures, documented in her service medical records, AR 62, 66, 69, should have been referred to an MEB, despite the fact that the VA found those fractures to be service-connected disabilities meriting VA compensation payments. AR 179-82.

## ARGUMENT

### 1. DOES THE COURT HAVE ANCILLARY DECLARATORY AND EQUITY JURISDICTION TO AFFORD MS. BANERJEE FULL RELIEF INCLUDING PLACEMENT ON THE U.S. ARMY DISABILITY RETIREMENT LIST?

The United States was confused by Ms. Banerjee's complaint. It devoted more than half of its brief to a Rule 12(b)(1) motion to Dismiss Counts I and II of complaint, as if Ms. Banerjee

had relied on the Declaratory Judgment Act and the Administrative Procedures Act for jurisdictional purposes. In fact, Counts I and II of Complaint are proceedings for ancillary relief under 28 U.S.C. § 1491(a)(2). Jurisdiction is, and always has, been grounded on 28 U.S.C. § 1346 which permits Ms. Banerjee to seek to recover money from the United States for a contractual claim based on 10 U.S.C. § 1201 and 1401. As the Court well knows, § 1491(a)(2) contains the following pertinent language:

(2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just.

Since the court has the power to issue an order declaring that Ms. Banerjee was wrongfully discharged and should be placed on the Disability Retirement List, Count I of complaint asked for ancillary relief . The governing statutory guidelines are those contained in 28 U.S.C. §701 et seq. (Administrative Procedure Act) which highlight the nature and scope of judicial review. In *Haselrig v. United States*, 53 Fed. Cl. 111(2002) an Air Force Officer was not promoted to Lt. Colonel and was forcibly retired. He asserted in addition to his Tucker Act claim for back pay and allowances, that he should be restored to active duty and his case go before a new promotion board because the Air Force failed to follow its own procedure in declining to promote him. *Id.* at 113 The United States moved to dismiss his claim as non-justiciable, and alternatively to grant the United States judgment on the administrative record. This Court held that the plaintiff was entitled to additional ancillary relief when he was denied promotion to Lt. Colonel, comparable to the kind of relief routinely granted by other Article III courts reviewing an

officer's termination for non-promotion. *Id.* at 120-23. The Court held that Maj. Haselrig's claims were justiciable. *Id.* at 123.

*Haselrig* followed the Federal Circuit's opinion in *Adkins v. United States*, 68 F.3d 1317 (1995). Adkins, an Army officer, was passed over for promotion to Colonel. He sought an order from the court "that certain material be removed from Adkins's Official Military Personnel File ("OMPF") and that all obstacles to Adkins's restoration to the 1988 Colonel Army Promotion List be removed." *Id.* at 1318. The United States moved to dismiss Adkins' claims for non-monetary relief because the Court of Federal Claims lacked jurisdiction to decide the issues relating to removal of documents from a personnel file, and otherwise restore Adkins to a promotion list. *Id.* The Federal Circuit held that the Court of Federal Claims had jurisdiction under 28 U.S.C. § 1346 to order specific relief. *Id.* at 1319.

The *Adkins* court held that LtCol. Adkins had invoked the Court of Federal Claims' jurisdiction by raising a Tucker Act claim under a money-mandating statute. Prior to his involuntary retirement, Adkins was "a member of a uniformed service who is on active duty" as defined by 37 U.S.C. § 204(a)(1). So long as Lt. Col. Adkins' was involuntarily retired improperly, he had a right to his pay and a Tucker Act claim for back pay and allowances. *Id.* at 1321. The Court then tackled the difficult issue of "justiciability:"

> Even where a court possesses jurisdiction to hear a claim, it may not do so in cases where the claim presents a nonjusticiable controversy -- i.e., the claim is such that the court lacks "ability to supply relief." *Murphy v. United States*, 993 F.2d 871, 872 (Fed. Cir. 1993). A court is said to have such ability when "the duty asserted can be judicially identified and its breach judicially determined, and . . . protection for the right can be judicially molded."

> *Baker v. Carr*, 369 U.S. 186, 198, 7 L. Ed. 2d 663, 82 S. Ct. 691 (1962). See also *Voge v. United States*, 844 F.2d 776, 780 (Fed. Cir. 1988) ("A controversy is 'justiciable' only if it is 'one which the courts can finally and effectively decide, under tests and standards which they can soundly administer within their special field of competence.'" (quoting *Greene v. McElroy*, 103 U.S. App. D.C. 87, 254 F.2d 944, 953 (D.C. Cir. 1958), rev'd on other grounds, 360 U.S. 474, 3 L. Ed. 2d 1377, 79 S. Ct. 1400 (1959)). Because "orderly government requires that the judiciary be . . . scrupulous not to interfere with legitimate Army matters," *Orloff v. Willoughby*, 345 U.S. 83, 94, 97 L. Ed. 842, 73 S. Ct. 534 (1953), "justiciability is a particularly apt inquiry when one seeks review of military activities." *Murphy*, 993 F.2d at 872. An appellate court decides de novo whether a claim challenging a military decision presents a nonjusticiable political question. See, e.g., *Bledsoe v. Webb*, 839 F.2d 1357, 1359 (9th Cir. 1988).

*Id.* at 1321.

The *Adkins* court stated that executive decisions to promote or retain a service-member are generally non-justiciable, as are decisions relating to placing a service member on disability retirement because the courts lack the expertise required to make those types of decisions. *Id.* at 1322. However, the courts are able to review the service's compliance with its own rules and procedures:

> Not every claim arising from a military decision presents a nonjusticiable controversy, however. This court has consistently recognized that, although the merits of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular procedure followed in rendering a military decision may present a justiciable controversy. . . . Other Circuit Courts of Appeals have recognized a similar distinction. See, e.g., *Watson v. Arkansas Nat'l Guard*, 886 F.2d 1004, 1011 n.16 (8th Cir. 1989) ("Adjudication of [plaintiff's] claims requires the district court to determine only whether the Secretary's decision making process was deficient, not whether his decision was correct."); *Kreis v. Secretary of Air Force*, 275 U.S. App. D.C. 390, 866 F.2d 1508, 1511 (D.C. Cir. 1989) (same). In cases in which procedural violations are alleged, the test or standards against which this court measures the military's conduct are inherent: they are the applicable statutes and regulations. See *Murphy*, 993 F.2d at 873. In such instances, this court does not improperly exercise any discretion reserved for the military; "it merely determines whether the procedures were followed by applying the facts to the statutory or regulatory standard." Id.(footnote 8 omitted intentionally)

*Id.* at 1322-23.

*Haselrig* was followed by the decision in *Roth v. United States*, 378 F.3d 1371 (Fed. Cir. 2004). Major Roth had been denied promotion to LtCol. and was involuntarily retired from the U.S. Air Force. *Id.* at 1374. Roth asked the Court of Federal Claims to correct his Air Force records by adding several documents to his file that had been excised by the Air Force, and the Court of Federal Claims voided his calendar year 1993 and 1994 nonselections for promotion to lieutenant colonel and directed the Board to reinstate him to active duty at the rank of major, then to send him before a Special Selection Board to consider his promotion to Lt. Col. *Id.* at 1375, citing *Roth v. United States*, 56 Fed. Cl. 239 (2003). The United States agreed that the Court of Federal Claims had Tucker Act jurisdiction, but argued that Maj. Roth's request for specific relief were non-justiciable. The United States also argued that the Court of Federal Claims exceeded its authority when it retroactively reinstated Maj. Roth to active duty. *Id.*

The Federal Circuit affirmed the Court of Federal Claims in part, and reversed and remanded the Roth case with directions that the Court of Federal Claims instruct the AFBCMR to make the four record corrections noted by the Court, to correct the record with respect to the gap in service between January 31, 1989, and June 27, 1991 and to order the Board to convene SSBs for the 1993 and 1994 lieutenant colonel selection boards so that Roth could be considered for promotion to Lt. Col. in light of the corrections made to his military records. *Id.* at 1376. The Court' analysis respecting ancillary relief in Tucker Act cases is instructive:

> We spelled out in *Murphy* that a court may in fact decide whether the military followed its own procedures, which by their nature limit the military's discretion. 993 F.2d at 873. Accordingly, in cases in which procedural violations are alleged, "the test or standards

> against which this court measures the military's conduct are inherent: they are the applicable statutes and regulations." *Adkins*, 68 F.3d at 1323. To engage in such an inquiry does not intrude upon any discretion reserved exclusively for the military; rather, the inquiry merely ascertains whether applicable military procedures, statutory or regulatory, were followed. We have therefore determined that questions of procedural compliance are justiciable.

*Id.* at 1385.

Ms. Banerjee asks the Court to grant ancillary relief of the type and kind approved by *Adkins* and *Roth.* She does not claim that the Declaratory Judgment Act or the Administrative Procedures Act confer a waiver of the right of the United States to be sued in the Court of Federal Claims.

Ms. Banerjee sought only the kind of relief available under § 1491(a)(2) by this Count of Complaint and she would be content if the Court struck all reference to 5 U.S.C. § 701 et seq. and to the declaratory judgment act from Counts I and II of her complaint as surplusage so long as it was understood that the Court had the broad power to grant specific non-cash relief to her. Ms. Banerjee requests the Court order the ABCMR to correct her record to reflect that she was not fit for military duty at the time of her discharge by reason of a mental disease or disorder that manifested itself for the first time while Ms. Banerjee was stationed at Ft. Sam Houston, TX, that the ABCMR be directed to reconsider its finding that she was not entitled to be placed on the Temporary or Permanent Disability Retirement List, as well as an award of back retirement pay.

**2. WAS THE DECISION OF THE U.S. ARMY BOARD FOR CORRECTION OF MILITARY RECORDS ("ABCMR") ARBITRARY, CAPRICIOUS AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE?**

The United States and Ms. Banerjee agree on the standard and scope of review of an ABCRM decision: an ABCMR decision may be reversed if it was arbitrary, capricious and unsupported by substantial evidence:

> When a plaintiff challenges an adverse military personnel decision, the applicable standard of review is whether the adverse decision "was arbitrary, or capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation or mandatory published procedure of a substantive nature, by which a plaintiff has been seriously prejudiced, and money is due." *Sanders v. United States*, 219 Ct. Cl. at 298, 594 F.2d at 811; see also *Chappell v. Wallace*, 462 U.S. 296, 303, 76 L. Ed. 2d 586, 103 S. Ct. 2362 (1983) (citing *Grieg v. United States*, 226 Ct. Cl. 258, 640 F.2d 1261 (1981), cert. denied, 455 U.S. 907, 71 L. Ed. 2d 444, 102 S. Ct. 1251 (1982) and Sanders); *Porter v. United States*, 163 F.3d at 1312; *Doe v. United States*, 132 F.3d 1430, 1434 (Fed. Cir. 1997); *Wronke v. Marsh*, 787 F.2d 1569, 1571-72, 1576 (Fed. Cir.), *cert. denied*, 479 U.S. 853, 93 L. Ed. 2d 121, 107 S. Ct. 188 (1986).

*Haselrig*, 53 Fed. Cl.124.

The ABCMR's decision not to place Ms. Banerjee on disability retirement was arbitrary and capricious and made in the face of substantial evidence submitted by Ms. Banerjee.

First, Ms. Banerjee had some type of mental breakdown when she was stationed at Fort Sam Houston involving her company commander and her fellow soldiers. She went through basic training and was assigned to Fort Sam Houston to learn pharmacy as a pharmacist's assistant. AR 301. At Fort Sam Houston, she was unable to meet basic military behavior standards and her company commander initiated her administrative separation from the Army. AR 289. Major Brannen, an Army psychiatrist, gave Ms. Banerjee a mental status examination and concluded that she was mentally responsible and able to participate in her administrative separation. This examination took place on May 28, 1991. Brannan wrote in his report that there was " no

evidence of a mental disease or defect of psychiatric significance of sufficient severity to warrant disposition through medical channels." AR 64. Major Brannen did not state that Ms. Banerjee had no mental disease or disorder. *Id.*

On July 26, 1991, less than two months later, a VA psychiatrist diagnosed Ms. Banerjee as suffering from "a character order and depression." AR 86. Twenty days later, on August 15, her therapist changed her diagnosis to "incipient schizophrenic decompensation." AR 90. On August 23, eight days later, her therapist gave Ms. Banerjee the diagnosis of "acute schizophrenic disorder." AR 93.

Major Brannen's May 28, 1991, report is inconsistent with the findings of two other psychotherapists who saw Ms. Banerjee within two months after her discharge from the Army. His conclusion flies in the face of two psychiatric diagnoses of serious mental diseases or disorders within 60 days after Ms. Banerjee's discharge. AR 86, 89, 90. It is also inconsistent with the VA's award of 100% disability compensation for service-connected schizophrenia, with an effective date of August 15, 1991, within 60 days after Ms. Banerjee was discharged from the Army. Complaint Ex. B at 9.

It is also inconsistent with the report of Col. Hansa Raval, a medical officer, who provided special care to Ms. Banerjee in 1991 at Fort Sam Houston, TX. According to Col. Raval said: "When I first met Ms. Banerjee in January 1991, she was a very happy vibrant person and appeared to be very emotionally grounded. In the month of May and June, before her discharge,

she was extremely depressed, fearful and in emotional turmoil." AR 20. According to Col. Raval, Ms. Banerjee was subjected to multiple incidents of sexual harassment by soldiers from her unit. Ms. Banerjee has not asserted any kind of claim for any torts committed by service members because *Feres v. United States*, 340 U.S. 135, 71 S. Ct. 153, 95 L. Ed. 152 (1950) erected a complete bar to suits against the United States arising out of the actions of military personnel against other military personnel. She is not asserting a claim based on denial of her civil rights under *Bivens v. Six Unnamed Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971) because the Court of Federal Claims has no jurisdiction over *Bivens*-type claims. *See, e.g. Ayala v. United States*, 16 Cl. Ct. 1, 3-4 (1988) (held: Court has no jurisdiction over Title VII Civil Rights Actions; Bivens-type claim dismissed by District Court prior to transfer). The statute of limitations for any Title VII claim by Ms. Banerjee expired many years ago.

Ms. Banerjee was presumed to be physically and mentally sound prior to entering military service, except for disabilities noted at the time of her pre-enlistment physical examination. Army Regulation 645-40 ¶ 3-1 (a). Any disease discovered after Ms. Banerjee entered the Army is presumed not to be due to her own misconduct and incurred in line of duty. *Id.* The burden of overcoming these presumptions by a preponderance of the evidence is on the Army. *Id.*

Ms. Banerjee had a psychotic episode during military service provoked by sexual harassment by her fellow soldiers. She also suffered from stress fractures that made it difficult for her to keep up with her fellow soldiers on the march and during physical training. See SF 88 AR 62, 66, 69.

She reported the harassment incidents to her commanding officer, but her reports were ignored according to Col. Raval. AR 20. Major Brannen, who was unaware that Ms. Banerjee had been the victim of sexual harassment, a history not communicated to him by Ms. Banerjee's superiors at Ft. Sam Houston, simply mis-diagnosed her apathetic state. She ought to have been referred to a Medical Evaluation Board for her psychotic condition and for her stress fractures. Army Regulation 645-40 ¶ 3-1 mandated this result on the medical and psychiatric evidence as it existed in May and June, 1991.

The ABCMR's acceptance of Maj. Brannen's summary report over Ms. Banerjee's cumulative evidence is not simply a disagreement about the weight and substance of the evidence. It is a mis-application of the Army's standards of Medical Fitness as outlined in Army Regulation 40-501. Army Regulation 40-501 ¶ 3.14(f) states that the victim of a fracture of any part of the lower extremity that a "bone fusion defect when manifested by more than moderate pain and loss of function" is cause to refer the soldier to a Medical Evaluation Board.("MEB"). According to Army Regulation 40-501 ¶ 2-27 ( c) any soldier with "[C]urrent. . . disorders with psychotic features such as schizophrenia. . ." is unfit for military service and should be referred to an MEB. Ms. Banerjee was unfit for military service as a pharmacy technician by reason of a severe mental illness provoked by in-service incidents and by reason of a badly healed stress fracture of the foot. . The ABCMR had Col. Raval's letter before it. AR 20. It had the copious medical and psychiatric reports from VA psychiatrists and psychologists diagnosing Ms. Banerjee's condition as schizophrenia and placing it origin during her military service. See e.g. AR 86, 90-93, 95, 115-18, 222-24. The ABCMR had the report of Dr. Apud for the National

Institute for Mental Health's special study group that correctly diagnosed Ms. Banerjee's illness as schizophrenia and connected her mental condition to her military service period. AR 362-68.

On remand, the ABCMR may determine Ms. Banerjee's per-cent of disability due to her stress fractures and due to her serious mental disorder as of June, 1991, when she was discharged. Since the ABCMR uses the VA Schedule for Rating Disabilities for appraisal of per-cent of disability, the ABCMR should be directed to consult 38 C.F.R. §§ 4.125 with regard to use of DSM-IV criteria for diagnoses and diagnosis 9203 (paranoid schizophrenia)using the general rating formula following diagnosis 9440 (Chronic Adjustment Disorder).

**CONCLUSION**

Therefore, the Court should overrule the United States' Motion to Dismiss under Rule 12(b)(1), strike as surplus any reference to the Administrative Procedure Act and Declaratory Judgment Act, and overrule the United States' Motion for Judgment on the Administrative Record.

The Court should also grant Plaintiff's Motion for Judgment on the Administrative Record as supplemented, and make an appropriate award of back retirement pay with ancillary relief consisting of an appropriate remand order to the ABCMR directing it to review the medical and psychiatric evidence supporting unfitness for military service in June, 1991, considering the failure of the ABCMR to articulate the reasons and bases for its decision that Ms. Banerjee was

fit for military service in June, 1991, to review the Schedule for Rating Disabilities to assess the degree of her unfitness, and for all other relief.

DATED: May 10, 2007

/s/ Thomas J. Reed
Widener University School of Law
Veterans Law Clinic
P.O. Box 7474
Wilmington, DE 19803
TEL: (302) 477-2070
FAX: (302) 477-2257
E-mail: tjreed@mail.widener.edu

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of May, 2007, a copy of the foregoing Reply to Defendant's Motion to Dismiss and Motion for Judgment on the Record and Cross-Motion for Judgment on the Record was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system, Parties may access this filing through the Court's system.

/s/ Thomas J. Reed
Attorney for Plaintiff
Widener University School of Law
Veterans Law Clinic
P.O. Box 7474
Wilmington, DE 19803
TEL: (302) 477-2070
FAX: (302) 477-2257
E-mail: tjreed@mail.widener.edu
Veterans Law Clinic

(4) Hand (for this purpose, combined joint motion is the arithmetic sum of the motion at each of the three finger joints (VASRD))—an active flexor value of combined joint motions of 135 degrees in each of two or more fingers of the same hand, or an active extensor value of combined joint motions of 75 degrees in each of the same two or more fingers, or limitation of motion of the thumb that precludes opposition to at least two finger tips.

*c.* Recurrent dislocations of the shoulder, when not repairable or surgery is contradicated.

### 3–13. Lower extremities

The causes for referral to an MEB are as follows (see also para 3–14):

*a. Amputations.*

(1) Lower extremity amputations are defined, for purposes of this regulation, as follows:

*(a)* Loss of toes that precludes the abilities to run or walk without a perceptible limp and to engage in fairly strenuous jobs.

*(b)* Any loss greater than that specified above to include foot, ankle, below the knee, above the knee, femur, hip.

(2) Soldiers with amputations will (assuming no other disqualifying medical conditions) be provided a temporary profile not less than 4 months (but not to exceed 1 year) to enable the Soldier to attain maximum medical benefit.

*b. Feet.*

(1) Hallux valgus when moderately severe, with exostosis or rigidity and pronounced symptoms; or severe with arthritic changes.

(2) Pes planus, when symptomatic, more than moderate, with pronation on weight bearing which prevents the wearing of military footwear, or when associated with vascular changes.

(3) Pes cavus when moderately severe, with moderate discomfort on prolonged standing and walking, metatarsalgia, and which prevents the wearing of military footwear.

(4) Neuroma that is refractory to medical treatment, refractory to surgical treatment, and interferes with the satisfactory performance of military duties.

(5) Plantar fascitis or heel spur syndrome that is refractory to medical or surgical treatment, interferes with the satisfactory performance of military duties, or prevents the wearing of military footwear.

(6) Hammertoes, severe, that precludes the wearing of appropriate military footwear, refractory to surgery, or interferes with satisfactory performance of duty.

(7) Hallux limitus, hallux rigidus.

*c. Internal derangement of the knee.*

(1) Residual instability following remedial measures, if more than moderate in degree.

(2) If complicated by arthritis, see paragraph 3–14*a*.

*d. Joint ranges of motion (ROM).* ROM that does not equal or exceed the measurements listed below. Measurements should be made with a goniometer (a bubble goniometer/inclinometer is also acceptable) and conform to the methods illustrated and described in the VASRD.

(1) Hip—flexion to 90 degrees or extension to 0 degree.

(2) Knee—flexion to 90 degrees or extension to 15 degrees.

(3) Ankle—dorsiflexion to 10 degrees or planter flexion to 10 degrees.

*e.* Shortening of an extremity that exceeds 2 inches.

*f.* Recurrent dislocations of the patella.

(See also para 3–14.)

### 3–14. Miscellaneous conditions of the extremities

The causes for referral to an MEB are as follows (see also paras 3–12 and 3–13):

*a.* Arthritis due to infection, associated with persistent pain and marked loss of function with objective x-ray evidence and documented history of recurrent incapacity for prolonged periods. For arthritis due to gonococcic or tuberculous infection, see paragraphs 3–40 *j*and 3–45*b*.

*b.* Arthritis due to trauma, when surgical treatment fails or is contraindicated and there is functional impairment of the involved joints so as to preclude the satisfactory performance of duty.

*c.* Osteoarthritis, with severe symptoms associated with impairment of function, supported by x-ray evidence and documented history of recurrent incapacity for prolonged periods.

*d.* Avascular necrosis of bone when severe enough to prevent successful performance of duty.

*e.* Chondromalacia or osteochondritis dissecans, severe, manifested by frequent joint effusion, more than moderate interference with function, or with severe residuals from surgery.

*f.* Fractures.

(1) Malunion of fractures, when, after appropriate treatment, there is more than moderate malunion with marked deformity and more than moderate loss of function.

(2) Nonunion of fractures, when, after an appropriate healing period, the nonunion precludes satisfactory performance of duty.

(3) Bone fusion defect, when manifested by more than moderate pain and loss of function.

(4) Callus, excessive, following fracture, when functional impairment precludes satisfactory performance of duty and the callus does not respond to adequate treatment.

*g.* Joints.

(1) Arthroplasty with severe pain, limitation of motion, and of function.

(2) Bony or fibrous ankylosis, with severe pain involving major joints or spinal segments in an unfavorable position, and with marked loss of function.

(3) Contracture of joint, with marked loss of function and the condition is not remediable by surgery.

(4) Loose bodies within a joint, with marked functional impairment and complicated by arthritis to such a degree as to preclude favorable results of treatment or not remediable by surgery.

(5) Prosthetic replacement of major joints if there is resultant loss of function or pain that precludes satisfactory performance of duty.

*h.* Muscles.

(1) Flaccid paralysis of one or more muscles with loss of function that precludes satisfactory performance of duty following surgical correction or if not remediable by surgery.

(2) Spastic paralysis of one or more muscles with loss of function that precludes the satisfactory performance of military duty.

*i.* Myotonia congenita.

*j.* Osteitis deformans (Paget's disease) with involvement of single or multiple bones with resultant deformities or symptoms severely interfering with function.

*k.* Osteoarthropathy, hypertrophic, secondary with moderately severe to severe pain present, with joint effusion occurring intermittently in one or multiple joints, and with at least moderate loss of function.

*l.* Osteomyelitis, chronic, with recurrent episodes not responsive to treatment and involving the bone to a degree that interferes with stability and function.

*m.* Tendon transplant with fair or poor restoration of function with weakness that seriously interferes with the function of the affected part.

(See also paras 3–12 and 3–13.)

**3–15. Eyes**

The causes for referral to an MEB are as follows:

*a.* Active eye disease or any progressive organic disease or degeneration, regardless of the stage of activity, that is resistant to treatment and affects the distant visual acuity or visual fields so that distant visual acuity does not meet the standard stated in paragraph 3–16*e* or the diameter of the field of vision in the better eye is less than 20 degrees.

*b.* Aphakia, bilateral.

*c.* Atrophy of the optic nerve due to disease.

*d.* Glaucoma, if resistant to treatment or affecting visual fields as in a above, or if side effects of required medication are functionally incapacitating.

*e.* Degenerations, when vision does not meet the standards of paragraph 3–16*e*, or when vision is correctable only by the use of contact lenses or other special corrective devices (telescopic lenses, etc.).

*f.* Diseases and infections of the eye, when chronic, more than mildly symptomatic, progressive, and resistant to treatment after a reasonable period. This includes intractable allergic conjunctivitis inadequately controlled by medications and immunotherapy.

*g.* Residuals or complications of injury or disease, when progressive or when reduced visual acuity does not meet the criteria stated in paragraph 3–16*e*.

*h.* Unilateral detachment of retina if any of the following exists:

(1) Visual acuity does not meet the standard stated in paragraph 3–16*e*.

(2) The visual field in the better eye is constricted to less than 20 degrees.

(3) Uncorrectable diplopia exists.

(4) Detachment results from organic progressive disease or new growth, regardless of the condition of the better eye.

*i.* Bilateral detachment of retina, regardless of etiology or results of corrective surgery.

**3–16. Vision**

The causes for referral to an MEB are as follows:

*a.* Aniseikonia, with subjective eye discomfort, neurologic symptoms, sensations of motion sickness and other gastrointestinal disturbances, functional disturbances and difficulties in form sense, and not corrected by iseikonica lenses.