# In the United States Court of Federal Claims

**No. 06-829C**
**Filed: July 26, 2007**

* * * * * * * * * * * * * * *
**URMILA BANERJEE,**
**Plaintiff,**
**v.**
**UNITED STATES,**
**Defendant.**
* * * * * * * * * * * * * * *

**Motion to Dismiss; Motion for Judgment Upon the Administrative Record; Military Disability Retirement; Veteran's Administration Disability Ratings.**

**THOMAS J. REED,** Veterans Law Clinic, Widener University School of Law, Wilmington, Delaware, for the plaintiff.

**MEREDYTH D. COHEN**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With her were **PETER D. KEISLER**, Assistant Attorney General; **JEANNE E. DAVIDSON**, Director, Commercial Litigation Branch; and **BRYANT G. SNEE,** Deputy Director. **MAJOR JERRETT DUNLAP**, United States Army Litigation Division, Washington, D.C., of counsel.

## O P I N I O N

**HORN, J.**

## FINDINGS OF FACT

Plaintiff, Urmilia Banerjee, enlisted in the United States Army and entered on active duty on October 9, 1990. She was Honorably Discharged from the Army for Unsatisfactory Performance on June 24, 1991. Ms. Banerjee completed her basic training at Fort Dix, New Jersey, and was assigned to the Academy of Health Sciences at Fort Sam Houston, Texas, reporting on February 5, 1991 for further training. On May 17, 1991, Ms. Banerjee was counseled that her overall behavior was not in keeping with military standards. An entry on her General Counseling Form stated that she did not want to stay in the Army and requested discharge. Ms. Banerjee's desire to be discharged from the Army was again reflected on a General Counseling Form, dated May 22, 1991, together with a notation that

she had been advised that separation proceedings were being initiated. On the May 22, 1991 General Counseling Form, Ms. Banerjee hand-wrote: "[t]here has been [a] conscious lack of motivation on my part because of an extended period of sexual harassment which was reported to the E.O."[1]

As part of her separation proceedings, Ms. Banerjee was required to undergo a medical examination and a mental evaluation, in accordance with Army Regulations 635-200, Chapter 13, Separation for Unsatisfactory Performance and Chapter 1, ¶ 1-34, Medical Evaluation (Sept. 17, 1990, effective Oct. 17, 1990), and Army Regulation 635-40, Physical Evaluation for Retention, Retirement, or Separation (Aug. 15, 1990, effective Sept. 15, 1990). Major Stephen J. Brannen, who listed his titles as MS, Assistant Chief CHMS, an Army Medical Services officer, gave Ms. Banerjee her Mental Status Evaluation on May 28, 1991. His Report of Mental Status Evaluation found plaintiff's behavior to be "normal" and her mood "unremarkable." He found that she was "fully alert" and "fully oriented," and that she had "good" memory, "clear thinking process," and "normal thought content." The Report stated that plaintiff was "mentally responsible" and "has the mental capacity to understand and participate in the proceeding." Major Brannen found "no evidence of a mental disease or defect of psychiatric significance or of sufficient severity to warrant disposition through medical channels," and that "[s]he has indicated her desire to be separated IAW [in accordance with] applicable regulations." He, therefore, cleared Ms. Banerjee for separation based on his examination. Major Brannen's report was approved and also signed by Lieutenant Colonel Paul D. Amos, Chief, Patient Administration Division, Medical Services.

In addition to the mental evaluation, a bone scan on May 22, 1991 revealed a "stress fracture of the distal third metatarsal of the left foot" and "stress related changes of the tibias and left foot." A medical examination on May 30, 1991 confirmed the stress fracture of the distal third metatarsal. The reviewing medical officer did not recommend Ms. Banerjee for review by a Medical Evaluation Board (MEB) and cleared her for separation by marking the box "Examinee is Qualified for ETS [Expiration Term of Service]/Chapter." Nowhere in the record or in plaintiff's filings submitted to the court is there a suggestion that Ms. Banerjee objected to Major Brannen's Mental Status Evaluation or that she requested an MEB at the time of her discharge processing.

On June 14, 1991, Ms. Banerjee's commander initiated separation proceedings for plaintiff under the provisions of Army Regulation 635-200, Chapter 13, for Unsatisfactory Performance. In a document dated June 14, 1991, signed by Ms. Banerjee, plaintiff

---

[1] Ms. Banerjee alleges that she was sexually harassed in the allegation of facts section of her complaint. She does not, however, pursue the allegation or base a claim for relief on the allegation. The defendant's motion to dismiss points out that any sexual harassment tort claims would be barred in this court for lack of subject matter jurisdiction. In her filings with the court, Ms. Banerjee acknowledges that sexual harassment tort claims are not proper in this court. Moreover, as tort claims, they also be time barred.

acknowledged her right to consult with counsel, which she declined. In the same document, she also stated that she understood the basis for the contemplated separation action and the effect of any action taken in waiving her rights, acknowledging that she had "received adequate counseling and rehabilitative measures." On June 24, 1991, Ms. Banerjee was Honorably Discharged from the Army for Unsatisfactory Performance under the provisions of Army Regulation 635-200, Chapter 13.

Following her discharge from the Army, Ms. Banerjee's Veteran's Administration (VA) medical records indicate that she was frequently seen for a variety of physical and psychological complaints.[2] Highlights of her records indicate that, among these numerous medical and psychological visits, she was seen by a VA physician on July 25, 1991, approximately one month after her discharge. The reviewing physician diagnosed her "with [a] profile of a character disorder and depression." She began weekly appointments, and, on August 15, 1991, was diagnosed with "[i]ncipient schizophrenic decompensation." On August 23, 1991, she was diagnosed with "schizophrenic disorder, acute." She continued to receive psychiatric treatment from the VA in the years after her diagnosis.

Ms. Banerjee also obtained and appealed a series of disability Rating Decisions from the VA, including those discussed below. On October 15, 1996, Ms. Banerjee's VA disability rating was determined to be 0 percent for the stress fracture. The VA also denied benefits for the "delusional disorder" (schizophrenia), service connection because there was no evidence demonstrating that the claimed condition was incurred during or aggravated by military service. Because in the record presented to the court this is the VA rating received by Ms. Banerjee closest in time to her release from the Army, it is quoted, in large part, below:

> <u>DECISION:</u>
> 1. Service connection for residuals, stress fracture, left third metatarsal is granted with an evaluation of 0 percent effective March 29, 1996.
> 2. The claim for service connection of delusional disorder (claimed as depression) is not well grounded.
> 3. The claim for service connection of fractures of left hip, left tibia and femur and pain/swelling in legs is not well grounded.
>
> <u>REASONS AND BASES:</u>
> 1. Service connection for residuals, stress fracture, left third metatarsal has been established as directly related to military service. This condition is evaluated at 0 percent disabling from March 29, 1996. A noncompensable

[2] The court notes the total disarray of the administrative record and the illegibility of some of the documents submitted to the ABCMR and to this court, as well as references in filings with this court to documents which were not provided to the court. Therefore, this opinion includes references to the relevant files in the record, but does not reference each of Ms. Banerjee's many medical consultations with the VA or ratings in her VA files.

evaluation is assigned unless there is objective evidence of painful or limited motion of a major joint or group of minor joints.

* * *

2. The law provides that a person who submits a claim for VA benefits must submit evidence sufficient to justify a belief that the claim is well grounded. A well-grounded claim is a plausible claim, one which has merit on its own, or is capable of substantiation. Such a claim need not be conclusive, but it must be accompanied by evidence which shows that the claimed condition exists and is possibly related to service.

A well[-]grounded claim for service connection requires evidence of a current disability, evidence of incurrence or aggravation of a disease or injury in the service, and evidence of a nexus, or link, between the in-service injury or disease and the current disability. There is no record of treatment in service for delusional disorder (claimed as depression). In order to establish a well-grounded claim, it is necessary to provide evidence which demonstrates that the claimed condition was incurred in or aggravated by military service. Unless evidence to make the claim well grounded is received within one year from the date of this notification, benefits, if entitlement is established, may not be paid prior to the date of receipt of the evidence.

The veterans [sic] service medical records show she underwent a mental evaluation on 5-30-91. This examination found no evidence of mental illness or defect of psychiatric significance.

3. The law provides that a person who submits a claim for VA benefits must submit evidence sufficient to justify a belief that the claim is well grounded. A well-grounded claim is a plausible claim, one which has merit on its own, or is capable of substantiation. Such a claim need not be conclusive, but it must be accompanied by evidence which shows that the claimed condition exists and is possibly related to service.

A well[-]grounded claim for service connection requires evidence of a current disability, evidence of incurrence or aggravation of a disease or injury in the service, and evidence of a nexus, or link, between the in-service injury or disease and the current disability. There is no record of fractures of left hip, left tibia and femur and pain/swelling in legs showing a chronic disability subject to service connection. In order to establish a well-grounded claim, it is necessary to provide evidence which demonstrates the existence of the claimed condition and its possible relationship to service. Unless evidence to make the claim well grounded is received within one year from the date of this notification, benefits, if entitlement is established, may not be paid prior to the date of receipt of the evidence.

Ms. Banerjee also underwent numerous orthopedic examinations, including one on July 9, 1998. The July 9, 1998 report diagnosed her with "[p]ossible residuals of a fracture of the left foot." Ms. Banerjee continued to file requests for an increase in service connection for her "physical and mental disabilities," including allegations that her conditions were deteriorating.

On January 5, 1999, plaintiff's VA disability rating for the stress fracture was increased to 10 percent, but the service connection for paranoid schizophrenia was again denied, as follows:

> <u>DECISION:</u>
> 1. Evaluation of residuals, stress fracture, left third metatarsal, which is currently 0 percent disabling, is increased to 10 percent effective June 16, 1998.
> 2. Service connection for chronic paranoid schizophrenia is denied.
> 3. Entitlement to pension is granted.

The 10 percent service connection was assigned for "painful or limited motion of a major joint or group of minor joints," but the examination cited as the basis for the rating also noted "good range of motion bi-laterally," albeit with some pain. As for Ms. Banerjee's schizophrenia claim, the Rating Decision stated:

> A well-grounded claim for service connection requires evidence of a current disability, evidence of incurrence or aggravation of a disease or injury in service, and evidence of a nexus, or link, between the in-service injury or disease and the current disability. There is no record of treatment in service for chronic paranoid schizophrenia. In order to establish a well-grounded claim, it is necessary to provide evidence which demonstrates that the claimed condition was incurred in or aggravated by military service.
>
> The veterans [sic] service medical records were silent for any treatment of diagnosis of schizophrenia. A mental status evaluation of 5-28-91 showed there is no evidence of mental disease or defect of psychiatric significance.

Ms. Banerjee was notified of the results of the January 5, 1999 VA Rating Decision by a letter dated February 6, 1999. Plaintiff appealed the results of the February 6, 1999 letter by filing a Notice of Disagreement, dated February 28, 1999, which was accepted by the VA on March 4, 1999. Ms. Banerjee stated that she believed she was "unemployable in fact due to my illness," and that her "mental illness is a product of my experiences in military service." She also wrote that she disagreed with the 10 percent disability rating for her stress fractures because her injuries "make it impossible for me to hold a job that requires standing on my feet for long periods of time."

After she filed the Notice of Disagreement, the VA sent Ms. Banerjee a letter dated April 3, 1999, which enclosed a Statement of the Case, dated March 17, 1999. The Statement of the Case reiterated the reasons for the January 5, 1999 Rating Decision, which had awarded the plaintiff a 10 percent rating for stress fractures and denied service connection for schizophrenia. The letter also explained general principles for how VA Rating Decisions are established, including the following discussion:

> (a) General. Service connection connotes many factors but basically it means that the facts, shown by evidence, establish that a particular injury or disease resulting in disability was incurred coincident with service in the Armed Forces, or if preexisting such service, was aggravated therein. This may be accomplished by affirmatively showing inception or aggravation during service or through the application of statutory presumptions.

The Statement of the Case also discussed the purpose of the VA's evaluative rating schedule:

> This rating schedule is primarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service. The percentage ratings represent as far as can practicably be determined the average impairment in earning capacity resulting from such diseases and injuries and their residual conditions in civil occupations. Generally, the degrees of disability specified are considered adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability. For the application of this schedule, accurate and fully descriptive medical examinations are required, with emphasis upon the limitation of activity imposed by the disabling condition. Over a period of many years, a veteran's disability claim may require reratings in accordance with changes in laws, medical knowledge and his or her physical or mental condition. It is thus essential, both in the examination and in the evaluation of disability, that each disability be viewed in relation to its history.

Subsequently, Ms. Banerjee filed an appeal to the Board of Veterans Appeals.

On September 17, 1999, the VA issued a Rating Decision granting Ms. Banerjee service connection for "paranoid schizophrenia" with a rating of 70 percent, but denying (thereby eliminating the earlier award) service connection for stress fractures, as follows:

> <u>DECISION:</u>
> 1. Service connection for paranoid schizophrenia is granted with an evaluation of 70 percent effective June 16, 1998.
> 2. Service connection for stress changes, tibias (claimed as stress fractures) is denied.
> 3. New and material evidence adequate to reopen the claim for left hip and

femur has not been submitted.

The VA indicated under "Reasons and Bases" in the September, 1999 Rating Decision, "[s]ervice connection may be granted for specific diseases or conditions which are presumed to have been caused by service if manifested to a compensable degree following military discharge," and that "service connection for paranoid schizophrenia has been granted on the basis of presumption." The evaluation of 70 percent was assigned for "occupational and social impairment, with deficiencies in most areas, such as work, school family relations, judgment, thinking, or mood . . . . A higher evaluation of 100 percent is not warranted unless there is a total occupational and social impairment . . . ." The Rating Decision noted that "there is a likelihood of improvement," she is "competent to manage her affairs," and that "[c]learly she is able to obtain employment." For the stress fracture claim, the VA denied service connection because "[a]lthough there is a record of treatment in service for stress related changes, tibias, no permanent residual currently exists." The Rating Decision pointed to medical records from May 18, 1999, which found:

> [N]o evidence of any residual of any stress fractures in any of the x-rays reviewed, or in the reports of the previous x-rays. The physical findings on exam show essentially normal motion with no significant discomfort on motion, therefore, there is no objective evidence to support the degree of pain complaint present.

The Rating Decision indicated that this decision satisfied the Notice of Disagreement and, thus, removed the claim from appellate action before the Board of Veterans Appeals.

Ms. Banerjee was informed of the September, 1999 VA Rating Decision in a letter dated October 27, 1999. The letter stated that as a result of the increase in service connection, her appeal of the February 6, 1999 decision to the Board of Veterans Appeals would be considered withdrawn, and that if she wished to contest either the evaluation or effective date, she would be required to file a new Notice of Disagreement. Ms. Banerjee submitted a new Notice of Disagreement to the VA Rating Decision, which had denied service connection and given her a 0 percent rating for orthopedic disability. She disputed the finding that the residuals of her stress fractures of both tibias were not service connected, and stated that she was "entitled to a much earlier effective date relating back to my date of discharge" for her mental condition.

On July 3, 2000, the VA awarded Ms. Banerjee a Rating Decision of 100 percent disability for her mental illness, with an effective date of June 16, 1998, as follows:

> <u>DECISION:</u>
> 1. Evaluation of schizophrenia, which is currently 70 percent disabling, is increased to 100 percent effective June 16, 1998.
> 2. Entitlement to special monthly compensation based on the need for regular aid and attendance or being housebound is denied.
> 3. Entitlement to individual unemployability is denied.

The July 3, 2000 VA Rating Decision stated that Ms. Banerjee was awarded 100 percent service connection for schizophrenia because the "[l]ongitudinal view of all evidence shows a totally disabling situation at present." The decision stated, "she is able to obtain employment, but it is doubtful in her present state that she will ever be able to sustain gainful employment," and "[a]lthough the veteran is totally disabled, permanence has not yet been established." The Rating Decision made no changes to the denial of service connection and no rating for residual stress fractures.

Ms. Banerjee filed a formal appeal with the United States Court of Appeals for Veterans Claims, disputing the assignment of an effective disability date of June 16, 1998, and stating that the effective date should have been her military discharge date, June 24, 1991. While the formal appeal was pending, two more VA Rating Decisions, dated June 27, 2001, and December 10, 2001, declared Ms. Banerjee to be mentally incompetent, but did not discuss percentage disability awards. The Rating Decisions were issued so that a fiduciary could be appointed to assist Ms. Banerjee to manage her VA benefits. On December 14, 2000, Ms. Banerjee was notified that the VA would find someone to assist her.

Ms. Banerjee submitted an Application for Change of Discharge to the Army Board for Correction of Military Records (ABCMR) on May 22, 2000, seeking to have her discharge under Army Regulation 635-200, Chapter 13, Separation for Unsatisfactory Performance changed to a medical discharge with disability retirement pay. Ms. Banerjee argued that she was entitled to have had a formal MEB before her discharge from the Army. Ms. Banerjee provided the ABCMR with a selection of her VA medical records, VA Rating Decisions, military records, compensation and pension examination reports, a legal brief, and her sworn statement. Ms. Banerjee also included a statement from a Colonel Hansa Raval, a retired Army Medical Corps officer, dated August 27, 1999 (prepared well after plaintiff's time in service), which did not suggest plaintiff was unfit to serve, but in which Colonel Hansa indicated that he had been made aware of sexual harassment incidents toward Ms. Banerjee, that her emotional situation had worsened until it became a crisis, and that in May and June of 1990 before her discharge, she was extremely depressed, fearful, and in emotional turmoil. Colonel Ravel asserted that he had written a letter to Major General Moore, the commander of the Academy of Health Sciences, about Ms. Banerjee's sexual harassment incidents, and that General Moore had met with Ms. Banerjeee.

The brief in support of Ms. Banerjee's claims to the ABCMR alleged that she had not received an appropriate mental examination when she was discharged, because the examination she did receive was not "comprehensive and specifically did not address any symptoms of PTSD or paranoid schizophrenia that were evident to Dr. Raval." In her sworn statement, Ms. Banerjee alleged that while she was in training in Texas, she was sexually harassed by members of the unit, which she had found very disturbing. Plaintiff also indicated that she had experienced pain in her legs and feet while training, had felt at times like she had broken bones in her feet and legs, and sometimes could not run or walk.

She also stated that she had been informed of her rights before her discharge and had been given a medical and mental examination, but she had been very confused and anxious during the proceedings, and did not remember much from the medical tests and examinations.

On August 8, 2002, Ms. Banerjee supplemented her ABCMR application records with records from the National Institute for Health (NIH). The NIH mental evaluation records were from her July, 2001 to January, 2002 admittance into a special study group. On July 27, 2001, Dr. Jose A. Apud took a history of Ms. Banerjee's condition, noting she had stated that her illness started during her time with the Army, but that reports from her family indicated that prior to her enlistment with the Army, they had noticed periods of "high mood and increased energy, with grandiosity." The report indicates Ms. Banerjee stated that "[a]t the time of her first psychotic break, which she reported as being in October, 1990 after her October 9, 1990 enlistment, she had felt she was being stalked, that someone was poisoning her food, and that male recruits and officers were sexually harassing her." The report also states that she "attempted to dismiss her delusional thoughts, but her job performance progressively deteriorated, had problems waking up in the morning, and developed self-care deficit concerning her personal hygiene and clothing." Her father stated that a psychologist had seen her twice, but that she never mentioned her thoughts and had gotten a "clean bill of mental health." According to the same interview, Ms. Banerjee was taken to the Wilmington, Delaware VA hospital for evaluation in 1991 after her separation from the Army, and was to be sent to a Perryville, Maryland VA Medical Center for hospitalization, but she ran away from home. She stated she was in an arranged marriage in 1992, after her discharge, which became abusive, divorced her husband in 1994, became "despondent, hopeless, helpless," and tried to kill herself. Continuing the interview, she stated that after her suicide attempt, she was hospitalized at the Wilmington, Delaware VA Medical Center and reported paranoid and bizarre delusions. At the time that Ms. Banerjee was eventually discharged from the NIH study group on January 15, 2002, she was diagnosed with "schizophrenia paranoid."

On August 7, 2003, the ABCMR denied Ms. Banerjee's application for correction of her military records. The Board decision stated:

> Army Regulation 635-200 sets forth the basic authority for the separation of enlisted personnel. Chapter 13 contains the policy and outlines the procedures for separating individuals for unsatisfactory performance, and provides, in pertinent part, that commanders will separate a member under this chapter when, in the commander's judgment, the member will not develop sufficiently to participate satisfactorily in further training and/or become a satisfactory soldier.
>
> Title 38, United States Code, sections 310 and 331, permits the VA to award compensation for a medical condition which was incurred in or aggravated by active military service. The VA, however, is not required by law to determine medical unfitness for further military service. The VA, in

> accordance with its own policies and regulations, awards compensation solely on the basis that a medical condition exists and that said medical condition reduces or impairs the social or industrial adaptability of the individual concerned. Consequently, due to the two concepts involved, an individual's medical condition, although not considered medically unfitting for military service at the time of processing for separation, discharge or retirement, may be sufficient to qualify the individual for VA benefits based on an evaluation by that agency. Furthermore, unlike the Army the VA can evaluate a veteran throughout his or her lifetime, adjusting the percentage of disability based upon that agency's examinations and findings.

After reviewing Ms. Banerjee's claim and the factual record discussed above, the ABCMR concluded:

> 1. A mental health evaluation, conducted on 28 May 1991, found the applicant fully alert and oriented, her memory good, and her thought process clear and normal. It determined the applicant was mentally responsible, able to distinguish right from wrong and to adhere to the right.
>
> 2. The applicant's administrative separation was accomplished in compliance with applicable regulations with no indication of procedural errors which would tend to jeopardize her rights. There is no evidence that the applicant ever raised the issue of sexual harassment to her chain of command as the reason for her inability to meet performance expectations.
>
> 3. The evidence of record indicates she did not have any medically unfitting disability which required physical disability processing. Therefore, there is no basis for physical disability retirement or separation.
>
> 4. A rating decision by the VA does not necessarily demonstrate any error or injustice by the Army. The VA, operating under its own policies and regulations, assigns disability ratings as it sees fit. Any rating decision by the VA does not compel the Army to modify its reason or authority for separation.
>
> 5. In order to justify correction of a military record the applicant must show to the satisfaction of the Board, or it must otherwise satisfactorily appear, that the record is in error or unjust. The applicant has failed to submit evidence that would satisfy that requirement.
>
> 6. In view of the foregoing, there is no basis for granting the applicant's request.

After the ABCMR issued its August 7, 2003 decision, the United States Court of Appeals for Veterans Claims remanded plaintiff's appeal of her July 3, 2000 VA Rating Decision to the Board of Veterans Appeals. The Board, in turn, remanded Ms. Banerjee's

case to the VA Regional Office on November 7, 2003. On March 8, 2005, in a Review Officer Decision, the VA granted Ms. Banerjee 100 percent disability status for paranoid schizophrenia, as of August 15, 1991, the first date of "[i]ncipient schizophrenic decompensation" diagnosis, approximately two months after her discharge on June 24, 1991. The reasoning for the effective date chosen was offered as follows:

> Service connection has been granted for schizophrenia based upon presumption. The law provides in 38 CFR 3.400 (b)(2)(ii) that service connection based on presumption will be granted from "Date entitlement arose, if claim is received within 1 year after separation from active duty; otherwise date of receipt of claim, or date entitlement arose, whichever is later. Where the requirements for service connection are met during service, the effective date will be the day following separation from service if there was continuous active service following the period of service on which the presumption is based and a claim is received within 1 year after separation from active duty."
>
> Since the requirements for service connection were not met while veteran was in service, the effective date cannot be the day following separation.
>
> Since a claim for service connection was received within 1 year after separation from active duty, the effective date is the date entitlement arose. The date entitlement arose is the first date on which the condition was diagnosed. Based on granting benefit of doubt, service connection has been granted from August 15, 1991, the date of diagnosis of "incipient schizophrenic decompensation."
>
> The evaluation has also been set at 100 percent from August 15, 1991, based upon the longitudinal review of the entire record. It appears that the veteran has been suffering from an active disease process since August 1991. There have been periods of relative remission and exacerbation, depending partially on whether she took her medications and other life stressors. (emphasis added).

On August 28, 2006, the VA granted plaintiff service connection for "trochanteric bursitis, left hip," with an evaluation of 10 percent, effective March 31, 1999. Plaintiff, however, still received a 0 percent rating for stress fractures, which already had been reduced from the 10 percent awarded on January 5, 1999 to 0 percent shortly thereafter on September 17, 1999.

According to plaintiff, the ABCMR adopted a rule requiring that all petitions for reconsideration of its decisions must be filed within one year of the original decision. See 32 C.F.R. § 581.3 (2003). Thus, Ms. Banerjee felt she was barred from submitting her petition for reconsideration based on the March 8, 2005 VA decision because it was issued more than one year after the ABCMR's decision on August 28, 2003. 32 C.F.R. § 581.3.

Ms. Banerjee, therefore, filed a complaint to review the ABCMR's decision in the United States Court of Federal Claims on December 6, 2006.

## DISCUSSION

After Ms. Banerjee filed her complaint in this court, the defendant filed a motion to dismiss for lack of subject matter jurisdiction pursuant to the Rules of the Court of Federal Claims (RCFC) 12(b)(1) on Counts I and II and a motion for judgment upon the administrative record pursuant to RCFC 52.1 regarding Count III of the complaint. Ms. Banerjee filed a response to the defendant's motion to dismiss Counts I and II and a cross-motion for judgment upon the administrative record regarding Count III of the complaint. Ms. Banerjee requests that this court order the ABCMR to correct her records to reflect that she was not fit for military duty at the time of her discharge by reason of mental disease or disorder and physical disability due to stress fractures, that the ABCMR be directed to reconsider its finding that she was not entitled to be placed on the Temporary or Permanent Disability Retirement List, and to award her back disability pay from the date of her discharge.

### Subject Matter Jurisdiction

The Tucker Act, 28 U.S.C. § 1491 (2000), permits citizens to sue the government in this court. The Tucker Act, however, requires that the plaintiff identify an independent substantive right enforceable against the United States for money damages. See 28 U.S.C. § 1491. The Tucker Act states:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).

As interpreted by the United States Supreme Court, the Act waives sovereign immunity to allow jurisdiction over claims (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Testan, 424 U.S. 392, 400, motion denied, 425 U.S. 957 (1976) (citing Eastport Steamship Corp. v. United States, 178 Ct. Cl. 599, 605-06, 372 F.2d 1002, 1009 (1967)); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999); Stinson, Lyons & Bustamante, P.A. v. United States, 33 Fed. Cl. 474, 478 (1995), aff'd, 79 F.3d 136 (Fed. Cir. 1996). A waiver of traditional sovereign immunity cannot be implied but must be "unequivocally expressed." INS v. St. Cyr, 533 U.S. 289, 299 n.10 (2001); see also United States v. Nordic Village, Inc., 503 U.S.

30, 33 (1992); Ins. Co. of the West v. United States, 243 F.3d 1367, 1372 (Fed. Cir.), reh'g and reh'g en banc denied (2001); Saraco v. United States, 61 F.3d 863, 864 (Fed. Cir. 1995) (quoting United States v. King, 395 U.S. 1, 4 (1969)), cert. denied, 517 U.S. 1166 (1996).

The Tucker Act, however, merely confers jurisdiction on the United States Court of Federal Claims; "'it does not create any substantive right enforceable against the United States for money damages.'" United States v. Mitchell, 445 U.S. 535, 538 (quoting United States v. Testan, 424 U.S. at 398-99), reh'g denied, 446 U.S. 992 (1980); see also White Mountain Apache Tribe v. United States, 249 F.3d 1364, 1372 (Fed. Cir. 2001), aff'd, 537 U.S. 465 (2003); Cyprus Amax Coal Co. v. United States, 205 F.3d 1369, 1373 (Fed. Cir. 2000), cert. denied, 532 U.S. 1065 (2001); New York Life Ins. Co. v. United States, 118 F.3d 1553, 1555-56 (Fed. Cir. 1997), cert. denied, 523 U.S. 1094 (1998); United States v. Connolly, 716 F.2d 882, 885 (Fed. Cir. 1983) (en banc), cert. denied, 465 U.S. 1065 (1984). Individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. United States v. Mitchell, 445 U.S. at 538. In order for a claim to be successful, the plaintiff "must also demonstrate that the source of law relied upon 'can fairly be interpreted as mandating compensation by the federal government for the damages sustained.'" White Mountain Apache Tribe v. United States, 249 F.3d at 1372 (quoting United States v. Mitchell, 463 U.S. 206, 216-17 (1983)); see also United States v. Testan, 424 U.S. at 400; Tippett v. United States, 185 F.3d 1250, 1254 (Fed. Cir. 1999) ("[T]he plaintiff must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States." (quoting James v. Caldera, 159 F.3d 573, 580 (Fed. Cir. 1998))); Doe v. United States, 100 F.3d 1576, 1579 (Fed. Cir. 1996), reh'g and reh'g en banc denied (1997); Eastport Steamship Corp. v. United States, 178 Ct. Cl. at 607, 372 F.2d at 1009.

In her complaint, Ms. Banerjee cites 10 U.S.C. § 1201 (2000) as the money mandating statute giving rise to her claim. In Fisher v. United States, the United States Court of Appeals for the Federal Circuit acknowledged 10 U.S.C. § 1201 as a proper money mandating statute:

> In this case, Dr. Fisher has little difficulty establishing that § 1201 is understood as money-mandating. Section 1201 was the statute alleged to be money-mandating in Sawyer v. United States, 930 F.2d 1577 (Fed. Cir. 1991). Despite the presence of the word "may" in the statute, in Sawyer we determined that the Secretary has no discretion whether to pay out retirement funds once a disability is found qualifying. Id. at 1580. Thus, we held that the statute is money-mandating because when the requirements of the statute are met -- i.e., when the Secretary determines that a service member is unfit for duty because of a physical disability, and that disability is permanent and stable and is not the result of the member's intentional misconduct or willful neglect -- the member is entitled to compensation. See id.

Fisher v. United States, 402 F.3d 1167, 1174-75 (Fed. Cir. 2005); see also Chambers v. United States, 417 F.3d 1218, 1223 (Fed. Cir.), cert. denied, 126 S. Ct. 807 (2005); Neuren v. United States, 41 Fed. Cl. 422 (1998).

**Motion for Judgment Upon Administrative Record**

While it is not the responsibility of the courts to place or not place a service member on disability retirement, courts are available to review the service organization's compliance with its own rules and procedures. See Roth v. United States, 378 F.3d 1371, 1385 (Fed. Cir.) (holding that "questions of procedural compliance are justiciable"), reh'g denied (2004); see also Murphy v. United States, 993 F.2d 871, 873 (Fed. Cir. 1993), cert. denied, 511 U.S. 1019, reh'g denied, 511 U.S. 1118 (1994).

RCFC 52.1 provides for judgment upon the administrative record. In disability retirement claims, the United States Court of Federal Claims "has no jurisdiction over disability retirement claims until a military board evaluates a service member's entitlement to such retirement in the first instance." Chambers v. United States, 417 F.3d at 1225. This court then reviews the correction board's decision to determine whether the board's determination was "arbitrary, or capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced, and money is due." Sanders v. United States, 219 Ct. Cl. 285, 298, 594 F.2d 804, 811 (1979); see also Chappell v. Wallace, 462 U.S. 296, 303 (1983); Porter v. United States, 163 F.3d 1304, 1316 (Fed. Cir. 1998), reh'g denied, en banc suggestion declined, cert. denied, 528 U.S. 809 (1999); Skinner v. United States, 219 Ct. Cl. 322, 332, 594 F.2d 824, 830 (1979). This standard of review "does not require a reweighing of the evidence, but a determination whether *the conclusion being reviewed* is supported by substantial evidence." Heisig v. United States, 719 F.2d 1153, 1157 (Fed. Cir. 1983) (emphasis in original). The plaintiff's burden of proof also has been described as a "showing by cogent and clearly convincing evidence." Fisher v. United States, 402 F.3d at 1180; see also Colon v. United States, 71 Fed. Cl. 473, 485-86 (2006); Garcia v. United States, 40 Fed. Cl. 247, 254 (1998), aff'd sub nom. Acevedo v. United States, 216 Fed. Appx. 977 (Fed. Cir. 2007).

The United States Court of Federal Claims does not sit as a "super correction board." Skinner v. United States, 219 Ct. Cl. 322, 331, 594 F.2d 824, 830 (1979). "'When substantial evidence supports a board's action, and when that action is reasonable in light of all the evidence presented, the court will not disturb the result.'" Van Cleave v. United States, 70 Fed. Cl. 674, 678-79 (2006) (quoting Pope v. United States, 16 Cl. Ct. 637, 641 (1989)). Judicial review of a correction board should not be an opportunity for courts to substitute their judgment for that of the military board when reasonable minds could reach differing conclusions. See Sanders v. United States, 219 Ct. Cl. at 303-05, 594 F.2d at 814-15. Stated otherwise, responsibility for determining whether a service member is fit or unfit to serve in the armed forces is not a judicial decision, and "courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." Heisig v. United States, 719 F.2d at 1156.

The United States Supreme Court has noted that "judges are not given the task of running the Army. . . . The military constitutes a specialized community governed by a separate discipline from that of the civilian." Orloff v. Willoughby, 345 U.S. 83, 93-94, reh'g denied, 345 U.S. 931 (1953); see also Porter v. United States, 163 F.3d at 1316. Moreover, "[j]udicial deference to administrative decisions of fitness for duty of service members is and of right should be the norm." Maier v. Orr, 754 F.2d 973, 984 (Fed. Cir.), reh'g denied, 758 F.2d 1578 (Fed. Cir. 1985).

In addition, this court must recognize the strong presumption of regularity accompanying government proceedings, including that the military carries out its responsibilities properly, lawfully and in good faith. See Richey v. United States, 322 F.3d 1317, 1326 (Fed. Cir. 2003); Porter v. United States, 163 F.3d at 1316. The plaintiff bears the burden of overcoming the "strong, but rebuttable, presumption" that the military discharges its duties "correctly, lawfully, and in good faith." Bernard v. United States, 59 Fed. Cl. 497, 501 (quoting Hary v. United States, 223 Ct. Cl. 10, 17, 618 F.2d 704, 707 (1980) (citations omitted)), aff'd, 98 Fed. Appx. 860 (Fed. Cir. 2004).

In Fluellen v. United States, the court wrote:

> The plaintiff bears the burden of showing that the AFBCMR's [Air Force Board for Correction of Military Records] action was arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations. Wronke v. Marsh, 787 F.2d 1569, 1576 (Fed. Cir. 1986); Hoskins v. United States, 40 Fed. Cl. 259, 271-72 (1998). To prevail under the arbitrary and capricious standard, plaintiff must demonstrate that evidence was ignored or unreasonably construed, or that designated duties were not performed by the AFBCMR. Kirwin [v. United States], 23 Cl. Ct. [497], 502 [(1991)]. Moreover, "plaintiff must overcome the presumption that 'administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith.'" Chayra v. United States, 23 Cl. Ct. 172, 178 (1991), quoting Sanders [v. United States], 219 Ct. Cl. at 302, 594 F.2d at 813. "While the court might disagree with the board's decision, it cannot substitute its own judgment for the board's if reasonable minds could reach differing resolutions of a disputed fact." Chayra, 23 Cl. Ct. at 178-179.

Fluellen v. United States, 44 Fed. Cl. 97, 101 (1999), aff'd, 225 F.3d 1298 (Fed. Cir.), reh'g denied (2000).

In her complaint, in addition to the claims addressed by the court below, Ms. Banerjee seeks relief under the Administrative Procedure Act (APA) (Count I), and various forms of declaratory relief (Count II). In the complaint filed in this court, Ms. Banerjee's counsel cites to inappropriate statutes and regulations; for example, plaintiff cites 28 U.S.C. § 1346, which is a jurisdictional statute for the United States District Courts, 5 U.S.C. § 701 et seq., 28 U.S.C. § 2201 and § 2202, and 10 U.S.C. § 1552, to establish jurisdiction in this court.

The Administrative Procedure Act is not a money mandating statute, since the APA waives sovereign immunity only for claims seeking "relief other than money damages ...." 5 U.S.C. § 702 (2000). This court does not have jurisdiction over claims for relief pursuant to the APA. See Martinez v. United States, 333 F.3d 1295, 1313 (Fed. Cir. 2003) ("[T]he Court of Federal Claims lacks APA jurisdiction . . . ." (citing Murphy v. United States, 993 F.2d at 874)), cert. denied, 540 U.S. 1177 (2004).

Similarly, regarding declaratory judgments, the United States Court of Appeals for the Federal Circuit has stated:

> Although, as noted, Congress has authorized the Court of Federal Claims to grant equitable relief in certain limited circumstances, those circumstances do not include the general authority to grant equitable relief whenever a declaratory judgment or an injunction would assist a claimant in obtaining monetary benefits in another forum.
>
> * * *
>
> The Court of Federal Claims has never been granted general authority to issue declaratory judgments, and to hold that the Court of Federal Claims may issue a declaratory judgment in this case, unrelated to any money claim pending before it, would effectively override Congress's decision not to make the Declaratory Judgment Act applicable to the Court of Federal Claims.

Nat'l Air Traffic Controllers Ass'n v. United States, 160 F.3d 714, 716-17 (Fed. Cir. 1998). The claims brought by Ms. Banerjee do not fit the category of claims for which this court has declaratory authority.

Finally, in plaintiff's reply brief to defendant's motion to dismiss, plaintiff's counsel acknowledges the state of the law and writes:

> She [plaintiff] does not claim that the Declaratory Judgment Act or the Administrative Procedures Act confer a waiver of the right of the United States to be sued in the Court of Federal Claims.
>
> Ms. Banerjee sought only the kind of relief available under § 1491(a)(2) by this Count of Complaint and she would be content if the Court struck all reference to 5 U.S.C. § 701 et seq. and to the declaratory judgment act [sic] from Counts I and II of her complaint as surplusage so long as it was understood that the Court had the broad power to grant specific non-cash relief to her.

Thus, the court dismisses Counts I and II of Ms. Banerjee's complaint. Count III of plaintiff's complaint remains for the court's consideration, giving Ms. Banerjee and her counsel the benefit of assuming they intended to rely on 28 U.S.C. § 1491 and not on 28

U.S.C. § 1346 as the jurisdictional basis for the court's jurisdiction.

**Mental Status**

Plainitff, Urmila Banerjee, asks this court to correct her Army discharge records to reflect that she was unfit for military duty at the time of discharge due to her serious mental disorder, and to determine that she is entitled to disability retirement status and back pay as of June 24, 1991, the date of her discharge. Ms. Banerjee was honorably discharged from the United States Army on June 24, 1999 for Unsatisfactory Performance in accordance with Army Regulation 635-200, Chapter 13, Separation for Unsatisfactory Performance. If a soldier is separated for Unsatisfactory Performance, he or she must meet retention medical standards. See Army Reg. 635-200, ¶ 13-2a(7).

Army Regulation 40-501, Standards for Fitness indicates that soldiers with certain conditions should be given a medical board (MEB) and referred, for further physical evaluation, to a Physical Evaluation Board (PEB), for a determination of fitness, depending on "the soldier's ability to perform the duties of his or her office, grade, rank, or rating." Army Reg. 40-501, ¶ 3-3a(1) (May 15, 1989, effective June 14, 1989).[3] This regulation indicates that "[l]ack of motivation for service should not influence the medical examiner in evaluating disabilities under these standards except as it may be symptomatic of some disease process." Army Reg. 40-501, ¶ 3-3e. Chapter 3 of Army Regulation 40-501 lists various medical conditions which may render a soldier unfit to continue to serve. See Army Reg. 40-501, ¶ 3-4 to 3-45. Possession of these conditions listed in the regulation does not merit automatic retirement, but suggests that further medical examination is required. See Army Reg. 40-501, ¶¶ 3-3, 3-4.

Regarding mental illness of the type claimed by Ms. Banerjee, the following conditions are specifically referenced in the Army Regulations:

> 3-31. Disorders with psychotic features
> Mental disorders not secondary to intoxication, infectious, toxic or other organic causes, with gross impairment in reality testing, resulting in interference with duty or social adjustment.
>
> 3-32. Affective disorders (mood disorders)
> Persistence or recurrence of symptoms sufficient to require extended or recurrent hospitalization, necessity for limitations of duty or duty in protected environment or resulting in interference with effective military performance.

---

[3] Plaintiff incorrectly refers to the 2006 and 2007 revised versions of Army Regulation 40-501. The court refers to the applicable regulation, dated May 15, 1989, effective June 14, 1989, relevant to plaintiff's case, which is different in number and verbiage, but is not significantly different in effect.

> 3-33. Anxiety, somatoform, or dissociative disorders (alternatively may be addressed as neurotic disorders)
> Persistence or recurrence of symptoms sufficient to require extended or recurrent hospitalization, necessity for limitations of duty or duty in protected environment or resulting in interference with effective military performance.

Army Reg. 40-501, ¶¶ 3-31, 3-32, 3-33.

The Army Regulations specifically note that:

> 3-35. Personality, psychosexual, or factitious disorders; disorders of impulse control not elsewhere classified; substance use psychoactive disorders
> These conditions may render an individual administratively unfit rather than unfit because of physical disability. Interference with performance of effective duty in association with these conditions will be dealt with through appropriate administrative channels.

Army Reg. 40-501, ¶ 3-35.

Plaintiff was separated from the Army for Unsatisfactory Performance, which required that she "meets retention medical standards." Army Reg. 635-200, ¶ 13-2a(7). Therefore, in accordance with Army Regulation 635-200, Chapter 1, paragraph 1-34, plaintiff was medically evaluated by the Army prior to her discharge. She was found fit for discharge processing. Ms. Banerjee asserts that the VA medical reports and ratings she obtained after her discharge, as well as her NIH mental evaluation records, demonstrate that at the time of her medical examination just prior to discharge, she suffered from service-connected schizophrenia and disabling stress fractures. She argues that the discharge medical report prepared by Major Brannen was erroneous and "flies in the face of two psychiatric diagnoses of serious mental diseases or disorders within 60 days after Ms. Banerjee's discharge. It is also inconsistent with the VA's award of 100% disability compensation for service-connected schizophrenia, with an effective date of August 15, 1991 . . . ."[4] Similarly, plaintiff argues that her discharge medical evaluation which identified the stress fractures, but which found her fit to serve and fit for final processing, also was erroneous. Plaintiff asserts that she should have been referred to an MEB for further evaluation pursuant to Army Regulations.

[4] Both Ms. Banerjee and the government refer in their briefs filed in this court to exhibit B, attached to the plaintiff's complaint. The documents in exhibit B to plaintiff's complaint were not included in the administrative record filed with this court. They also were not before the ABCMR when it reviewed Ms. Banerjee's disability retirement claim. Therefore, the ABCMR had notice of the VA's 100 percent disability rating effective June 16, 1998, but not of the later revision of the VA 100 percent rating effective August 15, 1991, which is contained in exhibit B to plaintiff's complaint. As is discussed below, the court finds that the new effective date does not change the result in plaintiff's case.

The standards for awarding disability retirement status are set forth in Army Regulation 635-40, Physical Evaluation for Retention, Retirement, or Separation. The regulation indicates that: "Disability compensation is not an entitlement acquired by reason of service-incurred illness or injury; rather, it is provided to soldiers whose service is interrupted and they can no longer continue to reasonably perform because of a physical disability incurred or aggravated in service." Plaintiff must demonstrate qualification for disability compensation by a "preponderance of the evidence." Army Reg. 635-40, ¶¶ 3-2a(4), 3-2b(1). The key criteria is whether or not a service member can continue to "reasonably perform" military duties. See Army Reg. 635-40, ¶ 3-1. In order to qualify for disability retirement, the service member must have a service incurred, disabling condition which interferes with the ability to continue to serve, and must be able to demonstrate a "causative relationship between the less than adequate duty performance and the unfitting medical condition or conditions." See Army Reg. 635-40, ¶ 3-2b(2)(a). The disability must occur while the service member is "entitled to basic pay." 10 U.S.C. § 1201(a), see also Cole v. United States, 32 Fed. Cl. 797, 803 (1995). It is not enough to "merely show that his service-connected injuries resulted in an eventually disabling condition or that at the time of release from active duty this condition was in an incipient stage of pathological development. Plaintiff must proceed one step further and establish that the condition was of such extent and severity as to actually render him unfit for active [military] service at the time of his release or shortly thereafter." Cole v. United States, 32 Fed. Cl. at 803 (citing Walters v. United States, 175 Ct. Cl. 215, 224, 358 F.2d 957, 962 (1966)) (bracket in original).

Ms. Banerjee asserts that the VA reports[5] she obtained shortly after she was discharged demonstrate that Major Brannen's examination mis-diagnosed her mental state. The May 28, 1991 Report of Mental Status Evaluation was signed "Stephen J. Brannen, MAJ [Major], MS, Assistant Chief, CMHS." The report was approved and also signed by Paul D. Amos "LTC [Lieutenant Colonel], MS [Medical Services], Chief, Patient Admin[istration] Division." Thus, after examination, two Army medical professionals agreed that she was suitable for discharge. The May 28, 1991 Mental Status Evaluation indicated:

> There is no evidence of a mental disease or defect of psychiatric significance or of sufficient severity to warrant disposition through medical channels. She has indicated her desire to be separated IAW [in accordance with] applicable regulations. She is cleared for any administrative action deemed appropriate by command.

[5] Ms. Banerjee also complains that the ABCMR decision denying her request for disability retirement status did not refer to the VA Rating Decision awarding her 100 percent disability. The ABCMR decision, however, did refer to her VA Rating Decisions, and distinguished the VA's standard for assigning disability ratings from the Army's and the ABCMR's standard for awarding disability retirement status based on medical unfitness for further military service.

The report specifically noted Ms. Banerjee's behavior as "normal," that she was "fully alert," "fully oriented," had "unremarkable" mood or affect, "clear thinking process," "normal" thought content, "the mental capacity to understand and participate in the proceedings," and was "mentally responsible."

There also is no evidence in the record that, contemporaneously to her Army mental and medical examinations or prior to discharge, Ms. Banerjee objected to the findings in Major Brannen's and Lieutenant Colonel Amos' Report of Mental Examination, nor did plaintiff suggest that she was mentally unfit to serve in the military. Furthermore, there is nothing in the record to suggest that plaintiff requested an MEB at the time, or contemporaneously objected to the nature of her discharge. On the contrary, on June 14, 1991, after the mental and medical examinations, just prior to her discharge date, Ms. Banerjee signed a document which indicated that she understood the basis for her contemplated separation and that she had received "adequate counseling and rehabilitative measures."

The first notice to the Army that Ms. Banerjee was dissatisfied with her discharge status was in May, 2000, approximately nine years after her discharge, when she filed a claim with the ABCMR, although she did enter the VA medical examination and rating process shortly after her discharge from the Army. Her diagnosis of "character disorder and depression" was entered by the VA on July 25, 1991, followed by "[i]ncipient schizophrenic decompensation" on August 15, 1991 and "schizophrenic disorder, acute" on August 23, 1991, approximately two months after her discharge on June 24, 1991. While the VA mental reports and ratings reflect diagnosis at the time of each respective VA evaluation, including shortly after discharge, they do not prove by themselves that she was schizophrenic at the time of her discharge from service or while in the service. Morever, the March 8, 2005 VA Review Officer Decision, which awarded 100 percent benefits for schizophrenia from August 15, 1991, the first date of a VA "incipient schizophrenic decompensation" diagnosis, explained why the plaintiff was not awarded benefits from her discharge date, as follows: "the requirements for service connection were not met while veteran was in service."

As the decision by the ABCMR stated, the VA employs a different standard from the ABCMR to determine whether a veteran qualifies for disability status and compensation. See Cole v. United States, 32 Fed. Cl. at 802 ("In contrast to the issue of fitness, the VA rating schedule is not based on the impact of a disability on military service. Rather, the schedule rates the effect of the disability on civilian employment. Therefore, it is possible for a person who is unfit for military service to be zero percent disabled under the VA rating schedule." (citations omitted)). Although not always explicable, it also is not uncommon for records to present apparent disparities between the Department of Defense evaluation numbers for disability retirement purposes, and the VA disability ratings. The two entities employ different rating standards to accomplish different goals. As stated in Watson v. United States, the VA Schedule of Rating Disabilities,

> is written without regard to one's percentage of disability for military service. As to that, there are no percentages. One is either fit, or unfit. If he is unfit, the slight percentage of his unfitness will not keep him in the service. The Veterans Administration rating has to do with the extent, the percentage, of his disability to adjust himself to his surroundings and make a living outside the military service.

Watson v. United States, 152 Ct. Cl. 273, 280 (1961); see also Furlong v. United States, 153 Ct. Cl. 557, 565 (1961); Haskins v. United States, 51 Fed. Cl. 818, 826 (2002); Lord v. United States, 2 Cl. Ct. 749, 754 (1983).

As explained in Hinkle v. United States, the ABCMR is not bound by VA Rating Decisions:

> Nor is the court or the Air Force bound by this decision of the Veterans Administration which operates under different laws and standards and for different purposes than the military when it comes to deciding disability entitlements. Veterans Administration views and actions are entitled to respect and we have considered them, but they are only evidence to be considered along with other evidence and are in no way ultimately determinative of claims for military disability retirement. The awards of the Veterans Administration are in the nature of gratuities by a grateful nation and extend to nonservice-connected disabilities as well as those believed to be service-connected. The Veterans Administration does not determine fitness for military duty, which is the responsibility of the Secretary and military authorities. Rutherford v. United States, 216 Ct. Cl. 163, 573 F.2d 1224 (1978); Diggs v. United States, [215 Ct. Cl. 1013, 578 F.2d 1388 (1978)]; Finn v. United States, 212 Ct. Cl. 353, 548 F.2d 340 (1977); Unterberg v. United States, 188 Ct. Cl. 994, 412 F.2d 1341 (1969); Williams v. United States, 186 Ct. Cl. 611; 405 F.2d 890, cert. denied, 396 U.S. 966 (1969); Wood v. United States, 176 Ct. Cl. 737 (1966).

Hinkle v. United States, 229 Ct. Cl. 801, 804-05 (1982).

In Ms. Banerjee's case, the ABCMR's August 7, 2003 decision included a similar discussion:

> Title 38, United States Code, sections 310 and 331, permits the VA to award compensation for a medical condition which was incurred in or aggravated by active military service. The VA, however, is not required by law to determine medical unfitness for further military service. The VA, in

> accordance with its own policies and regulations, awards compensation solely on the basis that a medical condition exists and that said medical condition reduces or impairs the social or industrial adaptability of the individual concerned. Consequently, due to the two concepts involved, an individual's medical condition, although not considered medically unfitting for military service at the time of processing for separation, discharge or retirement, may be sufficient to qualify the individual for VA benefits based on an evaluation by that agency. Furthermore, unlike the Army the VA can evaluate a veteran throughout his or her lifetime, adjusting the percentage of disability based upon that agency's examinations and findings.

Although no Army medical records suggesting that Ms. Banerjee was mentally ill were presented to the Board or to this court, following her discharge, Ms. Banerjee was a frequent patient at VA facilities for evaluation and treatment for both medical and psychological issues. Her conditions apparently may have worsened over time, which was recognized by the VA in the increasing disability ratings awarded to plaintiff. But, despite the close chronological date of her discharge and the first medical diagnosis of her disease by the VA, as discussed more fully below, the record does not establish pre-discharge mental illness.

Ms. Banerjee also asserts that her mental evaluation records from the NIH demonstrate a service connection between her schizophrenia and her service in the Army. According to her NIH psychiatrist reports, during a psychiatric appointment on July 27, 2001, Ms. Banerjee stated that, in October, 1990, during service training, that she heard voices telling her to march in a different direction from the other recruits, that she had delusional thoughts, that she had difficulty communicating to others around her, and that she had developed a personal hygiene and self-care deficit. She also stated that she never mentioned her thoughts, even though she was taken to several psychiatrists, leaving her retrospective description unconfirmed and without the level of credibility necessary for ABCMR or court recognition. While Ms. Banerjee reported in 2001, more than ten years after her discharge, and after considerable experience with the VA rating process, that she had hallucinations and delusions during training, this is not reflected in the Army records and does not establish that Ms. Banerjee was schizophrenic during her military service prior to her discharge on June 24, 1991. Plaintiff is correct that she supplemented her original Board application with the NIH records, and that the ABCMR decision did not discuss the NIH report. However, although the Board has a duty to consider all of the evidence, the ABCMR need not discuss every piece of evidence presented in the record in its decision. The failure to discuss all the evidence presented does not, in and of itself, necessitate a remand for further proceedings. See Rebosky v. United States, 60 Fed. Cl. 305, 312 (2004).

Ms. Banerjee also asserts that several presumptions included in Army Regulation 635-40 are applicable and in her favor. All service personnel are presumed to be physically

and mentally sound prior to entering military service, except for disabilities noted at the time of a pre-enlistment, physical examination. See Army Reg. 635-40, ¶ 3-2a. Also, any disease discovered after entering Army service is presumed to have been incurred in the line of duty and not due to the soldier's misconduct. See Army Reg. 635-40, ¶ 3-2a(2). As discussed below, these presumptions, while operative, are not inconsistent with the ABCMR's decision.

Plaintiff's counsel states:

> Ms. Banerjee was presumed to be physically and mentally sound prior to entering military service, except for disabilities noted at the time of her pre-enlistment physical examination. Army Regulation 645-40 ¶ 3-1(a).[6] Any disease discovered after Ms. Banerjee entered the Army is presumed not to be due to her own misconduct and incurred in line of duty. Id. The burden of overcoming these presumptions by a preponderance of the evidence is on the Army. Id.

Plaintiff's counsel goes on to state:

> Ms. Banerjee had a psychotic episode during military service provoked by sexual harassment by her fellow soldiers. She also suffered from stress fractures that made it difficult for her to keep up with her fellow soldiers on the march and during physical training. . . . She reported the harassment incidents to her commanding officer, but her reports were ignored according to Col. Raval. . . . Major Brannen, who was unaware that Ms. Banerjee had been the victim of sexual harassment, a history not communicated to him by Ms. Banerjee's superiors at Ft. Sam Houston, simply mis-diagnosed her apathetic state. She ought to have been referred to a Medical Evaluation Board for her psychotic condition and for her stress fractures. Army Regulation 645-40 ¶ 3-1 mandated this result on the medical and psychiatric evidence as it existed in May and June, 1991. (citations omitted).

Although plaintiff suggests, through Colonel Ravel's statement introduced into the record by the plaintiff, that she reported alleged incidents of sexual harassment, there is no documented evidence of sexual harassment events in the plaintiff's Army record. Nor is there evidence in the record to prove that such incidents resulted in plaintiff's mental

---

[6] Plaintiff's counsel incorrectly cites Army Regulation 645-40, paragraph 3-1(a), as the relevant Army Regulation. The correct citation is Army Regulation 635-40, paragraph 3-1(a).

disease or even could result in schizophrenia.[7] Plaintiff's Army medical records before the court do not include a record of a "psychotic episode" while in the service. Moreover, the VA diagnoses following Ms. Banerjee's discharge from the Army also do not establish a direct causal link for schizophrenia as a result of the allegations of sexual harassment. Although plaintiff argues that the VA placed the origin of Ms. Banerjee's difficulties "during her military service," the VA Review Officer Decision dated March 8, 2005, which awarded plaintiff 100 percent disability rating for schizophrenia, specifically stated, "[s]ince the requirements for service connection were <u>not</u> met while veteran was in service, the effective date cannot be the day following separation." (emphasis added). The 100 percent disability rating for schizophrenia awarded by the VA purposefully was made effective August 15, 1991, a date after her discharge. In her filings with this court, Ms. Banerjee also alleges that her severe mental illness was provoked by her "badly healed stress fracture of the foot." Nowhere in any of the medical records is a causal link documented that stress fractures did, or even could, cause her mental illness.

Relief is not appropriate if the military service branch and the Board acted reasonably and their actions did not rise to the level of being arbitrary, capricious, in bad faith, unsupported by substantial evidence, or contrary to law, regulation or mandatory published procedure of a substantive nature, by which a plaintiff has been seriously prejudiced, and money is due. The record before the court does not contain information to controvert Major Brannen's May 28, 1991 Mental Status Evaluation, confirmed by Lieutenant Colonel Amos, which, just prior to her discharge, reflected no evidence of mental disease or defect of psychiatric significance, and which found Ms. Banerjee to be competent in all respects. The report contained no indication of schizophrenia. Plaintiff's military records before the court prior to plaintiff's mental examination and discharge also do not suggest mental disease. In fact, the VA Rating Decision dated January 5, 1999, indicated that the service connection criteria was not met by Ms. Banerjee when it included the following: "The veteran [sic] service medical records were silent for any treatment or diagnosis of schizophrenia."

As late as May 22, 1991, plaintiff signed a "General Counseling Form," which informed her that she would "not develop sufficiently to participate satisfactorily in further training and/or become a satisfactory soldier," and that action would be initiated to separate her from the service. On that form, just above her signature, Ms. Banerjee wrote "[t]here has been [a] conscious lack of motivation on my part because of an extended period of sexual harassment which was reported to the E.O." A conscious lack of motivation, offered as a way of accounting for poor performance, is far different from a suggestion of mental

---

[7] There also is some evidence in the record to suggest that even as Ms. Banerjee later described her version of the allegations to VA doctors, the allegations did not rise to the level of sexual harassment. For example, a VA Compensation and Pension Exam Report, dated April 29, 1996, repeated her description that she felt an officer had displayed a sexual interest in her, while never touching her.

disease. Moreover, on the General Counseling Form dated May 22, 1991, Ms. Banerjee does not suggest that sexual harassment caused her to be schizophrenic, only that it caused a lack of motivation.

Moreover, on May 30, 1991, in preparation for, and less than one month before her discharge, plaintiff filled out two documents, a "Report on Medical History" and a "Report on Medical Examination," the latter of which she signed. On the "Report of Medical History," the following boxes relevant to plaintiff's mental condition were all checked "No": "frequent trouble sleeping," "depression or excessive worry," "loss of memory or amnesia," "nervous trouble of any sort," and "periods of unconsciousness." On the same day, May 30, 1991, on the "Report of Medical Examination," which Ms. Banerjee signed, the following relevant questions to plaintiff's mental condition were all answered in the negative:

> 15. Have you been refused employment or been unable to hold a job or stay in school because of:
>
> A. Sensitivity to chemicals, dust, sunlight, etc.
>
> B. Inability to perform certain motions.
>
> C. Inability to assume certain positions.
>
> D. Other medical reasons (If yes, give reasons.)
>
> 16. Have you ever been treated for a mental condition? (If yes, specify when, where, and give details.)
>
> 17. Have you ever been denied life insurance (If yes, state reason and give details.)
>
> 18. Have you had, or have you been advised to have, any operations? (If yes, describe and give age at which occurred.)
>
> 19. Have you ever been a patient in any type of hospitals? (If yes, specify when, where, why, and name of doctor and complete address of hospital.)
>
> 21. Have you consulted or been treated by clinics, physicians, healers, or other practitioners within the past 5 years for other than minor illnesses? (If yes, give complete address of doctor, hospital, clinic, and details.)
>
> 22. Have you ever been rejected for military service because of physical, mental, or other reasons? (If yes, give date and reason for rejection.)
>
> 23. Have you ever been discharged from military service because of physical, mental, or other reasons? (If yes, give date, reason, and type of discharge: whether honorable, other than honorable, for unfitness or unsuitability.)

Only to Question 20 were the words “Stress Fractures” written on the form.

> 20. Have you ever had any illness or injury other than those already noted?
> (If yes, specify when, where, and give details.)

Finally, it is important to remember that at no time before her discharge, including at the time of her medical evaluation, or during her discharge processing, did Ms. Banerjee suggest she was suffering from a mental disease or describe symptoms to trigger further mental evaluation. She did not request an MEB after her medical examination or prior to her discharge. Plaintiff also did not object to the classification of her discharge as an Honorable Discharge for Unsatisfactory Performance. When the ABCMR reviewed the record, it found that Ms. Banerjee had not demonstrated evidence of schizophrenia at the time of her discharge, and that Major Brannen’s report was in compliance with applicable regulations and his conclusions were supported by substantial evidence.[8] Major Brannen was in the best position to evaluate plaintiff’s mental condition at that time of her examination and, thus, his opinion not to send Ms. Banerjee for further medical evaluation and to qualify her for discharge as fit for retention should be given deference. He is presumed to have discharged his medical duties correctly, and acted in good faith, in accordance with the applicable medical review and retention standards. Moreover, as noted above, plaintiff, herself, did not ask for an MEB or further medical attention at the time of her discharge.

When the record before the court is reviewed, including the VA examinations, reports, and ratings, and the NIH mental evaluation records, plaintiff has not carried her burden of proof to rebut the presumption of the regularity of the proceedings of the Executive Branch agency and to demonstrate that the ABCMR acted arbitrarily, capriciously, in bad faith or that its decisions were unsupported by substantial evidence or contrary to law, regulation or mandatory published procedure when plaintiff’s claims were denied. Plaintiff’s Army records prior to discharge contain no evidence or determinations to suggest she was suffering from schizophrenia or mental disease. Admittedly, Ms. Banerjee’s VA diagnosis of “[i]ncipient schizophrenic decompensation” came approximately two months after her discharge. See, e.g., Cole v. United States, 32 Fed. Cl. at 803. Ms. Banerjee, however, requested to be released from the Army for lack of motivation. She was found fit for retention after mental and medical examinations shortly before her discharge, based on no history in her military records of mental disease and no presentation of mental disease during her discharge examinations. She did not complain

---

[8] Although contrary to the Board’s notation that there was no evidence that plaintiff had ever raised the issue of sexual harassment, she did raise the issue, as discussed above. However, raising the issue to the Board, especially since it was not documented in plaintiff’s military records, does not document that the alleged incidents occurred or caused an in-service onset of schizophrenia.

of mental illness or describe the symptoms of mental distress she later outlined to VA medical personnel. She did not contest the finding that she was mentally fit, or object to her clearance for discharge for Unsatisfactory Performance.

**Stress Fractures**

In her complaint and her filings in this court, Ms. Banerjee also claims that she should have been awarded disability retirement status and compensation for alleged badly healed stress fractures in her "left foot and skeletal pain." She refers the court to the May 30, 1991 Reports of Medical History and Medical Examination on which the following entries appeared: on the Report of Medical History, an entry "broken bones" is checked "yes," and on the Report of Medical Examination, the following words and abbreviations appear: "Feet 3rd MT [Metatarsal] stress [unreadable]. Lower Extremities multiple skeletal pains [unreadable] stress [unreadable]." The complaint filed with this court also alleges that plaintiff suffered a "stress fracture of the distal third metatarsal of the left foot and stress related changes of the tibia and left foot" while stationed at Fort Sam Houston, Texas. Plaintiff requests this court to order the ABCMR to correct her record to change her discharge status to reflect that she was not fit for military duty because of her disabled status due to stress fractures and to award plaintiff disability retirement back pay. As discussed above in the section of this opinion on plaintiff's claims for disability retirement pay due to schizophrenia, the relevant standards to determine whether a service member qualifies for disability compensation are outlined in Army Regulation 635-40, Physical Evaluation for Retention, Retirement, or Separation. This regulation indicates that there is no entitlement to disability compensation, and that only soldiers whose service is interrupted so that they can no longer continue to reasonably perform because of a physical disability incurred or aggravated during service are eligible to receive such benefits. See Army Reg. 635-40, ¶ 3-2b(1).

Ms. Banerjee asserts that her physical examination without reference to an MEB before discharge was a "mis-application of the Army's standards of Medical Fitness as outlined in Army Regulation 40-501." Army Regulation 40-501, paragraph 3-14 states that a patient with a bone fusion defect, "[w]hen manifested by more than moderate pain and loss of function," must be evaluated by a medical board (MEB) and referred to a PEB. Army Reg. 40-501, ¶ 3-14c(3). Ms. Banerjee alleges that before her discharge from the Army, she had suffered from "stress fractures" that made it difficult for her to keep up with her fellow soldiers during marches and physical training. In her complaint and briefs filed with this court, plaintiff did not specify that she suffered from stress fractures in a particular part of her skeletal frame other than the foot prior to her discharge from the Army or that she had medical issues with her hips. Plaintiff's Army medical records also do not reflect stress fractures in any part of the body other than in her feet.

Prior to Ms. Banerjee's discharge, she had a bone scan performed on May 22, 1991.

With reference to the foot and tibia, the report was signed by Lieutenant Colonel James D. Heironimus, Medical Corps, Chief, Nuclear Medicine Service. His findings were: "Impression: 1) findings consistent with stress fracture of the distal third metatarsal of the left foot. 2) stress related changes of the tibias and left foot."

As noted above, before her discharge, Ms. Banerjee underwent a medical discharge evaluation. On the Report of Medical History, the entry for broken bones was checked "yes," however, the lines for "swollen or painful joints," "bone, joint or other deformity," "lameness," and "foot trouble," were checked "no." There also was a box checked to indicate that plaintiff's health records had been reviewed. The evaluating medical officer wrote on the form "multiple stress [unreadable]", and "stress [unreadable] 3rd MT." On the Report of Medical Examination, also dated May 30, 1991, which Ms. Banerjee signed, the medical officer found "Feet 3rd metatarsal stress [unreadable]. Lower Extremities multiple skeletal pains [unreadable] stress [unreadable]." As an elaboration, the evaluating physician commented "stress [unreadable]," and "stress [unreadable] 3rd MT." The form also indicated that the words "stress fractures" were added next to the box that asked whether plaintiff had any other illnesses or injuries than noted elsewhere on the form. At the same time, however, there were negative answers to questions of whether plaintiff had "inability to perform certain motions," and "inability to assume certain positions." On the Report of Medical Examination, her examining officer, while noting the existence of stress fractures, specifically found that they were not sufficient to qualify plaintiff as unfit for service. The report stated: "Examinee is Qualified for ETS [Expiration Term of Service]/Chapter," thereby clearing plaintiff for discharge. Therefore, plaintiff was given an Honorable Discharge based on Unsatisfactory Performance, which she could only receive at the time of discharge if she was deemed physically fit for service. See Army Reg. 635-200, ¶ 13-2a(7).

As noted previously, following her discharge, Ms. Banerjee visited the Wilmington, Delaware VA Hospital numerous times. The results of the early VA examinations confirmed a history of stress fractures, but did not support a finding of disability based on the stress fractures. During one visit on July 23, 1991, she reported pain in her left hip, which was worse at night, knee pain lateral and swelling, and left arch pain. She stated that "when this began was during active Army time" and that she had been sent for a "bone scan." She also reported that she "[n]ow still cannot stand or walk for long periods of time or sit crossleg [sic]. L hip joint pain the worst." Hospital records from the same group of medical reports, stamped Orthopedic Clinic and dated July 29, 1991, state that she had multiple joint pain, knee pain laterally, improving left foot pain, and hip pain, which was worst at night. The report also noted that "Recent [unreadable] at Houston revealed L 3rd MT [metatarsal] stress Fx (healing) - bone scan showed stress [unreadable] in R femur, both tibia and feet. Has been using Motrin [unreadable] good relief . . . ."

On August 15, 1991, Ms. Banerjee underwent a VA medical examination by Dr. Donald F. Heinman, the results of which indicated that she had normal right and left knees.

On April 28, 1992, a Department of Veterans Affairs Medical Certificate stated that plaintiff had "good range of motions to knees and hips, no edema. No tenderness." Her December 14, 1995 VA medical record indicated lower leg pain, including swelling and left hip pain and tenderness. On May 2, 1996, a VA Hospital Compensation and Pension Examination Report stated that:

> The claimant relates in 5/91 swelling developed in her left foot and hip. Later, numbness was noted in both lower extremities worse on the left than the right with pain in the left hip and buttocks.
>
> X-rays were performed and a stress fracture diagnosed. She was placed on crutches.
>
> * * *
>
> Presently, this claimant relates she gets right leg symptoms involving the whole leg to the foot with pain about once a month. The left leg, she has constant pain from her hip to her foot with numbness when she walks or sits.
>
> This numbness occurs mostly from the knee to the foot on a daily basis. She relates swelling in the foot with walking on a daily basis.
>
> Presently, she takes Tylenol <u>2-3 times per month</u> for her symptomatology. (emphasis added).

In fact, however, the examination concluded that plaintiff had no limp, "[s]he was able to heel and toe walk without difficulty," "[j]ogging in place and jumping several times caused no pain," she could reach her toes, "[h]ip motion was full on forward flexion abduction and adduction," "[b]ilateral knees: [t]here was full range of motion without pain, tenderness, swelling, instability or crepitation. The knees were non tender. Continuing palpatation of the tibias distal to the knees including the anterior tibial spine, lateral, posterior and popliteal fossa and calf muscles revealed no pain or tenderness," "bilateral feet: [b]ilateral pronation but no pain or tenderness to palpatation." Plaintiff's diagnosis was as follows: "1. Chronic lumbar strain and sprain with chronic sprain left sacro-iliac joint. 2. Bilateral trochanteric bursitis, more so on the left than the right hip with mild arthrofibrosis of both hips. 3. Pronation in both feet."

A VA Rating Decision, dated October 15, 1996, rejected all of plaintiff's orthopedic-based disability rating requests, as follows:

> <u>DECISION:</u>
>
> 1. Service connection for residuals, stress fracture, left third metatarsal is granted with an evaluation of 0 percent effective March 29, 1996.
>
> * * *

3. The claim for service connection of fractures of left hip, left tibia and femur and pain/swelling in legs is not well grounded.

REASONS AND BASES:

1. Service connection for residuals, stress fracture, left third metatarsal has been established as directly related to military service. This condition is evaluated at 0 percent disabling from March 29, 1996. A noncompensable evaluation is assigned unless there is objective evidence of painful or limited motion of a major joint or group of minor joints.

The veterans [sic] service medical records show a stress fracture of the distal third metatarsal of the left foot in 1991. The VA examination of 5-2-96 showed she was able to heel and toe walk wihtout [sic] difficulty. Jogging in place and jumping several times caused no pain. Bilateral pronation was noted on examination of the feet but no pain or tenderness to palpation.

* * *

3. . . . . A well grounded claim for service connection requires evidence of a current disability, evidence of incurrence or aggravation of a disease or injury in the service and evidence of a nexus, or link, between the in-service injury or disease and the current disability. There is no record of fracture of left hip, left tibia and femur and pain/swelling in legs showing a chronic disability subject to service connection. In order to establish a well-grounded claim, it is necessary to provide evidence which demonstrates the existence of the claimed condition and its possible relationship to service. (emphasis added).

On January 30, 1998, Ms. Banerjee filed a Notice of Disagreement and a request (one in a series of many requests), to reassess her physical and mental disabilities. She indicated that her condition had deteriorated, that she could not stand for long periods of time, and, as a result, that she had become unemployed. On June 16, 1998, she also filed a request for an increase in percentage for, as she characterized it, her “bone problem,” stating, “it has gotten progressively worse,” and that this “condition prevents me from working especially when standing long hours.”

Plaintiff’s VA medical records, dated June 30, 1998, titled “Progress Notes,” reported: “[l]ower back pain with parathesia reported down left leg to toes.” On July 9, 1998, a VA medical examination was performed by Dr. Robert Garber, D.P.M [Doctor of Podiatric Medicine], which stated that:

There is good range of motion present bilaterally with pain in the 3rd and 4th

> mid shaft during palpation of the left foot. There is 30 degrees of inversion present on the left foot, and there is 20 degrees of inversion present on the right foot. There is 0 degrees eversion present bilaterally. There is poor muscle power present bilaterally. There is fair ankle stability bilaterally. There is fair heel-toe supination and pronation bilaterally. There is severe pronation on stance present bilaterally. The achilles's and patella reflexes are within normal limits bilaterally. There is a good dull, sharp and vibratory sensation bilaterally. There is good plantar response bilaterally.
>
> X-ray shows a questionable thickening of the shaft of the third metatarsal, indicative of a possible old fracture. There is also a biparte tibial sesamoid present.

Plaintiff's January 5, 1999, VA Rating Decision stated: "The evaluation of residuals, stress fracture, left third metatarsal, which is currently at 0 percent disabling, is increased to 10 percent effective June 16, 1998."[9] As the reason for its decision, the VA stated: "A 10 percent evaluation is assigned for painful or limited motion of a major joint or group of minor joints. The VA examination of 7-9-98 showed there is good range of motion bilaterally with pain in the 3rd and 4th mid shaft during palpation of the left foot. X-rays show a questionable thickening of the shaft of the third metatarsal."

Another of Ms. Banerjee's VA Compensation and Pension Examination reports, dated May 18, 1998, by Robert Glazer, M.D., reported:

> She has a normal station and gait. The thoracolumbar spine had 70 degrees of forward flexion, 35 degrees of extension, and 35 degrees of right and left lateral bending with no pain on extremes of motion and no local tenderness.
>
> * * *
>
> There was mild diffuse tenderness at the lateral aspect of both hips.
>
> * * *
>
> There is no evidence of any residual of any stress fractures in any of the x-rays I reviewed, or in the reports of the previous x-rays. The physical findings on exam show essentially normal motion with no significant discomfort on motion, therefore, there is no objective evidence to support the degree of pain complaint present. Therefore the functional impairment would be relatively mild, at most.
>
> * * *

[9] The same Rating Decision still denied "service connection for chronic paranoid schizophrenia."

The present scan no longer showed that increased uptake or any other abnormality besides a previously noted slight scoliosis.

Therefore, Ms. Banerjee's September 17, 1999 VA Rating Decision denied her Army service connection for "stress changes," stating:

DECISION:

* * *

2. Service connection for stress changes, tibias (claimed as stress fractures) is denied.

3. New and material evidence adequate to reopen the claim for left hip and femur has not been submitted.[10]

REASONS AND BASES:

* * *

Rating of 10/15/96 denied left tibia fracture. Service medical records for the period 10/90 to 6/91 include bone scan of 5/22/91 noting stress related changes of tibias. Separation exam of 5/30/91 noted multiple skeletal pains due to stress. Dr. S.J. Rogers' evaluation of 5/24/99 found pre-tibial tenderness with normal gait. Deep tendon reflexes of lower extremities +1 and symmetrical, no atrophy with full range of motion. He indicated tibial stress fractures.

* * *

VA examination of 5/18/99 finds no evidence of any residual of any stress fractures in any of the x-rays reviewed, or in the reports of the previous x-rays. The physical findings on exam show essentially normal motion with no significant discomfort on motion, therefore, there is no objective evidence to support the degree of pain complaint present. Therefore the functional impairment would be relatively mild, at most. 6/15/99 - A bone scan was done on 6/9/99 to assess the status of the left proximal femur which showed increased uptake on a bone scan done 5/9/96. The present scan no longer showed that increased uptake or any other abnormality. (emphasis added).

Ms. Banerjee's May 22, 2000 application to the ABCMR to have her discharge record revised stated, "I believe I was due a formal Medical Review Board before being separated. The formal evaluation would have documented my mental and physical

---

[10] At the same time, this Rating Decision awarded Ms. Banerjee a 70 percent disability rating for schizophrenia, effective June 16, 1998.

disabilities that existed at the time of my discharge." Her sworn statement to the ABCMR alleged that "[b]ecause there was so much physical activities [sic] required during the classes, I began to experience pains in my legs and feet. At times I felt as if there were broken bones in my feet and legs and I couldn't run or even walk sometimes." Her materials submitted to the ABCMR, however, only minimally address her physical, orthopedic issues. In support of her petition to the Board, plaintiff's counsel alleged that "[d]uring her basic training, Ms. Banerjee suffered some documented trauma to her legs and feet. These were eventually documented in her exit physical of 30 May 91." In addition, the brief submitted by plaintiff's counsel to the Board stated: "she was also in constant pain and discomfort due to her leg and feet traumas suffered in the Army and in fact was on crutches for a time in May of 1996." However, in the argument section of her brief, plaintiff did not elaborate on her stress fracture claim, focusing, instead, on her schizophrenia claim.

Rating Decisions dated July 3, 2000, June 27, 2001, and December 10, 2001 did not discuss any stress fractures. A September 12, 2005 Rating Decision still listed Ms. Banerjee at 0 percent service connection for stress fractures. However, not on its face consistent even with the much earlier January 5, 1999 VA Rating Decision awarded 10 percent for residuals from stress fracture to the third metatarsal, which approximately 9 months later was reduced to 0 percent, on August 28, 2006, the VA issued a Rating Decision which granted Ms. Banerjee "[s]ervice connection for trochanteric bursitis, <u>left hip</u> (claimed as residuals of stress fracture of left hip/femur)" (emphasis added), with an evaluation of 10 percent, effective March 31, 1999, but maintained a 0 percent rating for plaintiff's stress fracture on her left metatarsal. The Rating Decision explained:

> On August 10, 2006 you reported to VA examiner that you continue to have some left hip pain. It is located laterally along the hip. It is dull in nature and bothers you primarily during physical activity. You complained of associated left hip weakness, stiffness and fatigability. You denied swelling, redness, giving away or flare-ups. You do not use a cane. You are independent with walking, driving and activities of daily living. Examiner noted that gait and posture were normal, non antalgic. There was tenderness to palpation over the left greater trochanteric bursa.
>
> * * *
>
> An opinion was requested as to whether or not this condition is related to military service. On August 22, 2006 examiner noted that VA claims file was reviewed. Examiner stated that claims file documents from 1991 and 1996 show that veteran appeared to have left trochanteric bursitis. Examiner opined that current left greater trochanteric bursitis is at least as likely as not related to military service. Examiner reported chronic complaints since 1991. Examiner noted the rationale for this opinion was based upon history, physical examination, review of claims file and medical knowledge.

> Although the medical evidence shows your loss of range of motion is not severe enough to warrant a 10 percent evaluation, VA regulations provide for a higher rating based on greater limitation of motion due to pain on use, including during flare-ups. You have described constant pain and pain was shown at VA examination. <u>With reasonable doubt resolved in your favor</u>, it is determined that 38 CFR 4.40, 4.45 and 4.59 provide for a 10 percent rating due to increased pain on use. Your disability is 10 percent disabling, but no more.
>
> The evaluation of 10 percent is assigned from March 31, 1999, the date we received your claim since you have continuously pursued this claim through the appeals process. A 10 percent evaluation is assigned for painful or limited motion of a major joint or group of minor joints. (emphasis added).

As noted above, Army Regulation 635-200, Chapter 1, paragraph 1-34a, requires medical and mental examinations for soldiers being separated. If a soldier is separated for Unsatisfactory Performance, as was the case with Ms. Banerjee, the soldier must meet retention medical standards. <u>See</u> Army Reg. 635-200, ¶ 13-2a(7). Army Regulation 635-40 sets out the policies for Physical Evaluation for Retention, Retirement, or Separation. Paragraph 3-1, Standards for Unfitness Because of Physical Disability, explains that:

> The mere presences [sic] of an impairment does not, of itself, justify a finding of unfitness because of physical disability. In each case, it is necessary to compare the nature and degree of physical disability present with the requirements of the duties the soldier reasonably may be expected to perform because of his or her office, grade, rank, or rating.
>
> * * *
>
> These retention standards and guidelines should not be interpreted to mean that possessing one or more of the listed conditions or physical defects signifies automatic disability retirement or separation from the Army. The fact that the soldier has one or more defects sufficient to require referral for evaluation, or that these defects may be unfitting for soldiers in a different office, grade, rank, or rating, does not justify a decision of physical unfitness.

Army Reg. 635-40, ¶¶ 3-1, 3-1a.

Army Regulation 635-40, paragraph 3-1, explains that the existence of a physical defect does not signify automatic disability retirement or separation from the Army. Ms. Banerjee's discharge medical examination report noted the existence of "3rd MT stress

[unreadable]" and "[unreadable] stress [unreadable]," as well as multiple skeletal pains. There was no notation of hip pain or impairment. Nonetheless, the medical officer found that she met medical retention standards and cleared her for separation with an Honorable Discharge for Unsatisfactory Performance. As with the Mental Status Evaluation, the examining medical officer was in the best position to determine her medical fitness at the time of separation, is presumed to have acted in accordance with the applicable medical review and retention standards, and his opinion should be given deference. Based on the record before the court, there is insufficient information to conclude that Ms. Banerjee was physically unfit duty at the time of her discharge. Moreover, at the time of the medical examination, Ms. Banerjee did not indicate that she could not perform because she had stress fractures, or that she had hip problems. She also did not request an MEB prior to her discharge.

Army Regulation 635-40, Physical Evaluation for Retention, Retirement, or Separation, states: "[i]nadequate duty performance should not be considered as evidence of physical unfitness unless a cause and effect relationship exists between the inadequate duty performance and the presence of physical disabilities." Army Reg. 635-40, ¶ 3-1c. Paragraph 3-2 of the same Army Regulation states that "[t]here must be a causative relationship between the less than adequate duty performance and the unfitting medical condition or conditions." Army Reg. 635-40, ¶ 3-2b(2)(a), Presumptions. In the record before the court, there is no evidence of a causal relationship between Ms. Banerjee's stress fractures or other, later alleged orthopedic difficulties, to document that they caused her to be unable to perform her military duties. In fact, a General Counseling Form, dated May 17, 1991, and signed by Ms. Banerjee, indicates that the reason for Ms. Banerjee's discharge was because she "does not demonstrate the ability to become a successful soldier." A follow-up General Counseling Form dated May 22, 1991, also signed by Ms. Banerjee, states, "On 17 May 1991 you were counseled concerning your motivation and ability to become a productive soldier. You still desire to be discharged from the Army." Captain Mark C. Wilhite wrote on the form: "It is my judgment that you will not develop sufficiently to participate satisfactorily in further training and/or become a satisfactory soldier." On the same form plaintiff wrote, "[t]here has been [a] conscious lack of motivation on my part because of an extended period of sexual harassment which was reported to the E.O." On a discharge Memorandum dated June 14, 1991, Captain Wilhite stated: "Under the provisions of AR [Army Regulation] 635-200, Chapter 13, paragraph 13-2a, I am initiating action to separate you from the United States Army. The reasons for my proposed action are: You are unable and unwilling to adapt socially and emotionally to the military life-style." On the same date, Ms. Banerjee acknowledged with her signature that she would be discharged under the provisions of Army Regulation 635-200, Chapter 13, Separation for Unsatisfactory Performance. The record before the court fails to establish a causal relationship between Ms. Banerjee's orthopedic ailments and her reason for discharge from the Army.

In her filings in this court, Ms. Banerjee argues that:

> The ABCMR's acceptance of Maj. Brannen's summary report over Ms. Banerjee's cumulative evidence is not simply a disagreement about the weight and substance of the evidence. It is a mis-application of the Army's standards of Medical Fitness as outlined in Army Regulation 40-501. Army Regulation ¶3.14(f) states that the victim of a fracture of any part of the lower extremity that a "bone fusion defect when manifested by more than moderate pain and loss of function" is cause to refer the soldier to a Medical Evaluation Board.

Army Regulation 40-501, Chapter 3, Medical Fitness Standards for Retention and Separation, Including Retirement, states that the causes for mandatory referral to a Physical Evaluation Board (PEB), following an MEB, regarding an individual's extremities include: certain joint ranges of motion in the hip, knee or ankle, various forms of arthritis, malunion or nonunion of fractures in certain circumstances, and bone fusion defect when manifested by more than moderate pain and loss of function. See Army Reg. 40-501, ¶¶ 3-12, 3-13, and 3-14. There is no documentation in the record prior to Ms. Banerjee's discharge that she manifested any of these symptoms sufficiently, or at all, to qualify her for a PEB (or MEB), or for disability retirement. Based on the documents in the record before the ABCMR, there is no evidence that Ms. Banerjee ever felt more than moderate pain for her stress fractures. On her Report of Medical Evaluation that she signed, the boxes for "foot trouble" or "bone, joint or other deformity," were not checked, although the box for "broken bones" was checked. Even after noting the stress fractures, the medical officer nonetheless found her qualified for "ETS [Expiration Time of Separation]/Chapter." Ms. Banerjee's Army records before this court do not contain statements that she had difficulty performing physical tasks or that she was physically unfit for her military duties. The ABCMR's decision addressed Ms. Banerjee's stress fracture claim, stating that "[t]he evidence of record indicates she did not have any medically unfitting disability which required physical disability processing. Therefore, there is no basis for physical disability retirement or separation."

The VA rating reports obtained by Ms. Banerjee after her discharge also do not establish that the ABCMR acted arbitrarily or capriciously. As discussed above, a VA compensation rating is not equivalent to a determination of unfitness for retention for military duty at the time of discharge or entitlement to disability retirement. Nor, as noted above, are the ABCMR and the VA bound by each others' disability ratings. Regardless, the VA's ratings chronologically near the time of plaintiff's discharge are consistent with results of the Army's physical discharge examinations and the ABCMR's decision to uphold the Army's finding. The VA disability rating for service connection of stress fractures was 0 percent until January 5, 1999, when it was increased to 10 percent, with an effective date not of plaintiff's discharge, but of June 16, 1998. That rating was then reduced to 0 percent on September 17, 1999. Ms. Banerjee was awarded a 10 percent disability rating for bursitis of her left hip on August 28, 2006, more than 15 years following plaintiff's discharge. The 100 percent

rating for schizophrenia to Ms. Banerjee by the VA on August 28, 2006, effective March 31, 1999, also does not support a finding that the Army decision should have referred her to an MEB for orthopedic issues prior to her discharge.

Over the years following her discharge, Ms. Banerjee has been seen by many VA medical professionals. She has complained of orthopedic issues ranging from hips to feet. After many visits, on August 28, 2006, it appears the VA, reluctantly, gave her a 10 percent evaluation for "trochanteric bursitis, left hip (claimed as residuals of stress fracture of left hip/femur)," as directly related to military service, but made the evaluation effective March 31, 1999, not near her date of discharge, June 24, 1991. The examination upon which her Rating Decision relied stated the following, "Examiner opined that current left trochanteric bursitis is at least as likely as not related to military service." As if with some hesitation, the Rating Decision stated:

> Although the medical evidence shows your loss of range of motion is not severe enough to warrant a 10 percent evaluation, VA regulations provide for a higher rating based on greater limitation of motion due to pain on use, including during flare-ups. You have described constant pain and pain was shown at VA examination. With reasonable doubt resolved in your favor, it is determined at 38 CFR 4.40, 4.45 and 4.59 provide for a 10 percent rating due to increased pain on use. Your disability is 10 percent disabling, but no more.
>
> The evaluation of 10 percent is assigned from March 31, 1999, the date we received your claim since you have continuously pursued this claim through the appeals process. A 10 percent evaluation is assigned for painful or limited motion of a major joint or group of minor joints. A higher evaluation of 20 percent is not warranted unless flexion of the thigh is limited to 30 degrees, or; [sic] abduction of the thigh is lost beyond 10 degrees.

Thus, even the VA pattern of ratings does not establish that Ms. Banerjee had stress fractures or other orthopedic issues severe enough to warrant an MEB or PEB at the time she was separated from the Army. Moreover, at no time did the VA relate the orthopedic disability ratings it later awarded to Ms. Banerjee even close to her service discharge date.

In sum, the record before the court of Ms. Banerjee's medical and psychiatric complaints during her military service prior to her discharge present a simple and straightforward picture. There is no documentation of a psychiatric illness by a medical professional before plaintiff's discharge, and limited indication of possible stress fractures or of orthopedic difficulties, which, however, were found not to interfere with her ability to be retained to serve in the Army. For neither complaint is there any contemporaneous

indication in plaintiff's military records or in her discharge mental and medical examinations that her mental illness or stress fractures rendered her unfit to serve in her military capacity, or was the reason for her discharge. Major Brannen's Report of Mental Status Evaluation and plaintiff's own endorsements of her medical record at the time of her discharge medical and mental examinations also do not suggest that she believed her alleged or real ailments rendered her medically unfit to serve. At the time, she did not object to the medical or mental findings and did not request an MEB. The Honorable Discharge for Unsatisfactory Performance was dependent on her being medically fit. She accepted the discharge, only noting that she was unmotivated, not physically or mentally impaired. Although a VA doctor diagnosed her with "[i]ncipient schizophrenic decompensation" approximately two months following her discharge, it was not until September 17, 1999 that she was found sufficiently impaired, by an apparently deteriorating condition, to be awarded a VA disability rating of 70 percent effective June 16, 1998, not near the date of her discharge. That rating was increased to 100 percent, with the same effective date on July 3, 2000. It was not until September 12, 2005, that the 100 percent schizophrenia disability rating was made effective August 15, 1991, which still was not her discharge date, because the VA also did not find her mental illness to have been diagnosed or treated while on active duty, and plaintiff's first visit to a mental health clinic for treatment was in July, 1991. It appears that the plaintiff was not in the beginning stages of decompensation until August 1991, after her discharge from the Army. Even the VA concluded that "[s]ince the requirements for service connection were not met while veteran was in service, the effective date cannot be the day following separation." Consequently, the ABCMR's decision to reject plaintiff's claim for retirement disability based on schizophrenia was reasonable in light of the facts presented and must be upheld.

The ABCMR's refusal to grant plaintiff retirement disability for stress fractures was similarly proper. Even though plaintiff's Army records do have entries of physical discomfort and diagnosed stress fractures, there is nothing in the records to indicate that plaintiff was not physically fit for duty, or objected to the results of her medical examination or the nature of her discharge. Even though later VA records contain entries of orthopedic pain and stress fractures, there are competing entries in the VA medical records which found no evidence of stress fractures. Moreover, certain of the VA records which acknowledge the stress fractures indicate no residual effects from the stress fractures. Similar to the VA schizophrenia disability rating history, the VA did not grant plaintiff a 10 percent disability for stress fractures or hip pain until January, 1999, well after her 1991 discharge date. Then, in September, 1999, this disability rating was reduced to 0 percent. At no time was there a clear suggestion in the VA ratings that any orthopedic difficulties caused plaintiff to be unfit for military service prior to her 1991 discharge. Finally, the disability award in August, 2006 was for a left hip problem, effective March 31, 1999, years after plaintiff's discharge, not for foot stress fractures. Therefore, regarding plaintiff's orthopedic disability, the ABCMR also acted properly when it rejected plaintiff's claims.

**Request for an MEB**

Woven into plaintiff's complaint is an allegation that the Army should have ordered Ms. Banerjee to undergo further medical examinations prior to her discharge. Implicit in that request is the notion that plaintiff then would have been found eligible for disability retirement from the Army. Army Regulations support the conclusion that Ms. Banerjee's Honorable Discharge for Unsatisfactory Performance was appropriate following her mental and medical examinations. Regarding Ms. Banerjee's mental status, Army Regulation 40-50, paragraph 3-3, Policies for Medical Fitness Standards for Retention and Separation, Including Retirement, states that a service member must be evaluated by a medical board (MEB) and referred to a PEB if the service member experiences certain conditions. Those potentially relevant to plaintiff are found below:

> 3-14 Miscellaneous conditions of the extremities (see also paras 3-12 and 3-13)
>
> * * *
>
> (c). Fractures.
>
> (1) Malunion of fractures. When, after appropriate treatment, there is more than moderate malunion with marked deformity and more than moderate loss of function.
>
> (2) Nonunion of fractures. When, after an appropriate healing period, the nonunion precludes satisfactory performance of duty.
>
> (3) Bone fusion defect. When manifested by more than moderate pain and loss of function.
>
> 3-31. Disorders with psychotic features
>
> Mental disorders not secondary to intoxication, infectious, toxic or other organic causes, with gross impairment in reality testing, resulting in interference with duty or social adjustment.
>
> 3-32. Affective disorders (mood disorders)
>
> Persistence or recurrence of symptoms sufficient to require extended or recurrent hospitalization, necessity for limitations of duty or duty in protected environment or resulting in interference with effective military performance.
>
> 3-33. Anxiety, somatoform, or dissociative disorders (alternatively may be addressed as neurotic disorders)
>
> Persistence or recurrence of symptoms sufficient to require extended or

> recurrent hospitalization, necessity for limitations of duty or duty in protected environment or resulting in interference with effective military performance.

Army Reg. 40-501, ¶¶ 3-14(c), 3-31, 3-32, 3-33.

As discussed above, the record demonstrates that, while in the Army, Ms. Banerjee did not experience persistence or recurrence of symptoms "sufficient to require extended or recurrent hospitalization," or any such treatment. Army Reg. 40-501, ¶¶ 3-32, 3-33. Moreover, there is nothing in plaintiff's Army record to demonstrate that plaintiff evidenced a mental condition or that a mental disorder caused "gross impairment in reality testing resulting in interference with duty or sound adjustment."

Paragraph 3-35 of Army Regulation 40-501 further clarifies the standard for finding a service member medically unfit for personality, psychosexual, factitious disorders, or disorders of impulse control:

> 3-35. Personality, psychosexual, or factitious disorders; disorders of impulse control not elsewhere classified; substance use psychoactive disorders
>
> These conditions may render an individual administratively unfit rather than unfit because of physical disability. Interference with performance of effective duty in association with these conditions will be dealt with through appropriate administrative channels.

Army Reg. 40-501, ¶ 3-35. Although undocumented in plaintiff's case, this Army Regulation specifically anticipates the situation when a psychological issue arises, but is not severe enough to interfere with fitness to serve, and, therefore, the service member may be considered administratively unfit and discharged for other than medical reasons.

The only reason for plaintiff's discharge given at the time was that she was lacking in motivation, which she alleged was caused by sexual harassment incidents. Ms. Banerjee wrote as her reason for wanting to be discharged: "There has been [a] conscious lack of motivation on my part because of an extended period of sexual harassment which was reported to the E.O." Army Regulation 40-501 addresses lack of motivation for medical fitness standards for separation:

> e. Lack of motivation for service should not influence the medical examiner in evaluating disabilities under these standards except as it may be symptomatic of some disease process. Poorly motivated soldiers who are medically fit for duty will be recommended for administrative disposition.

Army Reg. 40-501, ¶ 3-3e.

Given that Ms. Banerjee only offered lack of motivation as the reason for her desire to be discharged, it was proper for her to be discharged administratively instead of for medical lack of fitness. Army Regulation 40-501 states that, "[s]oldiers on extended active duty who meet retention medical fitness standards but who may be administratively unfit or unsuitable will be reported to the appropriate commander for processing as provided in other regulations, such as [Army Regulation] 635-200." Army Reg. 40-501, ¶ 3-4d. Ms. Banerjee's discharge was in accordance with Army Regulation 635-200, Chapter 13, Separation for Unsatisfactory Performance. She was found mentally capable, and, although stress fractures were noted in her discharge medical examination, she was not found medically unfit to serve. Major Brannen, an Army Medical Services officer, as well as the medical officer giving Ms. Banerjee her physical evaluation, found respectively that she was mentally and physically fit, as indicated by the boxed checked "Examinee is qualified for ETS [Expiration Term of Service]/Chapter." Ms. Banerjee was thus cleared for discharge processing under Army Regulation 635-200, Chapter 13, Separation for Unsatisfactory Performance, as required.

There is no indication in plaintiff's Army record of plaintiff's discharge examinations that documented stress fractures or an alleged mental illness were sufficient to cause an interference with effective military performance. Moreover, there is not even a notation of hip pain or hip impairment while plaintiff was in the service. After examination by Army medical staff for both mental and medical capability to serve, plaintiff was found physically and mentally fit for retention. On October 15, 1996, the VA acknowledged the plaintiff's stress fracture of the third metatarsal as "directly related to military service," but, nonetheless, denied benefits and deemed the injury "0 percent disabling," given an absence of "objective evidence of painful or limited motion of a major joint or group of minor joints." Although the VA subsequently awarded plaintiff 10 percent disability for hip bursitis, there were several additional times during the course of plaintiff's visits to VA doctors that insignificant or no residual impairment was found as a result of her stress fractures. In fact, the VA ultimately reduced plaintiff's rating for stress fractures of the metatarsal back to 0 percent, where it apparently remained, according to the records before the Board and the court. The ABCMR upheld the actions of the Army regarding Ms. Banerjee's discharge and this court must do so also, since the Army Board's actions have not been demonstrated to be arbitrary, capricious, or in bad faith, or unsupported by substantial evidence or contrary to law, regulation or mandatory published procedure. None of the Army medical professionals identified a problem serious enough to refer plaintiff for further medical follow up and, although stress fractures were identified, no mental disease was even identified. She was found mentally and physically fit for retention in the military and not eligible for medical disability retirement.

The court is bound to uphold the ABCMR decision unless, based on evidence in the record, the plaintiff has met the difficult burden of proof that the action of the ABCMR was arbitrary and capricious or not in accordance with the law. Even if a reviewing tribunal could reach a different conclusion, it is not for the court to substitute its own judgment for that of the ABCMR when reasonable minds could differ. After reviewing all the evidence before this court, including Ms. Banerjee's statements and filings, Army and VA medical reports and ratings, and the relevant statutes and Army Regulations, the court must conclude that plaintiff has not met the burden of proof to show that the ABCMR acted arbitrarily, capriciously, or in bad faith or that the ABCMR decision was unsupported by substantial evidence or contrary to law, regulation or mandatory published procedure, when plaintiff's claim for change in discharge status for her orthopedic, physical condition or her mental status was denied. The ABCMR's decision is affirmed.

## CONCLUSION

The court sympathizes with the difficulties Ms. Banerjee may face. Based on the record presented to the Board and filed with this court, however, the Board did not commit error when it rejected Ms. Banerjee's claims. Ms. Banerjee's relief for her current disabilities lies, as it properly has to date, with the VA. For the foregoing reasons, this court **GRANTS** defendant's motion to dismiss Counts I and II of plaintiff's complaint filed with the court, and **GRANTS** defendant's motion for judgment upon the administrative record on Count III of plaintiff's complaint. The Clerk of Court shall **DISMISS** plaintiff's complaint, and enter **JUDGMENT** for the defendant.

**IT IS SO ORDERED.**

/s Marian Blank Horn

**MARIAN BLANK HORN**

**Judge**